**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No._____

WILDEARTH GUARDIANS, a New Mexico non-profit corporation,

Plaintiff,

v.

LAMAR UTILITIES BOARD d/b/a LAMAR LIGHT AND POWER, and
ARKANSAS RIVER POWER AUTHORITY,

Defendants.

---

**COMPLAINT**

---

**INTRODUCTION**

**1.**   Plaintiff WildEarth Guardians brings this suit pursuant to the citizen suit provision of the federal Clean Air Act, 42 U.S.C. § 7604, against Lamar Utilities Board d/b/a Lamar Light and Power, and Arkansas River Power Authority (hereafter "Lamar Utilities") for constructing a new 43-megawatt coal-fired power plant in Lamar, Colorado (hereafter "Lamar Coal Plant") in violation of Section 112(g) of the Clean Air Act, 42 U.S.C. § 7412(g).   Under this section of the Clean Air Act, Lamar Utilities is prohibited from constructing or reconstructing the Lamar Coal Plant in the absence of a final determination that the facility will use the Maximum Achievable Control Technology ("MACT") to reduce emissions of mercury and other hazardous air pollutant.   Plaintiff seeks declaratory and injunctive relief against Lamar Utilities, as well as applicable civil penalties.

**2.**   Lamar Utilities' violation of the Clean Air Act poses a serious threat to the health of Colorado's people and surrounding environment.   The U.S. Environmental Protection Agency

("EPA") has found that coal-fired power plants such as the Lamar Coal Plant emit 67 of the 188 individual hazardous air pollutants Congress listed for regulation under the 1990 Clean Air Act Amendments, including mercury, selenium, dioxins, arsenic, acid gases, and other heavy metals.

3.  Mercury and its interaction with the environment is one clear example of how hazardous air pollutants emitted by coal-fired power plants pose serious health threats to the people of Colorado.  Once mercury is deposited in Colorado's waters, the formation of highly toxic methylmercury occurs.  Methylmercury then accumulates in fish tissue and threatens human health if consumed.  Nearly 20% of the state's fish species have high mercury concentrations, and many Coloradoans routinely consume locally caught fish.

4.  EPA  has determined that "[n]eurotoxicity is the health effect of greatest concern with methylmercury exposure . . . Dietary methylmercury is almost completely absorbed into the blood and distributed to all tissues including the brain; it also readily passes through the placenta to the fetus and fetal brain. The developing fetus is considered most sensitive to the effects from methylmercury . . . ."  65 Fed. Reg. 79,825, 79,829 (Dec. 20, 2000).  Fetuses, breast-fed infants, and children exposed to methylmercury when they or their mothers consume contaminated fish are at particular risk for developing permanent neurological disorders including mental retardation, vision loss, hearing loss, delayed developmental milestones, attention deficits, memory problems, auditory processing problems, language difficulties, ataxia, and, in extreme cases, seizures.

5.  Other hazardous air pollutants emitted by power plants include arsenic, dioxins, acid gases, selenium, lead, and other heavy metals, which have been shown to cause serious adverse health effects, including cancer, heart disease, stroke, and neurological impairment.  One of those pollutants, dioxin, is among the most potent carcinogens on the planet.

**6.**   Plaintiff, a citizen group whose members are harmed by Lamar Utilities' violations of the Clean Air Act, asks the Court, pursuant to the Clean Air Act's citizen suit provision, 42 U.S.C. § 7604(a), to: (1) declare that Lamar Utilities' construction and/or reconstruction and operation of the Lamar Coal Plant without an approved MACT determination is illegal under section 112 of the Clean Air Act, 42 U.S.C. § 7412; (2) enjoin Lamar Utilities from further construction, reconstruction, or operation of the Lamar Coal Plant unless and until it complies with the Clean Air Act and any applicable regulatory requirements; (3) assess civil penalties against Lamar Utilities for its violations of the Clean Air Act; and (4) award Plaintiff its cost of litigation.

## JURISDICTION AND VENUE

**7.**   This court has subject matter jurisdiction over this Clean Air Act citizen suit pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331.

**8.**   Pursuant to 42 U.S.C. § 7604(c), venue is proper because the Lamar Coal Plant is located in this District and violations have occurred and continue to occur in this District.

**9.**   On September 10, 2009, Plaintiff WildEarth Guardians provided Lamar Utilities with notice of the violations alleged in this Complaint as required by 42 U.S.C. § 7604.  Plaintiff also provided notice to the EPA Administrator, and to the State of Colorado via the Governor, pursuant to 42 U.S.C. § 7604(b).  At least 60 days have elapsed since Plaintiff provided notice of the violations alleged in this Complaint.  Neither EPA nor the State of Colorado has commenced or diligently prosecuted a civil action to require compliance with the violations alleged in this Complaint.

## THE PARTIES

**10.** Plaintiff WILDEARTH GUARDIANS is a non-profit corporation with approximately 4,000 members throughout the United States, including in Colorado.  WildEarth Guardians'

mission is to bring people, science, and the law together in defense of the American West's rivers, forests, deserts, grasslands, and the delicate web of life to which we are inextricably linked.

**11.** Members of WildEarth Guardians live, work, garden, and engage in outdoor recreation in areas that would be affected by the excessive amount of mercury and other hazardous air pollutants that the Lamar Coal Plant will emit if it is allowed to operate without a proper MACT determination. WildEarth Guardians regularly supports its mission by providing the State of Colorado with comments related to coal-fired power plants during the administrative review process. Thus, WildEarth Guardians, its staff, and its members have a substantial interest in this matter and are adversely affected and aggrieved by Lamar Utilities' failure to comply with the Clean Air Act. WildEarth Guardians brings this action on behalf of itself and its adversely affected members. A decision requiring Lamar Utilities to cease construction, reconstruction, or operation of the Lamar Coal Plant until it obtains a lawful MACT determination would redress these harms to Plaintiff and its members.

**12.** Defendant LAMAR UTILITIES BOARD d/b/a LAMAR LIGHT AND POWER, owns and operates the Lamar Coal Plant where the violations that gave rise to this action occurred and where construction continues on the Lamar Coal Plant. Lamar Light and Power has constructed, reconstructed, and/or operated the Lamar Coal Plant. Lamar Light and Power is a municipal utility providing electric power to Lamar, McClave, Wiley, Bristol, and Hartman in Bent and Prowers Counties, Colorado. Lamar Light and Power is a "person" within the meaning of 42 U.S.C. § 7602(e).

**13.** ARKANSAS RIVER POWER AUTHORITY owns and operates the Lamar Coal Plant where the violations that gave rise to this action occurred and where construction continues on

the Lamar Coal Plant.  Arkansas River Power Authority has constructed, reconstructed, and/or operated the Lamar Coal Plant.  Arkansas River Power Authority is a political subdivision of the State of Colorado, established pursuant to the Power Authority Act, COLO. REV. STAT. § 29-1-204.  Arkansas River Power Authority provides wholesale electric power to the seven municipalities that formed it:  Holly, Springfield, La Junta, Trinidad, Lamar, and Las Animas in Colorado and Raton in New Mexico.  The principal office for the Arkansas River Power Authority is located in Lamar, Colorado.  Arkansas River Power Authority is a "person" within the meaning of 42 U.S.C. § 7602(e).

## LEGAL BACKGROUND

**14.** In 2000, EPA placed "electric utility steam generating units" ("EGUs") on the list of categories of sources of hazardous air pollutants established by Clean Air Act Section 112(c), making them subject to regulation under Section 112.  65 Fed. Reg. at 79,830.  An EGU is defined in this context as "any fossil fuel fired combustion unit of more than 25 megawatts that serves a generator that produces electricity for sale."  42 U.S.C. § 7412(a)(8).

**15.** A coal-fired power plant capable of producing at least 25 megawatts is a type of EGU subject to regulation under Section 112(g).

**16.** After a source category is placed on the Section 112(c) list, EPA is required to promulgate maximum achievable hazardous air pollutant emissions standards for that category, at which point all new and modified plants must meet those standards.  *See* 42 U.S.C. §§ 7412(d), 7412(g)(2)(B).

**17.** In enacting Section 112(g), Congress provided a mechanism to ensure that new or reconstructed listed source categories do not escape MACT regulation in absence an EPA

promulgated standard under 42 U.S.C. § 7412(d).  This is done through a case-by-case MACT

determination for new or reconstructed sources.

**18.** Specifically, section 112(g)(2)(B) of the Clean Air Act prohibits any person from

"construct[ing] or reconstruct[ing] any major source of hazardous air pollutants unless the

Administrator (or the State) determines that the maximum achievable control technology

emissions limitation under this section for new sources will be met."  42 U.S.C. § 7412(g)(2)(B).

This section further requires that the MACT determination "shall be made on a case-by-case

basis where no applicable emission limitations have been established . . . ."  Id.

**19.**  For purposes of implementing Section 112, EPA has by regulation provided for

definitions of several terms.

**20.** Construction is defined as "the on-site fabrication, erection, or installation of an affected

source."  40 C.F.R. § 63.2.  Reconstruction is defined as:

> "the replacement of components of an affected or a previously non-affected source
> to such an extent that: (1) The fixed capital cost of the new components exceeds 50
> percent of the fixed capital cost that would be required to construct a comparable
> new source; and (2) It is technologically and economically feasible for the
> reconstructed source to meet the relevant standard(s) established by the
> Administrator (or a State) pursuant to section 112 of the Act. Upon reconstruction,
> an affected source, or a stationary source that becomes an affected source, is
> subject to relevant standards for new sources, including compliance dates,
> irrespective of any change in emissions of hazardous air pollutants from that
> source."

Id.

**21.**  Major source means "any stationary source or group of stationary sources located within

a contiguous area and under common control that emits or has the potential to emit considering

controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per

year or more of any combination of hazardous air pollutants, unless the Administrator establishes

a lesser quantity, or in the case of radionuclides, different criteria from those specified in this sentence." 40 C.F.R. § 63.2.

**22.** Pursuant to federal regulations implementing Section 112(g) of the Clean Air Act, a MACT determination must identify and require a level of control that "shall not be less stringent than the level of emission control which is achieved in practice by the best controlled similar source." 40 C.F.R. § 63.43(d)(1).

**23.** EPA regulations governing the process for conducting a case-by-case MACT determination provide the public the right to comment on and to appeal the MACT determination.  See 40 C.F.R. § 63.43(c)(2)(ii), (h).

**24.** In 2005, EPA purported to remove EGUs from the list of sources subject to Clean Air Act Section 112.  The EPA regulations provide that once a source is listed, the source may only be deleted from the source category list pursuant to Section 112(c)(9).  However, EPA did not purport to delist EGUs pursuant to Section 112(c)(9).

**25.** EPA's decision was challenged in the D.C. Circuit by numerous states, tribes, and environmental organizations.

**26.** On February 8, 2008, the D.C. Circuit vacated as unlawful EPA's attempt to remove coal-fired power plants from the list of sources regulated under Section 112 of the Clean Air Act. New Jersey v. EPA, 517 F.3d 574 (D.C. Cir. 2008).  The D.C. Circuit held that power plants "remain listed under section 112."  Id. at 583.  Accordingly, EGUs are sources subject to the Clean Air Act's requirements for hazardous air pollutants including mercury.

**27.** To date, EPA has not promulgated maximum achievable hazardous air pollutant emissions standards for EGUs.

**28.** On January 7, 2009, EPA Headquarters sent a memo to the Regional Administrators detailing how the MACT requirements of Section 112(g) should be applied to coal plants which began construction between March 29, 2005 and March 14, 2008.  See Memorandum from Bob Meyers, EPA Office of Air and Radiation to Regional Administrators (Jan. 7, 2009), Attachment A.  EPA affirmed in this memo that the MACT regulations require a case-by-case determination to be made by the permitting authority for each of these coal plants.  Id.  The memo also urged permitting authorities to conduct these Section 112(g) reviews without delay.  Id.

**29.** Pursuant to the citizen suit provision of the Clean Air Act, any person may commence a civil action for violation of an emission standard or limitation, including the requirements of Section 112(g).  42 U.S.C. § 7604(a), (f).  The Clean Air Act's citizen suit provision permits citizens to seek injunctive relief and civil penalties payable to the U.S. Treasury of up to $37,500.00 per day for each violation of the Clean Air Act.  See 42 U.S.C. §§ 7413(b), 7604(a); 40 C.F.R. § 19.4.

## FACTUAL BACKGROUND

**30.** Lamar Utilities has historically operated a natural gas fired EGU in Lamar, Colorado.

**31.** On August 21, 2007, the Colorado Department of Public Health and Environment ("CDPHE") issued construction permit # 05PR0027 to Lamar Utilities to authorize the Lamar Repowering Project.

**32.** The Lamar Repowering Project sought to replace the existing natural gas-fired EGU with a 43-megawatt, coal-fired boiler type power plant.

**33.** The Lamar Repowering Project involved extensive replacement of existing equipment at the plant, including, one diesel fueled compression ignition, reciprocating internal combustion engine powering a fire pump rated at 373 horsepower; one Babcock and Wilcox, bituminous or

sub-bituminous coal fired, circulating fluidized bed, steam boiler;  one-custom built, railcars coal unloading system; one custom-built, Coal Dome filing system consisting of two head-boxes and loading spouts; two custom-built, bituminous or sub-bituminous coal storage domes; one custom-built, starvac coal reclaim system; coal crushing system design rated at 150 tons per hour; one coal conveying system comprising two conveyor belts and one transfer tower between the two conveyors; three custom-built, day silos with a holding capacity of 180 tons each; one custom built limestone crusher and one storage silo; one limestone unloading pit and hopper; one custom built ash vacuum blower system; one custom built ash silo for holding ash collected in the main boiler; one trackmobile titan, railcars mover, equipped with a 260 horsepower, Cummins, diesel fuel-fired engine; truck on site haul and service roads.  See Construction Permit No. 05PR0027 (Aug. 21, 2007) at 15-20, Attachment B to this complaint.

**34.** Repowering of the Lamar Coal Plant began in late July 2006.

**35.** The Lamar Coal Plant's existing permit allows for the discharge of 38 pounds of mercury annually.

**36.** By July 2006, Lamar Utilities had not obtained a determination from EPA or the CDPHE that the Lamar Coal Plant will meet MACT emission limits for hazardous air pollutants. Additionally, as of March 14, 2008, the date of the D.C. Circuit's mandate vacating EPA's attempt to remove EGUs from the list of "major sources" of hazardous air pollutants, Lamar Utilities had not attempted to properly obtain a MACT determination and continued constructing the Lamar Coal Plant.

**37.** As of the date of the filing of this Complaint, Lamar Utilities had not obtained a MACT determination from EPA or CDPHE.  Likewise, CDPHE has not received an application to modify the permit, nor any documentation indicating intent to obtain a MACT determination.

**38.** Lamar Utilities submitted a notice of start-up for the boiler to CDPHE on June 1, 2009. The Lamar Coal Plant is currently undergoing a start-up process during which the plant is tested for operational and safety integrity.  Actual commercial operation may occur at any time, and without public notice.

**CLAIM FOR RELIEF**

**FIRST CAUSE OF ACTION**
*Violation of Clean Air Act Section 112(g)(2)(B)*
*Construction or Reconstruction Without a MACT Determination*

**39.** Plaintiff repeats and incorporates the allegations in the preceding paragraphs as if set forth in full.

**40.** The Lamar Repowering Project amounts to construction or reconstruction, within the meaning of Clean Air Act Section 112(g), of a coal-fired EGU, which is a listed source category of hazardous air pollutants under Section 112(c).

**41.** The Lamar Coal Plant, as constructed or reconstructed, is a major source of hazardous air pollutants within the meaning of Section 112(a)(1).

**42.** Lamar Utilities commenced construction or reconstruction of the Lamar Coal Plant in violation of Section 112(g), as well as federal and state implementing regulations.  Lamar Utilities have not obtained a case-by-case MACT determination for any of the hazardous air pollutants that would be emitted by the Lamar Coal Plant.  Pursuant to case-by-case MACT requirements, Lamar Utilities must demonstrate and obtain a final and effective determination from EPA or the State of Colorado that the Lamar Coal Plant will achieve reductions in hazardous air pollutant emissions that appropriately reflect MACT for each hazardous air pollutant emitted, which must be at least as stringent as the emissions performance achieved in practice by the best performing similar source.

10

**43.** Lamar Utilities will continue to violate the Clean Air Act until such time as they cease construction and/or operation of the Lamar Coal Plant, or obtain a valid and effective case-by-case MACT determination for each hazardous air pollutant that the Lamar Coal Plant would emit.

## PRAYER FOR RELIEF

WHEREFORE, based upon the allegations contained in the foregoing paragraphs, the Plaintiff requests that this Court:

1. Issue a declaratory judgment that Lamar Utilities' construction, reconstruction and/or operation of the Lamar Coal Plant without an approved MACT determination is illegal under Section 112 of the Clean Air Act, 42 U.S.C. § 7412;

2. Permanently enjoin Lamar Utilities from construction, reconstruction, or operation of the Lamar Coal Plant except in accordance with a MACT determination pursuant to Section 112(g) of the Clean Air Act and applicable regulatory requirements;

3. Assess a civil penalty against Lamar Utilities of up to $37,500.00 per day for each violation of the Clean Air Act and applicable regulations;

4. Award Plaintiff its cost and reasonable attorney fees incurred in initiating and prosecuting this action; and

5. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Michael Ray Harris
CO Bar # 35395
Michael Ray Harris
Assistant Professor & Director
Environmental Law Clinic
University of Denver
Sturm College of Law
2255 E. Evans Ave.
Denver, Colorado 80208
(303) 871-7870 (telephone)
(303) 871-6847 (facsimile)
mharris@law.du.edu

Kevin J. Lynch
CO Bar # 39873
Environmental Law Clinic
University of Denver
Sturm College of Law
2255 E. Evans Ave.
Denver, Colorado 80208
(303) 871-6039 (telephone)
(303) 871-6847 (facsimile)
klynch@law.du.edu

Dated: December 21, 2009

Plaintiff:
WildEarth Guardians
1536 Wynkoop St, Ste 301
Denver, CO 80202