## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-02974-DME-BNB

WILDEARTH GUARDIANS, a New Mexico non-profit corporation,

     Plaintiff,

v.

LAMAR UTILITIES BOARD d/b/a LAMAR LIGHT AND POWER, and
ARKANSAS RIVER POWER AUTHORITY,

     Defendants.

---

## DEFENDANTS' MOTION TO DISMISS, WITH AUTHORITIES

---

Defendants Lamar Utilities Board d/b/a Lamar Light and Power ("LUB") and Arkansas River Power Authority ("ARPA") (collectively "Defendants"), by and through their attorneys, Fairfield and Woods, P.C., hereby submit the following as their Motion to Dismiss, with Authorities, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and state as follows:

### INTRODUCTION

ARPA is a political subdivision of the state of Colorado, established pursuant to the Colorado Power Authority Act, Colo. Rev. Stat. § 29-1-204, for the purpose of supplying wholesale electricity to its member municipalities, including the Colorado cities of Lamar, La Junta, Las Animas, Springfield, Holly and Trinidad. LUB is the municipally-owned utility for the City of Lamar, and for many years operated a 25-megawatt gas-fired electric generation unit in Lamar.

In order to meet the long-term base load electricity requirements of ARPA's member municipalities, Lamar, LUB and ARPA entered into a Joint Operating Agreement in 2004, pursuant to which Lamar's gas-fired electric generation facility was to be "repowered" as a coal-fired facility with a net output of 38.5 megawatts (the "Lamar Repowering Project" or "LRP"). The LRP was to be owned by ARPA and operated by LUB.   In furtherance of this project, Defendants applied for and obtained on February 3, 2006, a construction permit addressing air emissions for the LRP from the Air Pollution Control Division ("APCD") of the Colorado Department of Public Health and Environment ("CDPHE").   There is no dispute that this permit was issued in accordance with all applicable rules and regulations relating to emissions from electric utility steam generating units ("EGUs") in effect at that time, including all control requirements for mercury and other hazardous air pollutants ("HAPs") as defined by the federal Clean Air Act ("CAA") and EPA regulations.   In reliance on this permit, ARPA issued approximately $130 million in bonds to finance the construction of the LRP.   Construction of the LRP commenced in 2006 and was substantially completed in 2008.   The LRP is currently undergoing final testing before becoming fully operational.

WildEarth Guardians ("WEG") seeks a declaration that the construction permit for the LRP is invalid because, prior to commencing construction of the LRP, Defendants failed to obtain a determination that the LRP complied with the "maximum achievable control technology" ("MACT") standards for HAPs pursuant to Section 112(g) of the CAA.   At the time the APCD issued its permit for the LRP in 2006, the MACT requirement was inapplicable to the LRP under the EPA's "Delisting Rule," which removed EGUs from the list of source categories subject to the MACT requirement of the CAA.   *See* 70 Fed. Reg. 15,994 (March 25, 2005).

However, in February 2008, approximately two years after the APCD issued its permit for the LRP and a year and a half after construction of the LRP began, the United States Court of Appeals for the D.C. Circuit held that the "Delisting Rule" was invalid in an unrelated lawsuit to which neither LUB or ARPA were parties. *See New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008). Based on the *New Jersey* opinion, WEG now asserts that this Court should retroactively invalidate the construction permit issued for the LRP.

WEG's claim constitutes an impermissible collateral attack on the permit issued for the LRP by APCD in February 2006. Furthermore, in light of the ongoing discussions between APCD, ARPA and LUB to determine if the MACT requirements of Section 112(g) are even applicable to the LRP, this Court should abstain from exercising jurisdiction over this lawsuit. Finally, the change in federal law on which WEG relies, *i.e.*, the *New Jersey* court's invalidation of the EPA's Delisting Rule, may not be applied retroactively to render Defendants' lawfully-issued air permit invalid. Accordingly, given the procedural and factual posture of this case, the Court should dismiss WEG's "citizen suit" for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## BACKGROUND

I. **STATUTORY AND REGULATORY BACKGROUND.**

A. **CAA Regulation of HAPs and Section 112(g).**

Section 112 of the CAA requires EPA to set emission standards for any HAP. *See* 42 U.S.C. § 7412(d). In 1990, Congress amended Section 112 to establish a statutory list of HAPs. *See* 42 U.S.C. § 7412(b)(1). Section 112 further requires EPA to publish a list of "categories and subcategories" of "major sources" and certain "area sources" that emit HAPs. 42 U.S.C. §

7412(c).  For each "category or subcategory of major sources and area sources" of HAPs, EPA

must also promulgate emission standards.  42 U.S.C. § 7412(d).  "Major sources" of HAPs must

comply with technology-based emission standards requiring the maximum degree of reduction in

emissions EPA deems achievable, often referred to as "maximum achievable control technology"

or "MACT" standards.  42 U.S.C. § 7412(d)(2); *see also Sierra Club v. EPA*, 353 F.3d 976, 980

(D.C. Cir. 2004) ("These emission standards are to be based not on an assessment of the risks

posed by HAPs, but instead on the maximum achievable control technology (MACT) for sources

in each category.").

Where EPA has not established a categorical MACT standard for new major sources of

HAPs under Section 112(d) of the CAA, Section 112(g) requires permitting authorities to make a

MACT determination on a case-by case basis *before* construction begins:

> [N]o person shall construct or reconstruct any major source of hazardous air
> pollutants, unless the Administrator (or the State) determines that the maximum
> achievable control technology emission limitation under this section for new
> sources will be met.  Such determination shall be made on a case-by-case basis
> where no applicable emission limitations have been established by the
> Administrator.

42 U.S.C. § 7412(g)(2)(B).  In promulgating final rules in 1996 to implement Section 112(g),

EPA explained that the section is a *preconstruction requirement*:

> Requirement for Preconstruction Determination:  Section 63.43 requires the
> MACT determination before construction or reconstruction of the major source.
> The requirement is based upon the language in section 112(g)(2)(B) requiring that
> the Administrator (or the State) determine that MACT "will be met."  The EPA
> believes that the future tense suggests an up-front determination.

61 Fed. Reg. 68,384, 68,393 (Dec. 27, 1996).  Thus, to the extent Section 112(g) applies, it

"requires the MACT determination *before* construction."  *Id.*  (emphasis added).

**B.** **CAA Regulation of EGUs.**

In adopting the 1990 amendments to the CAA, Congress recognized that EGUs are already heavily regulated under other sections of the CAA. Accordingly, Congress required EPA to evaluate regulatory options with care and to meet certain conditions before listing EGUs as a HAP source under Section 112(c)(1). 42 U.S.C. § 7412(n)(1)(A). Specifically, Congress required EPA to regulate EGUs under Section 112(g) only if EPA found "such regulation is appropriate and necessary after considering the results of the study required by this subparagraph." *Id.* After completing the study required by Section 112(n)(1)(A) in December 2000, EPA announced that it was "appropriate and necessary" to add EGUs to the list of polluting sources that must meet Section 112(g) requirements. 65 Fed. Reg. 79,825 (Dec. 20, 2000). Subsequently, EGUs were added to the list of "source categories" in 2002. 67 Fed. Reg. 6521, 6522, 6524 (Feb. 12, 2002).

In an effort to determine how best to regulate emissions from EGUs under Section 112, EPA proposed two alternatives in 2004 – one to issue MACT standards for EGUs under Section 112(d) of the CAA, and the other to remove EGUs from Section 112 and to regulate them under Section 111 of the CAA. *See* 69 Fed. Reg. 4652 (Jan. 30, 2004). After receiving considerable public comment, EPA adopted the second approach and promulgated two related rules in 2005 to regulate HAP emissions from EGUs. The first rule declared that EPA's original determination to list EGUs under Section 112(c) was legally and factually in error, and removed EGUs from the Section 112(c) list of source categories (the "Delisting Rule"). *See* 70 Fed. Reg. 15,994 (March 29, 2005). Accordingly, after March 2005, Section 112(g) no longer applied to EGUs. The second rule, known as the Clean Air Mercury Rule ("CAMR"), shifted regulation of HAPs from

EGUs from Section 112 to Section 111 of the CAA.   70 Fed. Reg. 28,606 (May 18, 2005). CAMR capped and significantly reduced mercury emissions from the EGU sector and established strict mercury performance standards for new EGUs.  *See Id.*

      **C.**      **The *New Jersey v. EPA* decision.**

      In *New Jersey v. EPA,* the State of New Jersey and others petitioned for review of the Delisting Rule and CAMR, asserting that EPA promulgated these rules in violation of Section 112(c)(9) of the CAA.   517 F.3d at 577-78.   This case did not involve the review of an air permits, nor were LUB or ARPA involved in any way in this lawsuit.

      On February 8, 2008, the Court of Appeals for the D.C. Circuit issued its opinion holding that EPA's decision to remove EGUs from the Section 112 list was improper for failure to follow the specific delisting process set forth in Section 112(c)(9).   517 F.3d at 583.   As a result of this decision, EGUs were once again listed under Section 112.   *Id.*   Furthermore, the Court vacated the CAMR because it was promulgated under Section 111 on the basis that EGUs would not be regulated under Section 112.   The Court issued its mandate on March 14, 2008, over two years after ARPA received its construction permit for the LRP, and EPA's petition for a writ of certiorari to the U.S. Supreme Court was denied on February 23, 2009.

**II.**      **THE LRP AIR PERMIT.**

      The LRP was constructed in the city of Lamar, Colorado, near the Colorado-Kansas border in order to meet the long-term baseload electricity requirements of ARPA's member municipalities, which are located primarily in southeastern Colorado.   The LRP combines an existing 25-megawatt turbine at LUB's Lamar facility with a new turbine, which increased the

facility's capacity to a net 38.5 megawatts.[1]  (*See* **Ex. A**, Permit Application (excerpt), p. 1 of 11).  The plant's 1970's-vintage natural gas-fired boiler was replaced with a modern circulating fluidized bed coal-fired steam boiler.  (*Id.*, p. 3 of 11).  In order to minimize hazardous air emissions, the LRP utilizes low-sulfur coal and incorporates state of the art emissions controls.

After public comment, the APCD issued a construction permit to ARPA on February 3, 2006 addressing air emissions.  (*See* **Ex. B**, Construction Permit).  The permit includes enforceable limitations on emissions of HAPs, including limitations on mercury emissions.  The permit was subsequently modified by the APCD on August 21, 2007 and again on October 13, 2009.  (*See* **Exs. C** and **D**).

In reliance on the permit, ARPA commenced construction of the LRP in July 2006, and construction was substantially completed in February 2008.  Throughout the permitting and construction process, LUB and ARPA have complied with all applicable state and federal regulations regarding emissions from coal plants, and WEG makes no assertion to the contrary in its Complaint.  The LRP has been operating in accordance with its permit and is in the final stages of commissioning before commencing full operation.

On January 7, 2009, EPA issued a memorandum to its Regional Administrators requesting that "the appropriate State or local permitting authority commence a process under Section 112(g) to make a new-source MACT determination" at facilities that began construction between the March 29, 2005 publication of the Delisting Rule and the March 14, 2008 vacatur of that rule.  (*See* **Ex. E**, Jan. 7, 2009 letter).  On July 14, 2009, Defendants first received notice that

---

[1] LUB and ARPA have attached excerpts from the administrative record to this brief.  Concurrently herewith, they have filed a Motion to Take Judicial Notice of the Administrative Record.  The court may properly consider these documents for the purpose of considering LUB and ARPA's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) without converting the motion to a motion for summary judgment.  *See Tal v. Hogan*, 453 F.3d 1244, 1264 (10th Cir. 2006).

EPA had determined that the LRP may be subject to the MACT requirement under Section 112(g) of the CAA.  In its letter dated July 6, 2009, EPA notified Defendants that they "must contact the appropriate permitting authority as expeditiously as possible to obtain a new source maximum achievable control technology (MACT) determination and a schedule for coming into compliance with the requirements of Section 112(g)." (*See* **Ex. F,** July 6, 2009 letter).  The July 6 letter further stated that "[i]f a source determines that it is not subject to the requirements of Section 112(g), the source should maintain a record of its applicability determination and all supporting analyses." (*Id.*)

Upon receipt of this letter, Defendants immediately contacted APCD to inquire as to how they should proceed.  Defendants were advised that a threshold question would be whether the LRP was, in fact, a "major source" of HAPs or whether it was more properly classified as a minor (or "area source"), i.e. a source capable of generating *less* that 10 tons of any HAP or 25 tons of all HAPs annually, which would be exempt from the MACT requirements of Section 112(g).  The determination of whether the LRP was a "major" or an "area" source would depend on the results of stack testing at the LRP.  If the LRP constitutes an "area source," its permit and emissions limitations would be modified accordingly.  APCD has approved testing criteria for the LRP.  (*See* **Ex. G**).

Initial testing of the LRP at mid-loads was conducted in October of 2009.  However, due to problems with the new steam turbine (unit 8), Defendants have been unable to conduct stack tests on the plant at full capacity.  (*See* **Ex. H**).  It is expected that these tests will be conducted in the first quarter of 2010.

Testing at the LRP and discussions between the APCD and the Defendants regarding any potential modifications to the permit for the LRP are ongoing.   EPA was advised of these discussions by the APCD in a letter dated August 28, 2009, which noted that APCD "and ARPA are actively engaged in this process, and the Division will make a timely determination and amend permits if appropriate." (*See* **Ex. I,** August 28, 2009 letter).   Notwithstanding these ongoing agency actions, WEG served a Notice of Intent to Sue on LUB on September 10, 2009, and commenced this action on December 21, 2009.  *See* Complaint [Doc. 1].

## ARGUMENT

I.   **WEG'S CITIZEN SUIT IS AN IMPERMISSIBLE COLLATERAL ATTACK ON THE APCD'S PERMITTING PROCESS.**

A.   **Legal Standard.**

Defendants move for dismissal of this case for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).  "As courts of limited jurisdiction, federal courts may only adjudicate cases that the Constitution and Congress have granted them authority to hear." *East West Resort Transp., LLC v. Sopkin*, 371 F. Supp. 2d 1253, 1257 (D. Colo. 2005).  "Statutes conferring jurisdiction on federal courts are to be strictly construed."  *Id.*  A motion to dismiss must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction.  *Id.*  WEG bears the burden of invoking federal jurisdiction. *Penteco Corp. Ltd. P'ship-1985A v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991).

B.   **WEG's Claim Impermissibly Challenges APCD's Actions.**

Notwithstanding the characterization of its Complaint as a "citizen suit" authorized under Section 304(a) of the CAA, WEG's allegations are not directed at ARPA's compliance with its permit or other CAA emission limits.  Rather, WEG's primary complaint is that APCD should

have required and performed a case-by-case MACT determination when issuing the construction permit for the LRP. As such, WEG's Complaint is nothing more than a *post hac* collateral attack on APCD's permitting process.

Federal courts have routinely found that citizen suits are not the proper forum to collaterally attack state permitting decisions. *See, e.g., Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 175 F. Supp. 2d 1071, 1079 (E.D. Tenn. 2001) ("[T]he Clean Air Act provides no cause of action for a citizen suit collaterally attacking a permit issued by a State's enforcement agency"); *Goodman v. PA D.E.P.*, Civil Action No. 07-4779, 2008 WL 2682698, *2 (E.D. Pa. June 30, 2008) (district courts do not have jurisdiction over collateral attacks to facially valid permits) (*See* **Ex. J,** Appendix of Unpublished Opinions); *Jamison v. Longview Power, LLC*, 493 F. Supp. 2d 786, 787 (N.D. W. Va. 2007) ("Although the plaintiffs contend that their claim raises federal issues under the CAA, a careful review of their allegations discloses a claim that is, at bottom, a collateral attack on the DAQ's permitting decisions.").

WEG does not suggest that Defendants initiated construction of the LRP without first obtaining a permit. Indeed, WEG concedes that Defendants received a valid permit from APCD, which authorized construction of LRP. *See* Compl., ¶ 31, at 8. Rather, WEG takes issue with the fact that APCD did not require Defendants to obtain a MACT determination. *Id.*, ¶ 36, at 9. However, a MACT determination was unnecessary at the time LUB and ARPA applied for and obtained its construction permits. Throughout the permitting process and construction of the LRP, LUB and ARPA complied with the permit and all state and federal regulations regarding pollution from coal plants that were effective at that time. WEG cannot now pursue enforcement against entities that have "committed no violation that can be attributed to it other than to act in

accordance with a permit it received from an authorized permit-issuing authority[.]" *United States v. Solar Turbines, Inc.*, 732 F. Supp. 535, 539 (M.D. Pa. 1989).

WEG had ample opportunity to raise the issue of MACT determination during the permitting process. APCD issued the initial construction permit for the LRP in February 2006 after allowing for public comment. At no time prior to the issuance of the permit did WEG suggest that the LRP must undergo a case-by-case MACT determination. WEG's failure to pursue such objections through the available state administrative and judicial venues during the permitting process precludes its current attempt to challenge or otherwise reopen the existing permit through a citizen suit in this court. *See Amigos Bravos v. Molycorp, Inc.*, 166 F.3d 1220, 1998 WL 792159, *4 (10th Cir. Nov. 13, 1998) (finding court lacked subject matter jurisdiction over a citizen suit brought under the Clean Water Act raising claims that should have been brought during the permit renewal proceeding) (*See* **Ex. J**).

WEG may assert that it could not have raised the issue of MACT determination in light of the Delisting Rule and CAMR, both of which were in place during the time APCD permitted the LRP. However, WEG certainly could have challenged the propriety of the Delisting Rule and CAMR as part of the permitting process. WEG cannot now legitimately argue that is unfair to have required WEG to raise the issue of MACT determination while the Delisting Rule was in effect, and at the same time argue that ARPA should have sought a MACT determination at a time when no such determination was required by virtue of the Delisting Rule and CAMR.

Moreover, Defendants are actively engaged with APCD regarding EPA's directive to obtain a new source MACT determination and a schedule for coming into compliance with the requirements of Section 112(g), if it is determined that the LRP is a "major" source, and has

stated that it "will make a timely determination and amend permits if appropriate." (*See* **Ex. I,** Aug. 31, 2009 letter). As of the date WEG commenced this action, no final determination had been made. Once a determination is made by APCD on whether further MACT controls are required, WEG will have an opportunity for comment. WEG must allow the process Congress, the EPA and the State have developed to run its course. WEG has an appropriate avenue outside of this Court to address its concerns through the Colorado regulatory process. Accordingly, this Court should dismiss WEG's citizen suit for lack of subject matter jurisdiction as an impermissible collateral attack on the construction permit for the LRP.

> **C.    The Court Should Decline Jurisdiction Over WEG's Citizen Suit Under the *Burford* Abstention Doctrine.**

>> i.    *Exercising Jurisdiction over WEG's Citizen Suit would Unnecessarily Intervene in Colorado's Comprehensive Regulatory Scheme Implemented to Address Issues Relating to Clean Air.*

Where, as here, a state has its own comprehensive system for issuing permits, a court should abstain from exercising its jurisdiction over WEG's claim that simply revisits a state's permitting decision. The *Burford* doctrine counsels abstention by federal courts under the following scenarios:

> (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or

> (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 480 (6th Cir. 2004) (citing *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989)); *see also Burford v. Sun Oil Co.*,

319 U.S. 315 (1943).  Abstention's "central idea has always been one of simple comity."  *MLC Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 280 (4th Cir. 2008).

The Sixth Circuit's decision in *Ellis v. Gallatin Steel Company* is illustrative.  In *Ellis*, the Sixth Circuit affirmed the district court's dismissal of the plaintiffs' citizen suit under the CAA alleging that the defendant companies had failed to obtain a state Prevention of Significant Deterioration ("PSD") permit as a precondition to construction of a "major emitting facility." *Ellis*, 390 F.3d at 481.  The district court had held that plaintiffs' PSD claims were in fact a "collateral challenge" to the state agency's permitting decisions that could not be litigated under the CAA's citizen suit provisions.  *Id.* at 479.  Affirming the district court's ruling, the Sixth Circuit explained that the *Burford* doctrine precludes a district court from revising the state agency's permitting decisions because Kentucky has its own comprehensive administrative system for issuing permits.  *Id.* at 480–81 ("Kentucky 'has enacted and is operating its own authorized program' under the Clean Air Act and 'is attempting to establish a coherent policy under its law concerning … licensing' of emitting facilities.").  Thus, the Sixth Circuit found that the plaintiffs' permit claims:

> boil down to allegations that the Kentucky agency 'failed to apply or misapplied [its] lawful authority under Kentucky law and under' the Clean Air Act by issuing Gallatin's PSD permit exclusive of Harsco's operations and by determining that a PSD permit was unnecessary with respect to Harsco.

*Id.* at 481.  As in *Ellis*, numerous other courts have found *Burford* abstention proper in cases similar to this one.  *See Sugarloaf Citizens Ass'n v Montgomery County, Md.*, 33 F.3d 52, 1994 WL 447442 (4th Cir. Aug. 17, 1994) (dismissing CAA citizen suit against a permittee for alleged deficiencies in the permit issued by the Maryland Department of the Environment and holding "exercise of federal jurisdiction over [Maryland's] permitting decisions would disrupt

Maryland's complex statutory scheme and frustrate the State's efforts to establish a coherent environmental policy") (*See* **Ex. J**); *Jamison*, 493 F. Supp. 2d at 790–91 (dismissing challenge to state-issued PSD permit because it would require a federal court to determine merits of underlying state permitting decisions); *Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1348–49 (D.N.M. 1995) (court review would "constitute a serious 'interference with the proceedings or orders of [a] state administrative agency' which would prove 'disruptive of state efforts to establish a coherent policy'").

As the federally authorized permitting authority in Colorado, APCD's process for the evaluation and issuance of permits, which includes extensive opportunity for public participation, should be afforded comity and protection against unnecessary federal intervention. *See* 42 U.S.C. § 7401(a)(3) ( "air pollution prevention … and air pollution control at its source is the primary responsibility of States and local governments"); *see also* COLO. REV. STAT. §§ 25-7-114.5(6)(a); 5 COLO. CODE REGS. § 1001-1 (1.7.4(1)) (providing for public participation). Furthermore, APCD's permitting decisions are subject to both administrative challenge and judicial review. *See* COLO. REV. STAT. §§ 25-7-114.5(8), 25-7-114.5(11). Colorado has assumed its responsibility under Section 101 and developed a comprehensive regulatory scheme designed to address issues relating to clean air. WEG's request that this Court apply hindsight to review APCD's permitting of the LRP requiring no MACT determination would circumvent the Colorado regulatory scheme and its administrative and judicial review of permit decisions. Such intervention would only lead federal courts such as this one to second-guess the APCD's permitting decisions and interfere with Colorado's primary responsibility for implementing air pollution prevention and control pursuant to its comprehensive regulatory scheme. Accordingly,

this Court should abstain from exercising jurisdiction over WEG's citizen suit pursuant to the *Burford* doctrine and allow the ongoing Colorado process to run its course.

      ii.     *The APCD is Currently Addressing the Very Subject of WEG's Claim in Its Citizen Suit.*

This Court's exercise of jurisdiction over WEG's claim is particularly inappropriate "where the state has supplied a concentrated and comprehensive review process that is currently addressing the very subject of [the] federal claims." *Ellis*, 390 F.3d at 481. As noted above, Colorado has a comprehensive regulatory scheme designed to address the very compliance issues WEG now complains of in its citizen suit.

In a case involving virtually the same claims under Section 112(g) that WEG alleges in its Complaint, the Western District for the District of North Carolina invoked the *Burford* doctrine to abstain from further involvement in the case so that review of the permit at issue could be carried out through the specialized State administrative review process. *S. Alliance for Clean Energy v. Duke Energy Carolinas, LLC*, Civil Action No. 1:08CV318, 2009 WL 1940048, *6 (W.D.N.C. July 2, 2009) ("*Duke Energy II*") (*See* **Ex. J**). Specifically, the Court found that:

> The State of North Carolina has a strong and major interest in the health and well being of its citizens and in the orderly conduct of proceedings to protect them. Obviously, the issue of clean air is one of major public importance and is the primary responsibility of state and local governments.
> …
>
> The Court finds that the State's administrative process is an adequate avenue to address the nature of the T29 permit at issue. Under the North Carolina regulatory framework, the Plaintiffs/ petitioner may proceed in an orderly process of review to and including the North Carolina Supreme Court. Unnecessary federal intervention should not "disrupt the orderly administration of state regulatory schemes."

*Id.* at *5.

Here, as in *Duke Energy II*, abstention is appropriate because APCD is currently involved in addressing the very compliance issues WEG now complains of in its citizen suit. *See Compl.*, ¶ 37, at 9 (alleging that Defendants have "not obtained a MACT determination from EPA or CDPHE"). Indeed, the APCD recently acknowledged that it is "actively engaged" with ARPA regarding EPA's directive to "obtain a new source MACT determination and a schedule for coming into compliance with the requirements of Section 112(g)" and that it "will make a timely determination and amend permits if appropriate." (*See* **Ex. I).** While no final determination has been made, WEG must allow the Colorado regulatory process to run its course. That process began in the summer of 2009, and WEG should not be permitted to short circuit it by an untimely "citizen suit."

## II.   SECTION 112(g) DOES NOT APPLY TO THE LAMAR REPOWERING PROJECT AS A MATTER OF LAW.

### A.   Legal Standard.

A complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1974 (2007). In ruling on a motion to dismiss, the court must accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the nonmoving party. *Sanders v. Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264, 1270 (D. Colo. 2002).

### B.   Section 112(g) Applies Only Before Construction is Commenced and Did Not Apply to EGUs at the Time ARPA Commenced Construction of the Lamar Repowering Project.

Contrary to WEG's suggestion otherwise, Section 112(g) requires permitting authorities to make a MACT determination on a case-by case basis *before* construction begins. 42 U.S.C. §

7412(g)(2)(B).  As noted above, EPA explained that the section is a *preconstruction requirement.  See supra*, pp. 3-4.

Consistent with its interpretation of Section 112(g) as a *preconstruction* requirement, EPA concluded that Section 112(g) would not apply to projects that received their construction permits before the effective date of Section 112(g).  *See* 40 C.F.R. § 63.40(b); *see also* 61 Fed. Reg. at 68,387 ("If a project does not receive its air quality construction permits before the effective date of section 112(g), then this rule will be applicable.").  According to EPA, "[t]his approach assures that if prior to the permit issuance, new approaches to control HAP emissions are considered appropriate, the source will apply the latest control technology."  *Id.*

Construction on the LRP began in July 2006 under a valid permit that APCD properly issued pursuant to the federal and state regulations.  No MACT determination was required at that time.  WEG had the opportunity to comment on the permit and insist on a MACT determination before Defendants began construction but failed to do so.  As a preconstruction requirement, Section 112(g) cannot apply now, over three years after construction on the LRP began.  Indeed, it is illogical to assert that Defendants violated a preconstruction requirement that did not exist at the time it began construction.  Furthermore, Section 112(g) does not impose any subsequent obligation for sources that lawfully commenced construction after the Delisting Rule but before the D.C. Circuit's opinion in *New Jersey*.  The *New Jersey* decision did *not* hold that a permit issued to a utility while EGUs were delisted must be vacated or deemed void. [2]

---

[2] The decision in *Southern Alliance for Clean Energy v. Duke Energy Carolinas, LLC*, Civil No. 1:08CV318, 2008 WL 5110894 (W.D.N.C. Dec. 2, 2008) ("*Duke Energy I*"), which has been cited by WEG in other cases, likewise does not support a determination that Defendants' construction permit is void.  (*See* **Ex. J**).  In that case, Duke Energy obtained a construction permit for an electric generation on January 29, 2008, only ten days before the *New Jersey* decision; however, Duke Energy refused to perform a MACT analysis.  In contrast, here construction of the LRP was substantially completed before the *New Jersey* decision.  Moreover, although the court in *Duke Energy*

**C.      Section 112(g) Does Not Apply Retroactively After the *New Jersey* Decision.**

The D.C. Circuit's decision to invalidate EPA's Delisting Rule cannot apply retroactively to render unlawful ARPA's otherwise lawful past conduct.  As a general rule, "[r]etroactivity is not favored in the law."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  This general presumption against retroactive application of the law is founded on "familiar considerations of fair notice, reasonable reliance, and settled expectations."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994).  Indeed, as the Supreme Court explained in *Landgraf*:

> Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.  For that reason, the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeals.

*Id.* at 265; *see also Martin v. OSHRC*, 941 F.2d 1051, 1057 n.9 (10th Cir. 1991) (holding that "while a rule may have retroactive effects (because the rule affects the utility of past transactions) and still be reasonable, a rule may not 'change what the law was in the past.'  Such a rule could well interfere with reliance interests.") (quoting *Bowen*, 488 U.S. at 220).

A law is considered to result in impermissible retroactive effect if "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  *Landgraf*, 511 U.S. at 280.  Thus, the validity of a permit should be assessed under the law that existed when the permit was issued."  *Id.* at 265.  These principles have been extended to judicial opinions that raise questions of retroactivity or otherwise purport to affect past conduct.  *See, e.g., Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 374 (1940) (although retroactive implications may flow from

---

ultimately determined that Section 112(g) applied retroactively, it failed to undertake any substantive analysis of the due process and other concerns potentially arising from the retroactive application of that section.  In any event, because *Duke Energy I* was decided by the Western District of North Carolina, it is not binding on this Court.

the finding of a statute's unconstitutionality, "[t]he actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. *The past cannot always be erased by a new judicial declaration.*") (emphasis added).

By seeking retroactive application of Section 112(g) through its reliance on the D.C. Circuit's decision in *New Jersey*, WEG ignores Defendants' compliance with federal and state law during the permitting process.  The problem with this approach is that EPA's actions simply cannot be ignored; indeed, for nearly three years, they governed the regulation of EGUs with respect to mercury and other HAPs.  Not only did numerous entities rely on EPA's actions in seeking permits for EGUs, but numerous state agencies relied on those same actions in approving the permits.

Defendants sought and obtained their permit from the APCD in accordance with all federal and state laws then in existence.  To suggest that Defendants could be subject to penalties and injunctive relief for alleged non-compliance after the decision in *New Jersey* contravenes the core due process principles of fairness, notice and reliance recognized in *Landgraf*, *Chicot County*, and *Martin*.  Accordingly, retroactive application of Section 112(g) is impermissible under the circumstances in this case.

Finally, it is important to note that CAA regulations cannot be made to apply retroactively without statutory provisions clearly indicating Congressional intent to authorize retroactive legislation.  *See Sierra Club v. Whitman*, 285 F.3d 63, 68 (D.C. Cir. 2002) (finding that provisions of the CAA do not contain language suggesting that Congress intended to give EPA the "unusual ability to implement rules retroactively").  Here, Section 112(g) contains no such authority to promulgate retroactive rules.  Accordingly, even if EPA had wanted in 2008 to

reinstate its December 2000 listing of EGUs under Section 112, it could not have done so retroactively.   Thus, it is impermissible to interpret the *New Jersey* decision to achieve an outcome that could not have been accomplished by EPA through its administration of the CAA. Because Section 112(g) was not applicable to EGUs when the LRP commenced construction in July 2006, that provision cannot be applied to the LRP now.   Accordingly, WEG has failed to state a claim pursuant to Section 112(g) upon which relief can be granted.

WHEREFORE, Defendants respectfully request that WEG's Complaint be dismissed for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted.

Respectfully submitted this 5th day of February, 2010.

FAIRFIELD AND WOODS, P.C.

By:  _____*s/*_____
Craig N. Johnson
Joseph B. Dischinger
Jason B. Robinson
1700 Lincoln Street, Suite 2400
Denver, Colorado 80203
(303) 830-2400
Email:  cjohnson@fwlaw.com
Email:  jdischinger@fwlaw.com
Email:  jrobinson@fwlaw.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 5th day of February 2010, I electronically filed the foregoing **MOTION TO DISMISS, WITH AUTHORITIES** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

>Kevin J. Lynch
>Michael Ray Harris
>University of Denver-Sturm College of Law
>2255 East Evans Avenue
>Denver, CO 80208
>klynch@law.du.edu
>mharris@law.du.edu


By: _s/ Gina A. Spruitenburg_
Gina A. Spruitenburg