EXHIBIT J

### Index of Unpublished Cases

1.  *Goodman v. PA D.E.P.*, Civil Action No. 07-4779, 2008 WL 2682698 (E.D. Pa. June 30, 2008).

2.  *Amigos Bravos v. Molycorp, Inc.*, 166 F.3d 1220, 1998 WL 792159 (10th Cir. Nov. 13, 1998).

3.  *See Sugarloaf Citizens Ass'n v Montgomery County, Md.*, 1994 WL 447442, 33 F.3d 52 (4th Cir. Aug. 17, 1994).

4.  *S. Alliance for Clean Energy v. Duke Energy Carolinas, LLC*, Civil Action No. 1:08CV318, 2009 WL 1940048 (W.D.N.C. July 2, 2009).

5.  *Southern Alliance for Clean Energy v. Duke Energy Carolinas, LLC*, Civil No. 1:08CV318, 2008 WL 5110894 (W.D.N.C. Dec. 2, 2008).



Westlaw

Not Reported in F.Supp.2d, 2008 WL 2682698 (E.D.Pa.)
**(Cite as: 2008 WL 2682698 (E.D.Pa.))**

©Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Jon GOODMAN
v.
PA D.E.P., et al.
**Civil Action No. 07-4779.**

June 30, 2008.

Jon Goodman, Schwenksville, PA, pro se.

Douglas G. White, Dept. of Environmental Protection, Wyncote, PA, Andrew P. Foster, Drinker Biddle & Reath, LLP, Philadelphia, PA, Neil S. Witkes, Manko, Gold, Katcher & Fox, LLP, Bala Cynwyd, PA, for Pa. D.E.P., Et.Al.

### MEMORANDUM AND ORDER

JUAN R. SÁNCHEZ, District Judge.

*1 Pennsylvania Department of Environmental Protection (DEP), Superior Tube Co., Inc., and Accellent, Inc. ask me to dismiss Jon Goodman's claim because the Clean Air Act does not prohibit the emission of more than 50 tons of volatile organic compounds (VOCs), and they have complied with the DEP's permits. Goodman contends DEP violated the Clean Air Act by granting the permits. The Defendants argue Goodman cannot challenge the validity of the permits in federal court, but must appeal to the appropriate administrative agency. I am sympathetic to Goodman's concern, but I must grant Defendants' motion to dismiss because he has failed to state a claim for which relief can be granted.

### FACTS [FN1]

> FN1. I accept all allegations in, and reasonable inferences from, the Complaint as true and view them in the light most favorable to Goodman. *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989).

Jon Goodman, a resident of Montgomery County, Pennsylvania, alleges DEP violated the Clean Air Act by giving Superior Tube Co., Inc. and Accellent, Inc., permits to emit more than 50 tons of VOCs per year. Goodman claims EPA regulations prohibit more than 50 tons of VOC emissions per year and require the implementation of control technology.

On August 8, 2006, DEP issued Superior Tube a permit to emit more than 166 tons of VOC per year. DEP then issued Accellent a permit to emit more than 94 tons of VOC per year on November 8, 2006. Goodman is not challenging the permit applications submitted by Superior Tube and Accellent, nor the sufficiency of these applications. Goodman is challenging the permits' validity because they allow more than 50 tons of VOC emissions per year without control technology.

### DISCUSSION

A 12(b)(6) motion to dismiss admits the complaint's well pleaded allegations, but denies their legal sufficiency. *Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *T.R. Ashe, Inc. v. Bolus,* 34 F.Supp.2d 272, 274-75 (M.D.Pa.1999). The complaint and every doubt is resolved in the plaintiff's favor. *In re Arthur Treacher's Franchise Litigation,* 92 F.R.D. 398,422 (E.D.Pa.1981). The court must accept the complaint's factual allegations as true, as well as all its reasonable inferences. *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). "[A] case should not be dismissed unless it clearly appears that no relief can be granted under any set of facts that could be proved consistently with the plaintiff's allegations." *Id.* (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Only the complaint's allegations, matters of public record, orders, and exhibits attached to the complaint are considered. *Chester County Intermediate Unit v. Pennsylvania Blue Shield,* 896 F.2d 808, 812 (3d Cir.1990). Courts must allow plaintiffs to amend unless amendment would be "inequitable or futile." *Phillips v. County of Allegheny,* 515 F.3d 224, 236 (3d Cir.2008) (citing *Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d

Not Reported in F.Supp.2d, 2008 WL 2682698 (E.D.Pa.)
**(Cite as: 2008 WL 2682698 (E.D.Pa.))**

Cir.2002).

District courts have jurisdiction over private citizen actions regarding the enforcement of current EPA emission standards and challenges to permit preconditions and requirements. *See, e.g., Delaware Valley Citizens Council for Clean Air v. Davis*, 932 F.2d 256, 265 (3d Cir.1991) (citing 42 U.S.C. § 7604); [FN2] *Ogden Projects, Inc., et al. v. New Morgan Landfill Company, Inc.*, 911 F.Supp. 863, 865 (E.D.Pa.1996) (permitting private citizen law suits against those constructing facilities without the necessary permit pre conditions and requirements). Individuals can sue in federal court regarding violations of the Clean Air Act's emission standards. 42 U.S.C. § 7604(a)(1). These individuals must then ultimately prove which and how the Clean Air Act's emission standards were violated. *Id.* Regarding the permits, individuals can sue those who have not met permit requirements, preconditions, or who have violated the permit's conditions. 42 U.S.C. § 7604(a)(3).

FN2. Section 7604 reads:

a) Authority to bring civil action; jurisdiction

Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf-

(1) against any person (including (I) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator, or

(3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment) or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties (except for actions under paragraph (2)). The district courts of the United States shall have jurisdiction to compel (consistent with paragraph (2) of this subsection) agency action unreasonably delayed, except that an action to compel agency action referred to in section 7607(b) of this title which is unreasonably delayed may only be filed in a United States District Court within the circuit in which such action would be reviewable under section 7607(b) of this title. In any such action for unreasonable delay, notice to the entities referred to in subsection (b)(1)(A) of this section shall be provided 180 days before commencing such action.

42 U.S.C. § 7604

**\*2** Goodman makes two arguments. First, he argues the Clean Air Act prohibits emissions of more than 50 tons of VOC per year and requires the use of control technology. The Clean Air Act lacks such a prohibition. Sections 7511(a)-(c) require facilities with the potential to emit more than 50 tons per year to endure specific permit and compliance requirements. *See* 42 U.S.C. §§ 7511(a)-(c)(b)(2). Nevertheless, Goodman misinterprets Sections 7511(a)-(c) [FN3] as prohibiting more than 50 tons without control technology or requiring control technology. This section

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2682698 (E.D.Pa.)
**(Cite as: 2008 WL 2682698 (E.D.Pa.))**

serves as guidelines for facilities to comply with State Implementation Plans. Alleged violations of this section must be brought before the EPA and then the Court of Appeals. 42 U.S.C. § 7607(b)(1); *Benning v. Browner,* No. 97-7058, 1998 WL 717436, at *1 (E.D.Pa. Sept.24,1998). Goodman in all his pleadings and in his hearing, and request to amend, has failed to identify or allege any violation of the Clean Air Act.

> FN3. Goodman's pleadings, including his motion for leave to file an amended complaint, identify this section as Section 184.

Goodman's second argument challenges the validity of the permits. Goodman argues the Defendants should not be allowed to use their permits as a defense because the permits violate the Clean Air Act. District courts do not have jurisdiction over collateral attacks to facially valid permits. *National Parks Conservation Ass'n, v. TVA,* 175 F.Supp.2d 1071, 1078 (E.D.Tenn.2001). Goodman would be able to challenge the permits before this Court if he alleged the permits failed to include all the appropriate application and requirements. *See Ogden Projects, Inc., et al.,* 911 F.Supp. at 865 (stating dispute was whether defendants had the requisite permit); *Commonwealth of Pennsylvania v. Allegheny Energy, Inc.,* No. 05-585, 2006 WL 1509061, at *6 (W.D.Pa. Apr. 19, 2006) (finding jurisdiction because plaintiff challenged the permit requirement and the appropriate "applications of emissions limitations and other operating conditions," distinguishing from a collateral attack). Challenges to the validity of a permit must go through the appropriate administrative process within 60 days after the permit's approval.[FN4] 42 U.S.C. § 7661(d)(b)(2). Based on the Clean Air Act's provisions and case law, Goodman has failed to state a claim for which this Court may grant him relief.

> FN4. The relevant statute reads:
>
> (2) If the Administrator does not object in writing to the issuance of a permit pursuant to paragraph (1), any person may petition the Administrator within 60 days after the expiration of the 45-day review period specified in paragraph (1) to take such action. A copy of such petition shall be provided to the permitting authority and the applicant by the petitioner. The

petition shall be based only on objections to the permit that were raised with reasonable specificity during the public comment period provided by the permitting agency (unless the petitioner demonstrates in the petition to the Administrator that it was impracticable to raise such objections within such period or unless the grounds for such objection arose after such period). The petition shall identify all such objections. If the permit has been issued by the permitting agency, such petition shall not postpone the effectiveness of the permit. The Administrator shall grant or deny such petition within 60 days after the petition is filed. The Administrator shall issue an objection within such period if the petitioner demonstrates to the Administrator that the permit is not in compliance with the requirements of this chapter, including the requirements of the applicable implementation plan. Any denial of such petition shall be subject to judicial review under section 7607 of this title. The Administrator shall include in regulations under this subchapter provisions to implement this paragraph. The Administrator may not delegate the requirements of this paragraph.

> 42 U.S.C. § 7661d(b)(2).

An appropriate order follows.

### *ORDER*

AND NOW, this 30th day of June, 2008, Defendants' 12(b)(6) Motion to Dismiss (Document 8) is GRANTED. Because leave to amend would be futile, Plaintiff's request for Leave to File Amendment to Complaint (Document 18) is DENIED.

The Clerk of Court is directed to mark the above-captioned case CLOSED.

E.D.Pa.,2008.
Goodman v. PA D.E.P.
Not Reported in F.Supp.2d, 2008 WL 2682698 (E.D.Pa.)

Not Reported in F.Supp.2d, 2008 WL 2682698 (E.D.Pa.)
**(Cite as: 2008 WL 2682698 (E.D.Pa.))**

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

166 F.3d 1220, 1998 WL 792159 (C.A.10 (N.M.)), 29 Envtl. L. Rep. 20,303, 98 CJ C.A.R. 5899
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 166 F.3d 1220, 1998 WL 792159 (C.A.10 (N.M.)))**

CNOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. See CTA 10 Rule 32.1 before
citing.)

United States Court of Appeals, Tenth Circuit.
AMIGOS BRAVOS, a nonprofit corporation; New
Mexico Citizens for Clean Air and Water, a nonprofit
corporation, Plaintiffs-Appellants,
v.
MOLYCORP, INC., Defendant-Appellee.
**No. 97-2327.**

Nov. 13, 1998.

ANDERSON, BARRETT, and TACHA, C.J.

BARRETT, S.C.J.

ORDER AND JUDGMENT [FN*]

FN* This order and judgment is not binding
precedent, except under the doctrines of law
of the case, res judicata, and collateral es-
toppel. The court generally disfavors the ci-
tation of orders and judgments; nevertheless,
an order and judgment may be cited under
the terms and conditions of 10th Cir. R.
36.3.

*1 After examining the briefs and appellate record,
this panel has determined unanimously to grant the
parties' request for a decision on the briefs without
oral argument. See Fed. R.App. P. 34(f); 10th Cir. R.
34.1.9. The case is therefore ordered submitted with-
out oral argument.

I.

Defendant Molycorp Inc. operates a molybdenum
mine in New Mexico that discharges pollutants into
the Red River. Under the Clean Water Act (CWA),
the discharge of pollutants from a point source [FN1]

into the navigable waters of the United States is pro-
hibited unless authorized by a National Pollution
Discharge Elimination System (NPDES) permit.
See 33 U.S.C. §§ 1311(a), 1342. Molycorp was issued
an NPDES permit in 1977 covering discharges from
three point sources. Because NPDES permits are
valid only for a prescribed period of time, Molycorp
applied to the Administrator of the United States En-
vironmental Protection Agency (EPA) in December
1992 for renewal of its permit. The EPA renewed
Molycorp's NPDES permit in September 1993 after
adding two more point sources to those previously
regulated under Molycorp's permit. The September
1993 permit expired at midnight on October 14,
1998.

FN1. A point source is "any discernible,
confined and discrete conveyance, including
but not limited to any pipe, ditch, channel,
tunnel, conduit, well, discrete fissure, con-
tainer, rolling stock, concentrated animal
feeding operation, or vessel or other floating
craft, from which pollutants are or may be
discharged." 33 U.S.C. § 1362(14).

Plaintiffs are two non-profit corporations whose
members are interested in protecting New Mexico's
water resources. Plaintiffs brought suit against defen-
dant under the citizen suit provisions of the CWA,
alleging that pollutants were being leached from
waste rock piles at defendant's mine and discharged
into the Red River through ground water flow, seeps,
and springs, and that the discharge of these pollutants
was not authorized by an NPDES permit. See 33
U.S.C. § 1365(a) (authorizing suits by citizens
against any person alleged to be in violation of an
effluent limitation or standard or a federal or state
order concerning such limitation or standard). Plain-
tiffs sought several forms of relief, including an order
declaring that defendant was violating the CWA by
failing to obtain an NPDES permit for these dis-
charges, an order enjoining defendant from not com-
plying with the CWA, and an order imposing maxi-
mum civil penalties against defendant for violating
the CWA.

The district court concluded that it did not have sub-
ject matter jurisdiction over plaintiffs' claims because

166 F.3d 1220, 1998 WL 792159 (C.A.10 (N.M.)), 29 Envtl. L. Rep. 20,303, 98 CJ C.A.R. 5899
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 166 F.3d 1220, 1998 WL 792159 (C.A.10 (N.M.)))**

they should have been brought before the court of appeals in connection with the renewal of Molycorp's NPDES permit in 1993. *See* 33 U.S.C. § 1369(b)(1)(F) (providing for exclusive jurisdiction in the court of appeals for review of the EPA Administrator's action in issuing or denying any NPDES permit). We review the district court's dismissal for lack of subject matter jurisdiction de novo. *Chemical Weapons Working Group, Inc. v. United States Dep't of Army*, 111 F.3d 1485, 1491 (10th Cir.1997).

### II.

### A.

To understand the issues before us, we must first examine the permit renewal process. An applicant seeking to renew an existing NPDES permit must submit an application to the EPA Regional Administrator [FN2] before the existing permit expires. *See* 40 C.F.R. § 122.21(d)(2). Once the application is complete, the Regional Administrator makes a tentative decision either to issue or to deny a draft permit. *See id.* § 124.6(a). If the Regional Director decides to prepare a draft permit, the EPA will issue the draft permit and an explanatory fact sheet. *See id.* §§ 124.6, 124.8, 124.56. The Regional Administrator also must give public notice that a draft permit has been prepared and must allow at least thirty days for public comment. *See id.* § 124.10(a)(1)(ii),(b). During the public comment period, any interested person may submit comments on the draft permit and may request a public hearing if no hearing has been scheduled. *See id.* § 124.11. Anyone who believes that any condition of a draft permit is inappropriate must raise all reasonably ascertainable issues and arguments in support of his position before the end of the comment period. *See id.* § 124.13.

> FN2. When, as here, the permitting process is administered by the EPA rather than the state, the Regional Administrator stands as the "Director" referred to in the regulations. *See* 40 C.F.R. § 124.2(a).

*\*2* After the close of the public comment period, the Regional Administrator makes a final decision either to issue, deny, modify, revoke and reissue, or terminate a permit. *See id.* § 124.15. This decision must be based upon the administrative record, which must be complete by the date the final permit is issued. *See id.*

§ 124.18. The Regional Administrator must consider all public comments in making his final decision and must issue a response to all significant comments at the time the final permit decision is issued. *See id.* §§ 124.11, 124.17(a)(2).

The procedural regulations governing the public comment period "are intended to alert the EPA to potential problems with the draft permit and to ensure it has an opportunity to address those problems before the permit becomes final." *Adams v. United States EPA*, 38 F.3d 43, 51 (1st Cir.1994). In promulgating the regulations, the EPA "anticipated that most policy and technical issues would be decided as part of the public comment period, which is the most open, accessible forum possible and which comes at a stage where the Agency has the greatest ability to modify a draft permit." *Id.*

Within thirty days of the final permit decision, any interested person may request an evidentiary hearing to reconsider or contest that decision. *See* 40 C.F.R. § 124.74(a). The Regional Administrator will then decide whether to grant a hearing. *See id.* § 124.75(a). If the Regional Administrator denies a hearing, an appeal may be taken to the Environmental Appeals Board. *See id.* §§ 124.75(b), 124.91. If the Appeals Board denies review, the Regional Administrator's previous decision becomes final. *See id.* §§ 124.60(c)(5), 124.91(f)(1). Once an NPDES permit decision has become final, any interested person may petition the United States Court of Appeals for review of the decision.[FN3] *See* 33 U.S.C. § 1369(b)(1).

> FN3. Although an issue must be raised during the public comment period to be preserved for review, the person petitioning for judicial review need not be the same person who raised the issue during the comment period. *See Adams*, 38 F.3d at 52 n. 7.

### B.

During the period of public comment on Molycorp's draft permit, the EPA received numerous comments about Molycorp's discharge of pollutants into the Red River via ground water and seeps, and the need to regulate these discharges under the NPDES permit program. Several commenters requested that the EPA hold a public hearing on the draft permit. The most comprehensive comment was submitted by the Land

166 F.3d 1220, 1998 WL 792159 (C.A.10 (N.M.)), 29 Envtl. L. Rep. 20,303, 98 CJ C.A.R. 5899
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 166 F.3d 1220, 1998 WL 792159 (C.A.10 (N.M.)))**

and Water Fund, which specifically argued that seeps draining from the waste rock piles should be regulated under the NPDES permit program. The Land and Water Fund also expressed concerns about water draining from the waste rock piles into the mine's upper underground workings, which might then discharge into the Red River without ever reaching the surface.

The EPA issued Molycorp's final NPDES permit without holding a public hearing and without including in the permit the discharges at issue here. In its response to comments, the EPA explained its position as follows:

**\*3Response No. 9:**

While EPA understands the concern of these commenters for the possible impact of ground water seepage on the Red River, we do not agree that these are "point sources" under the NPDES permitting program. Ground water is regulated by the State through the [New Mexico Environment Department].

We are familiar with the case law citation[FN4] which relates to EPA authority to require construction and control of *surface* discharges (proscribed "point sources" of pollution) in instances where the operator has not applied the proper control and construction to the sources. However, the issue of seepage of groundwater which may have infiltrated through porous soil is a different matter. We recommend that the commenters continue to pursue this issue through the [New Mexico Environment Department].

> FN4. Some of the comments cited *Sierra Club v. Abston Construction Co.*, 620 F.3d 41 (5th Cir.1980), as support for the contention that seepage from mining pits and collection ponds is subject to regulation under the NPDES permitting program.

Appellant's App., Vol. I at 110. None of the commenters sought further administrative or judicial review of the EPA's final permit decision.

C.

The district court examined the issues raised in the permitting process to decide whether it had jurisdiction over the present action. The court determined that, "[w]ithout question, the EPA made a decision that Molycorp did not need a permit for any ground water seepage into the Red River, regardless of whether Molycorp's operations polluted the ground water and, eventually, the river. Because of this determination, the permit that the EPA reissued to Molycorp contained no regulation of ground water seepage." *Id.* at 34. The court also concluded that, "[a]t its core, plaintiffs' complaint attacks the EPA's decision to reissue Molycorp's NPDES permit without regulating ground water seepage into the Red River." *Id.* Therefore, the court held that plaintiffs should have been brought their claims in a petition for review under 33 U.S.C. § 1369(b)(1)(F), and could not now litigate their claims in the district court under the citizen suit provisions.

III.

On appeal, plaintiffs contend that the 1993 permitting process would not have provided them a proper basis for seeking judicial review of their claim that Molycorp is violating the CWA by discharging pollutants from its waste rock piles without an NPDES permit. Plaintiffs focus primarily on the language of 33 U.S.C. § 1369(b)(1)(F), which provides for "[r]eview of the Administrator's action ... in issuing or denying any [NPDES] permit," and advance several arguments in support of their theory.[FN5]

> FN5. In the district court, plaintiffs argued that it would be unjust to prohibit them from pursuing the present suit because they did not actually participate in the public comment process in 1993. The district court rejected this argument, and plaintiffs' opening brief does not challenge this aspect of the district court's ruling. Therefore, we will deem the issue waived. *See State Farm Fire & Cas. Co. v. Alborn*, 31 F.3d 979, 984 n. 7 (10th Cir.1994).

First, plaintiffs argue that the EPA could not have taken any "action" on the waste rock pile discharges during the permit renewal process because the agency did not follow all the procedures necessary to include these discharges in the final NPDES permit. The EPA's failure to include the waste rock pile dis-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

166 F.3d 1220, 1998 WL 792159 (C.A.10 (N.M.)), 29 Envtl. L. Rep. 20,303, 98 CJ C.A.R. 5899
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 166 F.3d 1220, 1998 WL 792159 (C.A.10 (N.M.)))

charges in the initial draft permit or accompanying fact sheet did not preclude the agency from making a decision about the propriety of regulating these discharges, however. That the regulations provide for public comment and subsequent modification of the draft permit, if necessary, reflects an expectation that the initial draft permit and fact sheet may not consider everything that will ultimately be included in the final permit. *See id.* §§ 124.14(b), 124.15. Further, if plaintiffs are correct that the public comments raised "substantial new questions" that should have prompted the EPA to take further action under 40 C.F.R. § 124.14(4)(b), plaintiffs could have challenged the agency's failure to take such action had they sought administrative and judicial review of the final permit decision. *See, e.g., Webb v. Gorsuch,* 699 F.2d 157, 158-59 (4th Cir.1983) (reviewing challenges to EPA's response to comments and its failure to hold public hearing).

*4 Next, plaintiffs argue that Response No. 9 concerned on ground water issues other than discharges from the waste rock piles and, therefore, the agency did not actually consider the discharges at issue here. Our examination of the public comments and the EPA's response thereto shows otherwise. Moreover, because the issue of waste rock pile drainage was raised in the public comments, plaintiffs could have challenged any failure to adequately address this issue had they sought review of the final permit decision. *See Adams,* 38 F.3d at 52 (discussing EPA's duty to respond to public comments).

Third, plaintiffs argue that the EPA did not take any "action" on the waste rock pile discharges because Response No. 9 neither issued, denied, nor required an NPDES permit for these discharges, nor threaten any such action. Plaintiffs also contend that judicial review of the decision stated in Response No. 9 would not have been appropriate because "[n]one of the specific clauses enumerated in 33 U.S.C. § 1369(b)(1) actually describe EPA's issuance of responses to comments." Appellant's Opening Br. at 24.

Again, plaintiffs misunderstand the procedural scheme. Once the EPA took final action by issuing the NPDES permit, the decisions the EPA made about the issues raised in the public comments became reviewable under 33 U.S.C. § 1369(b). *See Webb,* 699 F.2d at 161-62 (reviewing EPA's response

to comments); *cf.5 U.S.C. § 704* ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."); *Citizens for Clean Air v. United States EPA,* 959 F.2d 839, 846 (9th Cir.1992) (reviewing adequacy of EPA's response to petitioner's comments). The cases plaintiffs cite to establish that judicial review under § 1369(b) would have been premature are inapposite; they involve no final agency action whatsoever. *See, e.g., Appalachian Energy Group v. EPA,* 33 F.3d 319, 321-22 (4th Cir.1994) (declining to exercise jurisdiction over petition seeking review of internal EPA memorandum that did not involve or relate to any decision to issue or deny a permit).

Finally, plaintiffs argue that Response No. 9 did not correctly state the EPA's actual position on ground water discharges that were hydrologically connected to surface water. The accuracy of the statements in Response No. 9 is irrelevant to the jurisdictional question at issue here. If the position the EPA stated in Response No. 9 conflicted with the position it had stated elsewhere, plaintiffs could have challenged this discrepancy through administrative and judicial review of the final permit decision.

IV.

In sum, we agree with the district court that plaintiffs should have pursued their present claims during the 1993 permit renewal process. Having failed to do so, plaintiffs may not now use the vehicle of the CWA's citizen suit provisions to challenge Molycorp's discharge of pollutants from its rock waste piles without an NPDES permit.

*5 The judgment of the United States District Court for the District of New Mexico is AFFIRMED. Defendant's motion to strike Volume II of Appellants' Appendix is DENIED as moot.

C.A.10 (N.M.),1998.
Amigos Bravos v. Molycorp, Inc.
166 F.3d 1220, 1998 WL 792159 (C.A.10 (N.M.)), 29 Envtl. L. Rep. 20,303, 98 CJ C.A.R. 5899

END OF DOCUMENT

Westlaw

33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.)))**

H NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. See CTA4 Rule 32.1.

United States Court of Appeals, Fourth Circuit.
SUGARLOAF CITIZENS ASSOCIATION; Audu-
bon Naturalist Society of the Central Atlantic States;
Dickerson-Beallsville Coalition; Kenneth Cox;
Tracey Morgan; Gayle Morgan; Jane Hunter; J.
Houston Miller; John Snitzer; Karen Kalla; Beverly
Thomas, Plaintiffs-Appellants,
v.
MONTGOMERY COUNTY, MARYLAND; North-
east Maryland Waste Disposal Authority, Defen-
dants-Appellees.
**No. 93-2475.**

Argued May 9, 1994.
Decided August 17, 1994.

Appeal from the United States District Court for the
District of Maryland, at Baltimore. William M. Nick-
erson, District Judge. (CA-93-1023-WN)
Mick G. Harrison, Government Accountability Pro-
ject, Washington, D.C., for appellants.

Deborah Eileen Jennings, Piper & Marbury, Balti-
more, MD, for appellees.

Richard E. Condit, Washington, DC, for appellants.

Roger D. Redden, Piper & Marbury, Baltimore, MD,
for appellee Northeast Maryland Waste Disposal Au-
thority.

Joyce R. Stern, County Attorney, A. Katherine Hart,
Senior Asst. County Atty., Diane R. Schwartz Jones,
Associate County Atty., Rockville, Maryland, for
appellee Montgomery County.

D.Md.

AFFIRMED.

Before WILLIAMS, Circuit Judge, PHILLIPS, Sen-
ior Circuit Judge, and ERWIN, Senior United States
District Judge for the Middle District of North Caro-
lina, sitting by designation.

OPINION

WILLIAMS, Circuit Judge:

*1 In this appeal, we review the propriety of the dis-
trict court's invocation of the *Burford*[FN1] abstention
doctrine to avoid federal judicial interference in on-
going proceedings under a complex state regulatory
scheme, and the court's attendant dismissal of the
complaint. Finding no error, we affirm. However,
because the dismissal order should not operate as an
adjudication on the merits, we amend the dismissal
order to reflect that the dismissal is without prejudice.

I.

This controversy centers around a partially completed
resource recovery waste-to-energy incinerator facility
in Montgomery County, Maryland (the "County").
The facility is being built by the County and the
Northeast Maryland Waste Disposal Authority
("NMWDA"), and is designed to dispose of munici-
pal solid waste while generating electricity, which
may then be sold to a utility. The Maryland Depart-
ment of the Environment ("MDE") issued the requi-
site "Permit to Construct" and "Refuse Disposal
Permit" to the County and NMWDA in February
1993. Construction on the facility began in March
1993, and completion is targeted for 1995.

Since 1988, the Sugarloaf Citizens' Association
("Sugarloaf"),[FN2] a community environmental or-
ganization with members throughout Montgomery
County, has spearheaded efforts to insure strict com-
pliance with regulations governing the construction
and operation of such waste facilities. To that end,
Sugarloaf has engaged in an extensive campaign,
using the procedures outlined in the State's compre-
hensive regulatory scheme, to challenge the permits
issued for the facility. Sugarloaf's efforts have in-
cluded the presentation of adverse testimony at every

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.)))**

public hearing on the County's solid waste management options and on the issuance of various environmental permits, the initiation of a month-long adjudicatory hearing before a state administrative law judge ("ALJ") about the propriety of the permits' issuance,[FN3] the filing of objections with the Secretary of MDE to the ALJ's recommendation of permit issuance, the presentation of briefs and oral argument before the Secretary, a motion for reconsideration of the Secretary's acceptance of the ALJ's recommendation, and an appeal of MDE's decision to the Circuit Court for Montgomery County.

On April 7, 1993, twelve days after noting its appeal of MDE's decision to the Maryland Circuit Court, Sugarloaf filed this action in federal district court, pursuant to the federal citizen suit provisions of the Clean Air Act ("CAA"), 42 U.S.C.A. § 7604(a)-(f) (West 1983 & Supp.1994), and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)-(g) (West 1983 & Supp.1994). The four-count complaint alleged the same claims previously adjudged in the state administrative proceedings and on appeal before the Montgomery County Circuit Court: Count I, inadequate ozone-forming pollutant emission offsets in violation of the 1990 CAA amendments; Count III, failure to "size" the facility for adequate recycling under RCRA; and Count IV, Appellees' failure to include source separation, waste reduction, and recycling as part of their best available control technology analysis. The complaint also included a state law cause of action for nuisance, Count II. According to Sugarloaf, these alleged violations of federal statutes require invalidation of the Permit to Construct and the Refuse Disposal Permit issued by MDE. Sugarloaf also contends that the federal statutes compel the use of pollution control technologies not contemplated by the permits, as well as the performance of certain tests and demonstrations prior to any subsequent permit issuance for that facility.

*2 The County and NMWDA moved to dismiss the complaint. Relying on *Burford* and this Court's decision in *Palumbo v. Waste Technologies Indus.*, 989 F.2d 156 (4th Cir.1993), the district court found that Sugarloaf's "cause of action is a collateral challenge to the permitting decisions of the Maryland state environmental agencies," and abstained in favor of the proceedings still pending before the Montgomery County Circuit Court. (J.A. at 92.) The complaint was dismissed, and Sugarloaf filed a timely appeal to

this court.

On February 10, 1994, approximately four months after the district court dismissed the federal complaint and three months prior to oral argument before this panel, the Montgomery County Circuit Court dismissed Sugarloaf's appeal of MDE's permitting decision for lack of standing. An appeal of that dismissal is presently before the Maryland Court of Special Appeals.

II.

This court is obligated to consider cases and controversies properly placed before it. U.S. Const. art. III. § 2. "When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction...." *Willcox v. Consolidated Gas Co.*, 212 U.S. 19, 40 (1909). "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

Nevertheless, there are qualifications to this principle, certain limited circumstances in which this " 'virtually unflagging obligation' " [FN4] is averted in order to prevent unwarranted federal interference in state interests. *See generally* 17A Charles A. Wright et al., *Federal Practice and Procedure* § 4241 (2d ed.1988). These circumstances, referred to as the abstention doctrines, are "the exception, not the rule, and can only be justified in exceptional cases." *Neufeld v. City of Baltimore*, 964 F.2d 347, 349 (4th Cir.1992). It is the application of the *Burford* abstention doctrine that we examine here.

In *Burford*, the Sun Oil Company instituted a federal action challenging the decision of the Texas Railroad Commission to allow Burford drilling rights on a small plot of land in an East Texas oil field. The permits were issued under a complicated regulatory system established under Texas law in furtherance of that State's substantial policies and interests in the conservation of its oil and gas resources. Because "[d]elay, misunderstanding of local law, and needless federal conflict with the State policy, are the inevitable product of [the] double system of review" created by the exercise of federal jurisdiction, the Court concluded that "a sound respect for the independence of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.)))**

state action requires the federal equity court to stay its hand." *Burford*, 319 U.S. at 327, 334.

The Supreme Court has recently "distilled" the doctrine represented by the *Burford* decision into the following formulation:

**\*3** Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) ("*NOPSI* ") (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)). Our most recent decision involving the *Burford* doctrine concluded:

In cases in which plaintiffs' federal claims stem solely from construction of state or local land use or zoning law, not involving the constitutional validity of the same and absent exceptional circumstances not present here, the district courts should abstain under the *Burford* doctrine to avoid interference with the State's or locality's land use policy.

*Pomponio v. Fauquier County Bd. of Supervisors*, No. 91-1107, slip op. at 17 (4th Cir. Apr. 15, 1994) (en banc).

It is against this background that we must decide whether the district court erred in abstaining under the *Burford* doctrine.[FN5]

A.

This case centers on the permitting of a waste facility that may affect Maryland's environment, a matter of obvious public import with significant repercussions transcending the results of this litigation. *NOPSI*, 491 U.S. at 361;*see Ada-Cascade Watch Co. v. Cascade Resource Recovery, Inc.*, 720 F.2d 897, 904 (6th

Cir.1983) (Michigan has "overriding interest in the protection of its environment from the effects of unregulated hazardous wastes."). Proper disposition of the case will require resolution of difficult issues pertaining to the use of land within Montgomery County, Maryland, issues which "are the peculiar concern of local and state governments, and traditionally, federal courts have not interfered with state courts in the area of land use policy." *Browning-Ferris, Inc. v. Baltimore County*, 774 F.2d 77, 79 (4th Cir.1985) (renewal of refuse disposal permits for land fills); *see also* 42 U.S.C.A. § 7401(a)(3) (West Supp.1994) ("[A]ir pollution prevention [and] ... control at its source is the primary responsibility of States and local governments."); *Pomponio*, slip op. at 15 (questions of state and local land use law are "classic" *Burford* situations); *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal*, 945 F.2d 760, 763-64 (4th Cir.1991) (annexation and sewer services), *cert. denied*,112 S.Ct. 1477 (1992). Hence, the first *NOPSI* prong is applicable to this case.

Within its extensive Environment Article, Maryland instituted a comprehensive scheme for environmental permit applications, issuance, and review, aimed at establishing the kind of coherent State policy for the protection of its vital environmental interests that the Supreme Court referred to in the second prong of *NOPSI*, 491 U.S. at 361. Proper environmental permits must be obtained prior to the construction, installation, or operation of an incinerator or other facility capable of causing or controlling emissions into the air. Md. Envir. Code Ann. §§ 2-401, 9-204(d), (h) (1993 Repl.Vol.). Permit applications must include environmental impact statements; complete plans and specifications for the proposed facility; application forms, drawings, vendor proposals and guarantees, literature, and purchase specifications for all equipment to be used at the facility; area maps and descriptions (including distance to residences); alternative site sizes, production processes, and environmental control techniques; demonstrated compliance with applicable State workers' compensation laws; and any other information that MDE deems "necessary to determine whether the source or installation can operate in continuous compliance" with Maryland's environmental laws. Md. Envir. Code Ann. § 9-204(c); Md. Regs.Code tit. 26, § 11.02.09. Applicants for incinerator-related permits must provide additional information, including descriptions of pollution prevention and liquid waste treatment or disposal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.)))**

procedures; operational and maintenance manuals; methods for segregating and handling unacceptable waste; and detailed engineering plans for the facility and all related machinery. Md. Regs.Code tit. 26, § 04.07.25.B. Prospective permittees must also comply with an additional index of operating procedures and periodic reporting requirements. Md. Regs.Code tit. 26, § 04.07.25.E.

**\*4** Permit applications are then subjected to a preliminary technical review by MDE, Md. Envir. Code Ann. § 9-210(a)(1) (1993 Repl.Vol.), review by the county in which the facility is to be located for conformity with applicable county zoning and land use requirements and solid waste plans, Md. Envir. Code Ann. § 9-210(a)(3), and public [FN6] and adjudicatory hearings. Md. Envir. Code Ann. §§ 1-605, 1-606 (1993 Repl.Vol.), before final issuance of a permit by the Secretary of MDE. Md. Envir. Code Ann. §§ 1-602, 2-404 (1993 Repl.Vol.). Decisions of the Secretary or a designated hearing officer are directly appealable to the State courts. Md. Envir. Code Ann. § 1-606(g)(2).

Finally, issued permits are subject to continued review for purposes of renewal, alteration or extension of existing facilities, or installation of new systems at existing facilities. Md. Envir. Code Ann. §§ 9-213, 9-221 (1993 Repl.Vol.). The complexity of Maryland's permitting scheme rivals that of Michigan, which was deemed by the Sixth Circuit to be "a complex and systematic process to evaluate facilities which will have an impact on the environment" warranting the invocation of *Burford* abstention. *Ada-Cascade Watch Co.*, 720 F.2d at 905.

Of course, it is true that the mere presence of a complex state or local regulatory scheme does not mandate abstention. *NOPSI*, 491 U.S. at 361. Similarly, "a final appeal to a central administrative court with special expertise and jurisdiction to decide only certain kinds of cases is not an absolute prerequisite for the application of *Burford* abstention." *Browning-Ferris*, 774 F.2d at 89. In this case, however, we find that Maryland's "complex state regulatory scheme" satisfies *Burford* by providing "impartial and fair administrative determinations subject to expeditious and adequate judicial review" in these "important matters of state policy." *Id.* at 79 (quoting *Aluminum Co. v. Utilities Comm'n*, 713 F.2d 1024, 1029 (4th Cir.1983), *cert. denied,* 465 U.S. 1052 (1984)). The

exercise of federal jurisdiction over MDE's permitting decisions would disrupt Maryland's complex statutory scheme and frustrate the State's efforts to establish a coherent environmental policy, thereby warranting *Burford* abstention under the second prong of *NOPSI* as well. [FN7]

B.

In opposition to *Burford* abstention, Sugarloaf argues that, because its CAA and RCRA claims are within the exclusive jurisdiction of the federal judiciary, abstention by the district court precludes judicial review of those federal claims. *See Brandenburg,* 859 F.2d at 1192-95 (discussing civil RICO claims).

" '[T]he presence of federal-law issues must always be a major consideration weighing against surrender' [of federal jurisdiction]. ... [a] consideration [that] is even more significant when federal jurisdiction is exclusive." *Kruse v. Snowshoe Co.,* 715 F.2d 120, 124 (4th Cir.1983) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 26 (1983)), *cert. denied,* 465 U.S. 1065 (1984). If Sugarloaf's claims are indeed subject to exclusive federal jurisdiction, then the presence of the *NOPSI* circumstances discussed above would not warrant *Burford* abstention, because of the absence of available "timely and adequate state-court review" for those federal claims. *NOPSI,* 491 U.S. at 361. We need not consider whether the federal citizen suit provisions of CAA and RCRA contemplate exclusive federal jurisdiction, however, because our count-by-count examination of the substance of Sugarloaf's complaint, as undertaken in similar circumstances by this court in *Palumbo,* 989 F.2d at 160-61, leads us to the conclusion that Sugarloaf is merely attempting a collateral attack of MDE's permitting decisions.

**\*5** Count I of Sugarloaf's complaint alleges that the proposed facility does not comply with CAA's required lowest achievable emission rate for ozone pollution because it does not account for offsets that are required to be obtained upon the facility's operation. Examination of the provisions cited in support of this offset obligation, 42 U.S.C.A. § 7503(a)(2), (3), (5) (West 1983 & Supp.1994), reveals that such setoffs are a prerequisite for the issuance of construction permits for stationary pollutant emission sources, which in turn are required of all state implementation plans for nonattainment areas [FN8] under 42 U.S.C.A.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.)))**

§ 7502(c)(5) (West Supp.1994). Sugarloaf does not allege that Maryland's regulatory scheme fails to incorporate this federal statutory minimum requirement. See 42 U.S.C.A. § 7511(a)(a)(2)(C) (States bear responsibility of incorporating new ozone control requirements in state implementation plans) (West 1983 & Supp.1994); see also 42 U.S.C.A. § 7401(a)(3).

Rather, Sugarloaf's complaint claims that the failure of the County and NMWDA to comply with the offset obligation invalidates the permits because MDE, as the permitting authority, should not have issued the permits without first insuring full and proper compliance with the offset requirement. Hence, in effect, Count I is "simply [an] expression[ ] of displeasure with the alleged inadequacies of [MDE] review." Palumbo, 989 F.2d at 160. Count I is actually an objection to a state agency's findings under state law, and "nothing more than a collateral attack on the prior permitting decisions of" MDE. Palumbo, 989 F.2d at 159. As such, that claim is not actionable under CAA.[FN2] Moreover, a federal court's consideration of Count I would necessarily entail a determination of Appellees' compliance with the offset requirement and their ensuing eligibility for the permits, issues central to state land use control which federal courts are ill-equipped to resolve. Browning-Ferris, 774 F.2d at 80. Burford abstention remains appropriate.

Count III contends that Appellees failed to "size" the proposed facility for present and anticipated future recycling needs, consistent with the RCRA requirement in 42 U.S.C.A. § 6943(d) (West Supp.1994):

[I]t is the intention of this chapter and the planning process developed pursuant to this chapter that in determining the size of the waste-to-energy facility, adequate provision shall be given to the present and reasonably anticipated future needs of the recycling and resource recovery interest within the area encompassed by the planning process.

This provision, notably expressing a congressional intent as opposed to a minimum prerequisite for obtaining RCRA federal funding for solid waste disposal plans, is addressed to the state planning process, not individual permittees. Sugarloaf does not argue that Maryland's planning process fails to consider these recycling needs. Instead, Count III masks,

in RCRA language, a claim that MDE erred by issuing permits to the County and NMWDA despite their alleged "sizing" violation. Sugarloaf is essentially arguing that MDE erred in its "sizing" determination. Here again, Sugarloaf has unsuccessfully cloaked another collateral challenge to MDE's permitting decision as a federal statutory claim. Such a permitting challenge is more appropriately addressed by Maryland's administrative and judicial procedures specifically designed for that purpose, rather than by a federal law suit.

**\*6** Federal review of MDE's issuance of permits would violate this court's recent pronouncement that "federal courts should not leave their indelible print on local and state land use ... law by entertaining these cases and, in effect, sitting as a zoning board of appeals, ... or a Planning Commission, or Board of Supervisors." Pomponio, slip op. at 15.

Count IV cites an alleged failure to comply with CAA and Maryland statutory requirements that the facility include the "best available control technology," or BACT, including source separation, waste reduction, and recycling. The CAA does impose a preconstruction requirement that all proposed waste facilities contain the BACT. 42 U.S.C. § 7475(a)(4) (1988). However, that term is defined according to "emission limitation[s] ... which the permitting authority, on a case-by-case basis, ... determines is achievable for such facility through application of production processes and available methods, systems, and techniques" for the control of regulated pollutants. 42 U.S.C.A. § 7479(3) (West Supp.1994) (emphasis added). In other words, the determination of the BACT for a particular facility and the compliance therewith by potential permittees is again a preliminary finding MDE is required to make before issuing a permit. Sugarloaf does not allege that Maryland failed to implement CAA's BACT requirement. Instead, Count IV claims that MDE's BACT determination for this particular facility and Appellees' compliance with the appropriate BACT was lacking, again challenging the substantive basis for MDE's permitting decision. The CAA federal citizen suit provision does not allow such a challenge, and a federal court should abstain from rendering such review. Palumbo, 989 F.2d at 159.

Finally, given our conclusion that Sugarloaf has failed to invoke the federal jurisdiction contemplated

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.)))**

by the CAA or RCRA federal citizen suit provisions, there is no basis for federal jurisdiction over the remaining allegation in Count IV of a Maryland statutory violation or the state claim for nuisance set forth in Count II. 28 U.S.C.A. § 1367(c)(3) (West 1993).

Sugarloaf's complaint, dressed in the raiments of federal claims, does nothing more than resurrect in a different forum objections to a proposed incinerator that have already been litigated before a state ALJ and the Secretary of MDE. "Plaintiffs cannot launch a grapeshot collateral attack on the permitting decisions of[an agency]-invoking RCRA, the Clean Air Act, [state] hazardous waste laws, and the common law of nuisance-and hope that one of these shots will land them in a federal district court." *Palumbo*, 989 F.2d at 161; *see also Ada-Cascade Watch Co.*, 720 F.2d at 905 (refusing to "second-guess" state agency's permitting decision for a hazardous waste facility in context of RCRA citizen suit). Sugarloaf makes no constitutional challenge to Maryland's statutory permitting scheme, *see Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 788 n. 10 (4th Cir.1991) (abstention inappropriate in constitutional challenge to regulations within complex state regulatory scheme), or objection to Maryland's environmental permitting policy, *see Neufeld*, 964 F.2d at 350 (*Burford* abstention inappropriate merely because resolution of federal question may result in overturning state policy). The district court was faced solely with state land use issues. "[W]e have held that, absent unusual circumstances, a district court should abstain under the *Burford* doctrine from exercising its jurisdiction in cases arising solely out of state or local ... land use law, *despite attempts to disguise the issues as federal claims*." *Pomponio*, slip op. at 15-16 (emphasis added) (footnote omitted). With no exceptional circumstances present, the district court properly exercised its discretion under *Pomponio* in abstaining pursuant to the *Burford* doctrine. *Id.* at 17.

*7 Moreover, the absence of a properly asserted federal citizen suit under CAA or RCRA precludes any suggestion that state court review would deprive Sugarloaf of an adjudication on the merits of any claim asserted in its complaint. Hence, the presence of both *NOPSI* circumstances, as found above in section II. A., renders *Burford* abstention mandatory in this case. At best, this case represents "a claim that a state agency has misapplied its lawful authority or

has failed to take into consideration or properly weigh relevant state-law factors," circumstances deemed amenable by the *NOPSI* Court to *Burford* abstention. 491 U.S. at 362.

III.

Notwithstanding the district court's proper invocation of *Burford* abstention, we must modify the dismissal order to reflect the proper dispositive stance of this case. Dismissal is indeed "the appropriate course of action in a *Burford* abstention case." *Pomponio*, slip op. at 17. However, as it presently stands, the district court's final order does not specify the mode of dismissal contemplated, and therefore operates as an adjudication on the merits. Fed.R.Civ.P. 41(b). That disposition would preclude any judicial review as to the merits of the facts underlying Sugarloaf's erroneous invocation of the federal citizen suit provisions of CAA and RCRA and, potentially, any other viable federal claim under those acts. Hence, we amend the dismissal order to reflect a dismissal *without* prejudice.

At oral argument, the suggestion was made that, rather than amending the dismissal order, this court vacate that order and remand the case with instructions to the district court to hold the case in abeyance pending full review in Maryland's appellate courts of Sugarloaf's objections to the permit's issuance. Although dismissal is typically required in *Burford* cases, in certain limited circumstances, an abstaining district court may retain federal jurisdiction "in order to insure a just disposition of [the] litigation should anything prevent a prompt state court determination." [FN9] *Kaiser Steel Corp. v. W.S. Ranch Co.*, 391 U.S. 593, 594 (1968); *see also Ankenbrandt v. Richards*, 112 S.Ct. 2206, 2216 n. 8 (1992).

We decline the request to order that this case be held in abeyance, thereby retaining federal jurisdiction, for two reasons. First, dismissal is more consistent with "the object of *Burford* abstention ... to avoid disruption of a comprehensive state regulatory apparatus." *Brandenburg*, 859 F.2d at 1195 n. 18. Second, and perhaps more obvious, our conclusion herein that Sugarloaf has failed properly to invoke the federal citizen suit provisions of CAA and RCRA precludes exercise of federal jurisdiction over Sugarloaf's complaint. We note, consistent with *Brandenburg*, that this disposition does not prejudice Sugarloaf's right to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

pursue either the claims asserted herein in subsequent state court proceedings or new federal claims, properly invoked under the federal citizen suit provisions of CAA and RCRA, in a subsequent federal action. *See id.*

IV.

***8** For the reasons stated herein, we modify the district court's dismissal order to reflect dismissal without prejudice and affirm its decision to abstain from interfering in Maryland's complex environmental permitting regulatory scheme.

*AFFIRMED AS MODIFIED*

FN1. *Burford v. Sun Oil Co.,* 319 U.S. 315 (1943).

FN2. Other Appellants in this case include the Audubon Naturalist Society of the Central Atlantic States, the Dickerson-Beallsville Coalition, and several individuals. We refer to all Appellants hereinafter as Sugarloaf.

FN3. This trial-like proceeding was conducted after Sugarloaf's ultimate success on a motion for declaratory judgment originally denied by the Circuit Court for Baltimore City. *Sugarloaf Citizens' Ass'n v. Northeast Md. Waste Disposal Auth.,* 594 A.2d 1115 (Md.1991).

FN4. *Deakins v. Monaghan,* 484 U.S. 193, 203 (1988).

FN5. Our court has held that the invocation of *Burford* abstention is a discretionary act subject to a review only for abuse. *See, e.g., Pomponio,* slip op. at 9. In supporting its abuse of discretion review of the invocation of *Burford* abstention, the *Pomponio* court cited *Richmond, Fredericksburg & Potomac R.R. v. Forst,* 4 F.3d 244, 250-51 (4th Cir.1993), which in turn cited *Brandenburg v. Seidel,* 859 F.2d 1179, 1195 (4th Cir.1988), a *pre-NOPSI* decision. *Id.*

In *NOPSI,* the Supreme Court required abstention under the two enumerated circumstances, 491 U.S. at 361 ("a federal court sitting in equity *must* decline to interfere with" state proceedings) (emphasis added). Thus, it would seem at least arguable that, in either of the circumstances described in *NOPSI,* a district court's failure to abstain under *Burford,* as mandated by *NOPSI,* would be a legal error subject to *de novo* review. *See Farmer v. Employment Sec. Comm'n,* 4 F.3d 1274, 1279 (4th Cir.1993). The *Pomponio* court recognized the mandatory nature of *Burford* abstention as enunciated in *NOPSI,* but did not address its ensuing implication on the applicable standard of review. *See id.* at 12 ("[T]he Supreme Court has directed that in the two situations it has described [in *NOPSI* ], a federal court must decline to exercise its jurisdiction under the *Burford* abstention doctrine....").

We save for another day the resolution of the question of the appropriate standard of review for *NOPSI* abstention cases. In this case, in order to satisfy both positions, we have conducted a *de novo* review of the record, with particular attention to Sugarloaf's complaint, to determine whether the district court complied with its mandatory *NOPSI* obligation and whether, if *NOPSI* is inapplicable, the court otherwise properly acted within its discretion.

FN6. MDE is required to publish notice of all permit applications and, if a timely request is made thereafter, to conduct a public informational meeting concerning the application. Md. Envir. Code Ann. § 1-603(a), (c) (1993 Repl.Vol.). Additional public hearings must be conducted, upon request, after MDE makes a tentative determination to issue a permit. Md. Envir. Code Ann. §§ 1-604(a), 2-404(b) (1993 Repl.Vol.).

FN7. The fact that Sugarloaf is simultaneously pursuing state appellate review of MDE's permitting decision does not, by itself, warrant abstention, even under the abstention doctrine established by the Supreme Court in *Younger v. Harris,* 401 U.S. 37

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.)))**

(1971).

[I]t has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States.

*NOPSI*, 491 U.S. at 368. However, we find that the presence of ongoing state appellate review, implemented as part of the review process within a complex state regulatory scheme aimed at establishing a coherent state policy as to matters of substantial public interest, lends further credence to the invocation of the *Burford* abstention doctrine. See *Colorado River*, 424 U.S. at 815 (federal judicial review of permit otherwise subject to elaborate state review system "would have had an impermissibly disruptive effect on state policy"); *Aluminum Co.*, 713 F.2d at 1029 n. 2 (admonishing against interference with state appellate proceedings because it is "more highly duplicative" and "a direct aspersion on the capabilities and good faith of state appellate courts" (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 608 (1975))).

FN8. A nonattainment area is a geographic region "that does not meet ... the national primary or secondary ambient air quality standard" for a particular controlled pollutant. 42 U.S.C.A. § 7407(d)(1)(A)(i) (West Supp.1994).

FN9. The CAA federal citizen suit provisions applicable to this case authorize actions against persons allegedly violating an "emission standard or limitation," 42 U.S.C.A. § 7604(a)(1), or constructing a major emitting facility without a permit, 42 U.S.C.A. § 7604(a)(3). This case presently involves neither scenario, since Appellees have all of the permits required for the construction of this facility and, until construction is completed in 1995, can neither begin

emissions nor violate any emissions standard. See *Wilder v. Thomas*, 854 F.2d 605, 613-14 (2d Cir.1988) (CAA citizen suit provisions unavailable for challenges to actions that are valid under applicable state implementation plans), *cert. denied*, 489 U.S. 1053 (1989).

Because of our conclusion with regard to Sugarloaf's invocation of the CAA federal citizen suit provision, we do not consider the merits of Appellees' affirmative defense that, because the permits for this facility were issued prior to the implementation of the new ozone offset requirements, the permits are excused from the offset requirements under Maryland's still-pending proposed amendments to its state implementation plan.

FN10. Although the majority in *Kaiser Steel* did not identify the abstention doctrine applied in that case, it was characterized as a *Burford* abstention case by the three concurring justices and the Court's subsequent opinion in *Colorado River*, 424 U.S. at 814.17A Wright et al., *Federal Practice and Procedure* § 4245 n. 8.

C.A.4 (Md.),1994.
Sugarloaf Citizens Ass'n v. Montgomery County, Md.
33 F.3d 52, 1994 WL 447442 (C.A.4 (Md.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Not Reported in F.Supp.2d, 2008 WL 5110894 (W.D.N.C.), 69 ERC 1021
**(Cite as: 2008 WL 5110894 (W.D.N.C.))**

H Only the Westlaw citation is currently available.

United States District Court, W.D. North Carolina,
Asheville Division.
SOUTHERN ALLIANCE FOR CLEAN ENERGY;
Environmental Defense Fund; National Parks Conservation Association; Natural Resources Defense
Council; and Sierra Club, Plaintiffs,
v.
DUKE ENERGY CAROLINAS, LLC, Defendant.
**Civil No. 1:08CV318.**

Dec. 2, 2008.

West KeySummary
**Environmental Law 149E ☜269**

149E Environmental Law
    149EVI Air Pollution
        149Ek266 Particular Sources of Pollution
            149Ek269 k. Power-Generating Facilities;
Utilities. Most Cited Cases
Energy company was found liable for failing to satisfy the maximum achievable control technology
("MACT") requirements of the Clean Air Act before
starting construction on a new coal-fired power plant.
The company had refused to participate in an MACT
assessment before beginning construction. The court
gave the company the opportunity comply with the
requirements and withheld imposing injunctive relief
which would stop construction. Clean Air Act, §
112(g)(2)(B), 42 U.S.C.A. § 7412(g)(2)(B); 40
C.F.R. § 63.40(b).

Benjamin Hoyt Longstreth, Natural Resources Defense Council, Washington, DC, John Timothy Suttles, Jr., Chapel Hill, NC, James Blanding Holman,
IV, Charleston, SC, Aaron Michael Bloom, Mitchell
Seth Bernard, Nancy Sharman Marks, Natural Resources Defense Council, New York, NY, for Plaintiffs.

Kenneth D. Bell, Nash E. Long, III, T. Thomas
Cottingham, III, Hunton & Williams, Charlotte, NC,
for Defendant.

*MEMORANDUM AND ORDER*

LACY H. THORNBURG, District Judge.

**\*1 THIS MATTER** came on for hearing before the
Court on the parties' respective motions for summary
judgment and to dismiss on October 16, 2008. After
hearing argument of counsel and reviewing the materials submitted in support of these motions, this matter is now ripe for disposition.

**I. PROCEDURAL HISTORY**

On July 16, 2008, the Plaintiffs filed a complaint
against the Defendant Duke Energy Carolinas, LLC
("Duke"), alleging violations of the Clean Air Act
("the Act" or "CAA") by construction of Duke's new
800 megawatt coal fired power plant (Cliffside Unit
6) without first satisfying the Maximum Achievable
Control Technology ("MACT") requirements of the
Act. *See* Clean Air Act § 112(g)(2)(B), 42 U.S.C. §
7412(g)(2)(B).

On August 8, 2008, Plaintiffs filed their motion for
summary judgment on liability and standing; Defendant followed with a motion to dismiss the action on
August 11, 2008. *See* **Plaintiffs' Motion for Summary Judgment on Liability and Standing, and
Supporting Memorandum, filed August 8, 2008;
Defendant's Motion to Dismiss, and Supporting
Memorandum, filed August 11, 2008.** Thereafter,
the parties filed their respective responses and replies. *See* **Defendant's Response in Opposition to
Plaintiffs' Motion for Summary Judgment, filed
August 25, 2008; Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss, filed
August 28, 2008; Plaintiffs' Reply to Defendant's
Response, filed September 8, 2008; Defendant's
Reply to Plaintiffs' Response, filed September 12,
2008.**

On October 7, 2008, the Defendant moved to supplement the record; Plaintiffs did not oppose the relief sought, and the motion was granted. *See* **Order,
filed October 8, 2008.** On October 15, 2008, the
Defendant again moved to supplement the record,
which the Plaintiffs oppose. While not previously
granted by written order, Defendant's motion and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5110894 (W.D.N.C.), 69 ERC 1021
**(Cite as: 2008 WL 5110894 (W.D.N.C.))**

attached materials were considered by the Court in reaching the decision on the parties' dispositive motions; therefore, Defendant's second motion to supplement the record will be allowed *nunc pro tunc* as of October 15, 2008.

## II. DEFENDANT'S MOTION TO DISMISS

Defendants argues the action must be dismissed because the Court lacks subject matter jurisdiction, the Plaintiffs lack standing to bring the suit, and due to the application of § 112(g). These arguments are addressed *seriatim*.

### A. Subject matter jurisdiction

In ruling on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. The burden of proving subject matter jurisdiction is on the party asserting jurisdiction. If the defendant contends that a complaint fails to allege facts upon which subject matter jurisdiction can be based, all facts alleged in the complaint are assumed to be true. The plaintiff is then afforded the same procedural protection as he would receive under Rule 12(b)(6) consideration.... A motion to dismiss under Rule 12(b)(6) should be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

\*2 *Jetform Corp. v. Unisys Corp.*, 11 F.Supp.2d 788, 789 (E.D.Va.1998)(**internal quotations and citations omitted**). The Court may also consider exhibits outside the pleadings " 'to resolve factual disputes concerning jurisdiction.' " *Smith v. Washington Metro. Area Transit Auth.*, 290 F.3d 201, 205 (4th Cir.2002) (quoting *Williams v. United States*, 50 F.3d 299, 304 (4th Cir.1995). The Court "is free to weigh all the evidence in determining whether jurisdiction exists." *Hager v. First Virginia Banks, Inc.*, 2002 WL 57249, at *4 (W.D.Va.2002) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982) and *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977).

Duke contends that Plaintiffs' action should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief "because it seeks to impose

retroactively a pre-construction requirement that did not exist when the North Carolina Division of Air Quality ["DAQ"] issued a Clean Air Act permit to construct Cliffside Unit 6 and Duke Energy commenced construction." **Defendant's Motion to Dismiss, at 1-2.** In addition, Duke contends Plaintiffs' complaint exceeds the Court's jurisdiction "by attempting a collateral attack upon an ongoing state permitting process." *Id.* at 2 (citing Fed.R.Civ.P. 12(b)(1)).

Duke correctly identifies the main issue to be decided in this case, that is, whether or not the requirements of § 112(g)(2)(B) apply to the ongoing construction of Unit 6. This is a question of law for the Court to decide in this litigation. The complaint clearly articulates this issue and Rule 12(b)(6) does not require dismissal. "[A] Rule 12(b)(6) motion tests only the sufficiency of the complaint. Unlike a summary judgment motion, a motion to dismiss limits the court's review to the pleadings; the court is not resolving the merits of the case. Applying this standard, this Court finds that defendant ['s] motion to dismiss [Plaintiffs'] claim should be denied." *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Servs.*, 19 F.Supp.2d 567, 573 (N.D.W.Va.1998). Defendant's motion to dismiss pursuant to Rule 12(b)(1) alleging lack of subject matter jurisdiction fares no better. Properly construed, as Duke is well aware, Plaintiffs' complaint attacks Duke's failure to comply with requirements of federal law and accompanying regulations, not DAQ's permitting process.

Duke does not dispute that § 112(g)(2)(B) and 40 C.F.R. § 63.40(b) require pre-construction approval of a project where EPA rules are in effect at the time a construction permit is issued and construction begins. The Regulations provide:

The requirements [for § 112 MACT determinations] apply to any owner or operator who constructs or reconstructs a major source of hazardous air pollutants after the effective date of section 112(g)(2)(B) (as defined in § 63.41) and the effective date of title V permit program in the State or local jurisdiction in which the major source is ... located ... or the owner or operator of such major source has received all necessary air quality permits for such construction or reconstruction project before the effect date of section 112(g)(2)(B).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5110894 (W.D.N.C.), 69 ERC 1021
(Cite as: 2008 WL 5110894 (W.D.N.C.))

\*3 40 C.F.R. § 63.40(b); *see also*,40 C.F.R. § 63.43(c)(2).

The Act clearly prohibits a party from "construct[ing] or reconstruct[ing] any major source of hazardous air pollutants [HAP], unless the Administrator [of the EPA] (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met." 42 U.S.C. § 7412(g)(2)(B); **see also** 15A N.C. Admin. Code 2D.1112(a) **(which is North Carolina's equivalent of the § 112(g) rule that similarly "applies to the construction or reconstruction of major sources of hazardous air pollutants").**

The CAA defines "major source" as a source "that emits *or has the potential to emit* considering controls, in the aggregate, 10 tons per year or more of any [HAP] or 25 tons per year or more of any combination of [HAPs]." 42 U.S.C. § 7412(a)(1) **(emphasis added).** Section 63.41 of the Regulations defines "construct a major source" in great detail and leaves no doubt that the Cliffside Unit 6 is included. *See*40 C.F.R. § 63.41. North Carolina defines "construction of a major source" as meaning to "fabricate, erect, or install at any developed site a new process or production unit which in and of itself emits or *has potential to emit* 10 tons per year of any HAP or 25 tons per year of any combination of HAP[.]" 15A N.C. Admin. Code 2D.1112(c)(4)(B) **(emphasis added).**

HAP emissions were initially regulated under the CAA § 112 in 1970. In 1990, seeking to "avoid risk of serious, irreversible damage to human health," Congress amended the section to classify almost 200 contaminants as hazardous and provided a national pollution control program. **Plaintiffs' Memorandum in Opposition, at 2 (citing** S.Rep. No. 101-228 (1989)). The EPA was required to list the major sources of HAPs and develop standards for their control referred to as "maximum achievable control technology" for each listed category. *Id.*; *see also*,42 U.S.C. § 7412(c), (d). On December 20, 2000, following a comprehensive study, the EPA added coal and oil-fired electric generating units (EGUs) to the list of polluting source categories that must meet CAA § 112 requirements. *Id.* at 3; *see also*,65 Fed.Reg. 79,825, 79,830-31 (Dec. 20, 2000).

In 2005, EPA sought to remove power plants from the § 112(c) list. 70 Fed.Reg. 15,994 (Mar. 29, 2005). In deciding to delist coal-fired power plants, EPA failed to follow the requirements of 42 U.S.C. § 7412(c)(9)(B). EPA's action was immediately challenged by several environmental groups on the grounds that the delisting requirements of § 7412(c)(9)(B) had not been met. On February 8, 2008, the D.C. Circuit Court of Appeals reversed and vacated the attempted delisting by the EPA Administrator. *See* New Jersey v. EPA, 517 F.3d 574, 583 (D.C.Cir.2008)("**Accordingly, in view of the plain text and structure of section 112, we grant the petition and vacate the Delisting Rule.").** The Court further held:

\*4 EPA thus concedes that if EGUs *remain listed under section 112, as we hold,* then the CAMR [FN1] regulations for existing sources must fall.

FN1. Clean Air Mercury Rule.

*Id.* (emphasis and footnote added); *see also.* Nat'l Fuel Gas Supply Corp. v. F.E.R.C., 59 F.3d 1281, 1289 (D.C.Cir.1995) ("In sum, the decision of a federal court must be given retroactive effect regardless whether it is being applied by a court or an agency."); Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 97-98, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993); James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 540, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) ("[T]he question is whether it is error to refuse to apply a rule of federal law retroactively after the case announcing the rule has already done so. We hold that it is[.]"). This Court concludes, therefore, that EGUs, including Defendant, remain listed under § 112 and subject to its provisions. This Court concludes that § 112(g)(2)(B) and 40 C.F.R. § 63.40(b) were in effect at the time Duke began its construction of Cliffside Unit 6 and the completion of a MACT process were required before construction began.

As early as June 2005, Duke undoubtedly knew that the delisting of EUGs was being challenged and that the required delisting procedure had not been followed by the EPA. *See* Exhibit 6, Letter dated June 17, 2005, from Southern Environmental Law Center to B. Keith Overcash, Director of North Carolina Division of Air Quality, *attached to* Plaintiffs' Memorandum in Support of Summary Judgment.

On January 29, 2008, ten days before the *New Jersey*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5110894 (W.D.N.C.), 69 ERC 1021
**(Cite as: 2008 WL 5110894 (W.D.N.C.))**

decision was issued, the North Carolina DAQ issued an air quality permit to Duke authorizing the construction and operation of Unit 6. *See* **Exhibit 8, Letter dated January 29, 2008, to Rick R. Roper of Duke Energy from DAQ,** *attached to* **Plaintiff's Memorandum in Support of Summary Judgment.** Duke does not contend that at that time, or at any time before the permit was issued, a § 112 MACT proceeding had occurred. Nevertheless, Duke contends construction on the project began on January 30, 2008; Plaintiffs contend the construction actually began on February 9, 2008. Whatever the correct beginning date, construction has continued to the present date, without interruption.

On June 2, 2008, the DAQ wrote Duke regarding the D.C. Circuit's opinion overturning the EPA's CAMR.

> [O]pinions differ about whether the ruling affects a previously issued permit under which construction has begun but is not completed.... [The] DAQ has concluded that a formal public process consistent with [CCA § 112] should now be initiated to ensure that the permit contains the most stringent limits that are in fact achievable.

> ...

> Since the Delisting Rule has been vacated, it is clear that EGUs are now on the § 112(c) list. If DAQ were *now* to issue a construction permit for a covered new EGU, that new unit would be subject to CAA § 112(g) case-by-case emission limitations for hazardous air pollutants.

> ...

> DAQ believes that the best course of action is to initiate a public process now, consistent with the standards in § 112, to determine the maximum degree of reduction in emissions of HAPs that is achievable for the category of source in which Unit 6 falls, consistent with the analyses that would apply under § 112. If that process results in limits more stringent than those in the existing permit, then DAQ would modify the permit to incorporate those limitations.

> *5 In order to expedite this process, DAQ suggests that Duke agree at the outset to the public process

described above and affirm that DAQ is entitled to modify the existing permit to include the limits ultimately determined by the process, provided they are more stringent than limits currently in the permit.

**Exhibit 12, Letter dated June 2, 2008, to Rick R. Roper of Duke Energy from DAQ,** *attached to* **Plaintiff's Memorandum in Support of Summary Judgment;** *see also* **Exhibit 5,** *attached to* **Defendant's Memorandum in Support of Motion to Dismiss.** DAQ asked Duke to agree to the public process described, to affirm its authority to modify the existing permit, and to make a commitment that Duke would not contend that "any ongoing construction must or should be considered when determining appropriate [HAP] limits[.]" *Id.* In response, Duke contended that a case-by-case § 112(g) was not required for Unit 6, but that it would agree to provide a "MACT assessment" to DAQ by the end of June 2008, "without waiving any of its rights." **Exhibit 13, Letter dated June 13, 2008, to DAQ from Duke Energy,** *attached to* **Plaintiff's Memorandum in Support of Summary Judgment.**

On July 3, 2008, Duke advised DAQ that it was providing a "voluntary submittal ... for a [MACT] Assessment on Cliffside Unit 6[.]" **Exhibit 14, Letter dated July 3, 2008, to DAQ from Duke Energy,** *attached to* **Plaintiff's Memorandum in Support of Summary Judgment.** Duke also stated that it understood that "North Carolina's [DAQ] will now undertake a review of this submittal consistent with DAQ's process for performing a § 112(g) MACT determination. [Duke] intends to participate fully in that *MACT-like process.*" *Id.* (emphasis added).

Enclosed with the July 3 letter was Duke's own analysis of "MACTequivalent emission limitations" for the Cliffside Unit 6. *See* **Exhibit 9,** *attached to* **Plaintiffs' Memorandum in Support of Summary Judgment.** Contained within the document is Duke's continued refusal to submit to a full public MACT process as required by § 112 of the CAA.

> While this Assessment is not required by § 112 of the Clean Air Act, it is being submitted to determine levels of control for HAPs that is intended to be functionally modeled on the § 112 process as a "MACT-like" process, which [Duke] has agreed to

Not Reported in F.Supp.2d, 2008 WL 5110894 (W.D.N.C.), 69 ERC 1021
**(Cite as: 2008 WL 5110894 (W.D.N.C.))**

undertake at the request of DENR. References in this document to "MACT" or "MACT requirements" or similar topics are not to be taken in contravention of this being a "MACT-like" process, rather than one required under § 112.

*Id.* at 2 n. 1.

On October 14, 2008, Duke sent another letter to DAQ which continued to assert that § 112(g) requirements did not apply to Duke. *See* **Exhibit A, Letter dated October 14, 2008, to DAQ,** *attached to* **Defendant's Second Motion to Supplement the Record, filed October 15, 2008.** This letter refers to the July 3 letter and previous submittal and provides a "revised HAPs emissions determination with documentation for [DAQ's] review to demonstrate that no MACT or MACT-like requirements-whether mandatory or voluntary-apply to this *minor* source of HAPs. Our position remains, as we advised you in June, that Section 112(g) does not apply to a unit such as [Unit 6]..... [O]ur calculations demonstrate that [Unit 6] is not a *major* source of HAPs, which means that Section 112(g) does not apply regardless of when construction commenced." *Id.* at 1-2 (emphasis in original). In short, Duke continues to alter the original submission and has yet to participate in a full MACT, case-by-case procedure with full opportunity for public scrutiny.

**\*6** Neither party has provided the Court with any reference in the CAA or the North Carolina Clean Smokestack Act which provides for a "MACT-like" or "MACT equivalent" proceeding. *See* N.C. Gen.Stat. §§ 143-215.107D-143.215.111. The Court finds no reason to substitute a suggested process for that required under existing law. When a source category is listed, that is, an EGU, and is, therefore, subjected to the requirements of § 112, it must control to "the maximum degree of reduction in emissions of the hazardous air pollutants, subject to this section (including a prohibition on such emissions, where achievable)[.]" 42 U.S.C. § 7412(d)(2). This leaves no doubt as to the degree to which Congress sought to protect the public health and welfare by reducing or ultimately prohibiting the emission of HAPs. Whether Unit 6 is, or will be, at best a "minor source" of pollution, as Defendant alleges, and not a "major source" of HAPs has yet to be determined in the appropriate proceeding required by § 112(g)(2)(B), 42 U.S.C. § 7412(g)(2)(B).

In weighing all the evidence before the Court, including the allegations set forth in Plaintiffs' complaint as well as those contained in the parties' motions and supporting affidavits and memoranda, the Court concludes it has subject matter jurisdiction in this case. 42 U.S.C. § 7604(a); *see also,* 28 U.S.C. § 1331 **(federal question jurisdiction, generally).**

**B. Standing**

Defendant also contends the Plaintiffs have no standing to pursue their claims in this Court. In making that determination, "the standing inquiry focuses on whether the plaintiff[s][are] the proper par[ties] to bring this suit [.]" *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). Even though the Court may "ultimately determine that [Plaintiffs] have not established a right to relief, that does not mean that they have not alleged a cognizable injury sufficient to cross the threshold of justiciability." *Natural Res. Def. Council, Inc. v. EPA* (D.C.Cir.1994). Allegations based on injury to "aesthetic and recreational values" will support standing. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181-83, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

An individual plaintiff has standing under the Constitution's case-or-controversy limitation, Art. III, § 2, where "(1) [the plaintiff] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."... An association "has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

**\*7** *Sierra Club v. Tennessee Valley Auth.,* 430 F.3d 1337, 1344 (11th Cir.2005) (quoting *Laidlaw,* at 180-81) (other citations omitted). Although the Sierra Club action concerned the Clean Water Act, the Fourth Circuit has discussed the rights of an individual claimant-participant in a suit brought by a non-

Not Reported in F.Supp.2d, 2008 WL 5110894 (W.D.N.C.), 69 ERC 1021
**(Cite as: 2008 WL 5110894 (W.D.N.C.))**

profit environmental organization. *See Friends of the Earth, Inc. v. Gaston Copper Recycling, 204 F.3d 149 (4th Cir.2000)* (Wilkinson, C.J.).

The Plaintiffs here are nonprofit organizations consisting of numerous individuals who have the right to pursue individual claims for alleged injuries suffered or will suffer to their health, aesthetic and recreational interests. *See* **Plaintiffs' Exhibits 15-29, *attached to* Memorandum in Support of Summary Judgment.** Their statements are made under penalty of perjury and contend their injuries are actual or imminent absent a MACT compliance with the requirements of the CAA and DAQ standards for HAPs control. They also contend that these injuries would be redressed by Unit 6 compliance with applicable law. *Sierra Club, 430 F.3d at 1344.*

For the reasons stated above, the Court concludes the Plaintiffs have standing to pursue their claims in this Court.

**C. Abstention**

Finally, Defendant contends that this Court should dismiss the action or, in the alternative, abstain from interference because the action constitutes a collateral attack on DAQ's "ongoing review of Duke Energy's MACT assessment." **Defendant's Memorandum in Support of Motion to Dismiss, at 20.**

There is no ongoing review of a MACT assessment. There has been no opportunity for DAQ to hear and consider the opinions of experts such as Ranajit Sahu, Ph.D., Mechanical Engineering, California Institute of Technology, or any other expert opinion evidence as that set forth in Plaintiffs' exhibits submitted in support of their motion for summary judgment. *See, e.g.,* **Exhibit 2, Declaration of Ranajit Sahu, *attached to* Plaintiffs' Memorandum in Support of Summary Judgment.** As noted above, Duke Energy has refused to engage in a full MACT process or give certain assurances in response to the DAQ request. Therefore, DAQ is not presently requiring a MACT process involving Duke. The question as to "retroactive application" of § 112 to this litigation has not been finally addressed by the DAQ. There is also the desirability, if not the necessity, of determining with finality that a MACT process must be pursued by the Defendant. The ongoing construction without a prior determination of Duke's compliance with the CAA

requirements could result in HAPs emissions capable of causing serious health problems, or the shut down of construction and/or in costly retrofitting that would result in unnecessary rate increases.

It is worthy of note that § 113(b) authorizes the Administrator to "commence a civil action" in order "to restrain" CAA violations, "to require compliance" with CAA, to assess civil penalties up to $25,000 per day," and "to award any other appropriate relief." 42 U.S.C. § 7413(b). The grant of equity jurisdiction is broad and enables the Court to "retain inherent authority to award any equitable remedy that is not expressly taken away from [it] by Congress." *Meghrig v. KRC Western, Inc., 516 U.S. 479, 487, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996).* An immediate involvement in a public MACT process by Duke will be required by this Court.

**\*8** Federal courts may "entertain suits" to enforce the requirement of a CAA permit even though the EPA has approved a state implementation plan. *See Weiler v. Chatham Forest Products, Inc., 392 F.3d 532, 539 (2d Cir.2004).* Abstention would be improper in this case for reasons previously noted. "The issue in an abstention case is not so much whether the dispute can be resolved in a state forum (assuming one is available), but rather whether for some special reason a federal court *cannot, or should not,* resolve it." *Three Rivers Cablevision, Inc. v. City of Pittsburgh, 502 F.Supp. 1118, 1123 (W.D.Pa.1980)* (emphasis added). "When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction[.]" *Willcox v. Consol. Gas Co. of New York, 212 U.S. 19, 40, 29 S.Ct. 192, 53 L.Ed. 382 (1909)* (internal citation omitted).

"Considering that '[f]ew public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies,' the usual rule of comity must govern the exercise of equitable jurisdiction by [this Court] in this case." *Alabama Public Serv. Comm'n v. Southern Ry. Co., 341 U.S. 341, 350, 71 S.Ct. 762, 95 L.Ed. 1002 (1951)* (quoting *Railroad Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941)*). Keeping this in mind, the Court will retain jurisdiction to enforce a federal law if necessary, but deny Plaintiffs' injunctive relief at this time to provide an opportunity for DAQ to proceed with the MACT process.

Not Reported in F.Supp.2d, 2008 WL 5110894 (W.D.N.C.), 69 ERC 1021
**(Cite as: 2008 WL 5110894 (W.D.N.C.))**

Therefore, the Court denies the Defendant's motion to dismiss the case on the grounds that it constitutes an improper collateral attack on North Carolina's DAQ permit process or that abstention would be proper or required under the doctrine announced in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

### III. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

#### A. Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact, and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). "A genuine issue [of fact] exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In considering a motion for summary judgment, the Court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.*

By reviewing substantive law, the Court may determine what matters constitute material facts. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "The party seeking summary judgment has the initial burden to show a lack of evidence to support the nonmoving party's case." *Shaw*, 13 F.3d at 798. If that showing is made, the burden then shifts to the nonmoving party who must convince the court that a triable issue does exist. *Id.* A "mere scintilla of evidence" is not sufficient to defeat a motion for summary judgment. *Id.*

#### B. Discussion

**\*9** The Plaintiffs' motion for summary judgment on liability is allowed for the reasons previously discussed by the Court in denying the Defendant's motion to dismiss and for the following additional reasons.

Cliffside Unit 6 is an EGU under construction which has the potential to emit in excess of ten tons per year of an individual HAP (hydrochloric acid) and over 25 tons of a combination of other HAPs. As such, it is subject to the requirements of § 112 of the CAA. 42 U.S.C. § 7412(a)(1). It also has the potential of emitting various quantities of other HAPs regulated by the CAA such as mercury and other listed pollutants. As of this date, neither the EPA or DAQ (North Carolina's authority delegated with enforcing § 112) has issued to Duke an Air Quality Permit recognizing compliance with § 112. *See* **Exhibits, *attached to* Defendant's Second Motion to Supplement the Record and Defendant's Opposition to Plaintiffs' Motion for Summary Judgment,** *supra.* As a result, Defendant is continuing with the construction of Unit 6 without the required § 112 MACT determination. *See* 42 U.S.C. § 7412(g)(2)(B). The material facts herein are not in dispute. Duke is simply refusing to comply with controlling law.

The Plaintiffs are environmental organizations consisting of members who themselves have standing to bring this action. *See* **Exhibits 15-29, *attached to* Plaintiffs' Memorandum in Support of Summary Judgment; Complaint.** The individuals set forth a variety of interests they enjoy which they contend are at risk and germane to the purposes of the organizations of which they are members. The claims asserted by the organizations and the relief sought do not require the participation of individual members. The members show that they will suffer injuries to recreational, aesthetic, and health interests. These injuries are concrete and particularized, actual or imminent, not conjectural or hypothetical, are fairly traceable to Defendant's challenged actions, and more likely than speculative that the injuries will be redressed by a favorable decision. *Sierra Club,* 440 F.3d 1344; *see also, Laidlaw,* 528 U.S. at 180-81.

As previously discussed herein, the Court concludes Plaintiffs have standing to bring this action. They have identified the inadequacies which they contend result from the "MACT-like" assessment performed by the Defendant. *See* **Exhibit 2, Sahu Declaration,** *supra,* **at 11-19.** Such evidence, as well as other proper evidence, should be considered in a MACT process open to the general public and not confined to the evidence mentioned by Dr. Sahu. *Id.*

Plaintiffs contend Defendant's "MACT-like process"

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5110894 (W.D.N.C.), 69 ERC 1021
**(Cite as: 2008 WL 5110894 (W.D.N.C.))**

is inadequate in a variety of ways and as a result fails to meet compelling requirements of federal and state laws. **Plaintiffs' Memorandum in Support of Summary Judgment, at 17-20.** What a properly conducted MACT process will show is not now before the Court and must be conducted before and by the appropriate regulatory agency.

**\*10** Plaintiffs request the Court grant an immediate injunctive relief in the form of a halt to further construction of Unit 6 until a MACT process, conducted in accordance with current legal requirements, is completed. While such a drastic measure is justified by Defendant's refusal to comply with the plain requirements of current law, the Court concludes that Defendant should be given the opportunity to comply with CAA and DAQ requirements within a limited period of time, after which injunctive relief may be granted, if necessary.

In reaching these conclusions, the Court has considered the voluminous documentation presented by both parties "outside the pleadings ... and not excluded by the court[.]" Fed.R.Civ.P. 12(d). The parties have been given ample opportunity to present all relevant material they chose to share and Rule 56 is appropriate.

The current law required a full case-by-case type MACT process be conducted before construction of Unit 6 began. As of this date, the process has not begun. Therefore, Plaintiffs' motion for summary judgment as to standing and liability will be allowed.

### IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motions to dismiss are **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's second motion to supplement the record is **ALLOWED** *nunc pro tunc* as of October 15, 2008.

**IT IS FURTHER ORDERED** that the Plaintiffs' motion for summary judgment on liability and standing is **ALLOWED.**

A Judgment incorporating the findings herein is filed herewith.

W.D.N.C.,2008.
Southern Alliance for Clean Energy v. Duke Energy Carolinas, LLC
Not Reported in F.Supp.2d, 2008 WL 5110894 (W.D.N.C.), 69 ERC 1021

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Slip Copy, 2009 WL 1940048 (W.D.N.C.)
**(Cite as: 2009 WL 1940048 (W.D.N.C.))**

**H**Only the Westlaw citation is currently available.

United States District Court, W.D. North Carolina,
Asheville Division.
SOUTHERN ALLIANCE FOR CLEAN ENERGY;
Environmental Defense Fund; National Parks Con-
servation Association; Natural Resources Defense
Council; and Sierra Club, Plaintiffs,
v.
DUKE ENERGY CAROLINAS, LLC, Defendant.
**Civil No. 1:08CV318.**

July 2, 2009.

West KeySummary
**Federal Courts 170B 🗝47.1**

170B Federal Courts
　170BI Jurisdiction and Powers in General
　　170BI(B) Right to Decline Jurisdiction; Ab-
stention Doctrine
　　　170Bk47 Particular Cases and Subjects;
Abstention
　　　　170Bk47.1 k. In General. Most Cited
Cases

Abstention was warranted for a complaint regarding
the construction of a power plant that was already
being litigated at North Carolina Office of Adminis-
trative Hearings (OAH) proceedings. The plaintiffs
alleged that the power plant was being constructed in
the absence of a final determination of compliance
with the Maximum Achievable Control Technology
in violation of § 112(g) of the Clean Air Act. Absten-
tion was warranted since four of the five plaintiffs
were also plaintiffs in the OAH proceedings and liti-
gation in federal court would be duplicative of the
OAH proceedings. Clean Air Act, § 112(g)(2)(B), 42
U.S.C.A. § 7412(g)(2)(B); Code 02D.1112.

Aaron Michael Bloom, Natural Resources Defense
Council, New York, NY, Benjamin Hoyt Longbreth,
Natural Resources Defense Council, Washington,
DC, John Timothy Suttles, Jr., James Blanding
Holman, IV, Southern Environmental Law Center,
Charleston, SC, for Plaintiffs.

Kenneth D. Bell, Nash E. Long, III, E. Thomas

Cottingham, III, Hunton & Williams, Charlotte, NC,
for Defendant.

### ORDER OF DISMISSAL

LACY H. THORNBURG, District Judge.

**\*1THIS MATTER** is before the Court on Defen-
dant's motion for summary judgment filed May 1,
2009, and Plaintiffs' motion to enforce Judgment,
filed May 18, 2009. A hearing on these motions was
held before the undersigned on June 3, 2009. At that
time, the captioned parties along with the North
Carolina Department of Air Quality (DAQ), appear-
ing as *amicus curiae* by Court invitation, were heard.
Responses to the respective motions filed by the par-
ties herein along with the *amicus* brief were also con-
sidered.

### I. STATEMENT OF FACTS

On July 16, 2008, the Plaintiffs filed their complaint
alleging Defendant was in violation of § 112(g) of the
Clean Air Act (CAA) by the ongoing construction of
Cliffside Unit 6 in the absence of a final determina-
tion of compliance with the Maximum Achievable
Control Technology (MACT) requirements. *See*42
U.S.C. § 7412(g)(2)(B); *see also,*15A N.C. Admin.
Code 02Q.0528(b). The complaint further alleged
that the plant as designed would be a major source of
hazardous air pollutants (HAPs) and pose a serious
threat to the people and environment in surrounding
areas of North Carolina. Notices of violation were
sent to the required parties. Although notice of viola-
tion was sent to the North Carolina Department of
Environment and Natural Resources (DENR), neither
that department nor DAQ were named as defendants
to this lawsuit. In accordance with the provisions of
N.C. Gen.Stat. § 143-215.108, Defendant was
granted permit T28 to begin construction of Cliffside
Unit 6. At the time Defendant began construction of
the Unit 6 project, the Environmental Protection
Agency (EPA) sought to remove coal-fired power
plants from requirements of the CAA; by the time
Plaintiffs filed this complaint, the EPA action had
been nullified. *New Jersey v.*
*EPA,* http://www.westlaw.com/Find/Default.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1940048 (W.D.N.C.)
**(Cite as: 2009 WL 1940048 (W.D.N.C.))**

wl?rs=dfa1.0&vr=2.0&DB=506&FindType
=Y&ReferencePositionType=S&SerialNum
=2015171065&ReferencePosition=578517,
F.3d 574, 578, 582 (D.C.Cir.2008), *cert. denied,---*
U.S. ----, 129 S.Ct. 1308, 173 L.Ed.2d 583 (2009).
As a result, CAA compliance was required for a valid
permit.

On August 11, 2008, Defendant filed its motion to
dismiss this action primarily on the grounds that it
had commenced construction before the *New Jersey*
decision was issued. On December 2, 2008, this mo-
tion was denied and Judgment in favor of the Plain-
tiffs was entered by this Court. *See***Memorandum
and Order and Judgment, filed December 2, 2008.**

The December 2 Judgment determined that the De-
fendant qualified as a potential "major source" of
HAPs and was subject to regulation under § 112. The
Judgment noted the following:

The [DAQ] of the North Carolina [DENR] has the
authority and duty to enforce the requirement of a
full MACT proceeding and to modify its previ-
ously issued construction permit if the proceeding
indicates such is necessary to comply with the re-
quirements of current law.

The Defendant shall, within a period not to exceed 10
days from entry of this Judgment, proceed to initi-
ate and participate in a case-by-case type MACT
public process proceeding before the [DAQ] of the
North Carolina [DENR] which is consistent with
DAQ and § 112 standards. The process shall be
completed within a timeline of 60 days from the
date of entry of this Judgment.

**\*2Judgment, ¶¶ 4-5.**

The Defendant began compliance within a period of
two days after this Judgment was entered and DAQ
began a pattern of full cooperation by renewing the
previously issued permit and holding two publicly
announced hearings. The hearings were well attended
by supporters of both Plaintiffs and Defendant. Mail
responses were also invited, received and considered.

On December 17, 2008, Defendant appealed this
Court's Judgment to the Fourth Circuit Court of Ap-
peals, but subsequently sought and received a stay

from that Court pending the outcome of ongoing ef-
forts to reach agreement between the parties as to a
proper resolution of the case.

As proceedings continued in the case, this Court en-
tered an order extending an invitation to the Office of
the North Carolina Attorney General to file an
*amicus* brief herein addressing the following issue:

With reference to the letter from Plaintiffs to this
Court filed on January 7, 2009, is the North Caro-
lina [DENR] [DAQ] in full compliance with the
Judgment, Memorandum, and Order filed by the
Court on December [2], 2008, and if so, why or
why not?

**Order, filed January 9, 2009.** Also on January 9,
2009, DAQ filed a full report of numerous activities
undertaken by that department in an effort to fully
comply with the Court's Memorandum and Judgment
of December 2, 2008. *See***Notice by DAQ, filed
January 9, 2009.** On January 20, 2009, North Caro-
lina's Attorney General filed his responsive brief con-
cluding that DAQ had fully complied with the Court's
Judgment. *Amicus Curiae***Brief of the North Caro-
lina Division of Air Quality, filed January 20,
2009.**

On March 16, 2009, DAQ filed an *amicus* status re-
port indicating that it had completed the proceedings
contemplated by the Court and determined Unit 6 to
be a minor source of HAPs. **Report of Amicus Cu-
ri*** = **The North Carolina Division of Air Quality,
filed March 16, 2009, at 4.** The status report showed
that on March 13, 2009, DAQ issued the revised
Duke Cliffside Permit T29. *See* **Exhibit A,** *attached
to id.* It further noted that the decision would be ap-
pealable to the North Carolina Office of Administra-
tive Hearings (OAH) within a period of 30 days as
required by N.C. Gen.Stat. § 143-215.108(e) and §
150B-23(f). *Id.* **at 6-7.** Subsequent to the determina-
tion by the OAH administrative law judge, the North
Carolina Environmental Management Commission
(EMC) would issue its final permitting decision. *Id.*
**at 7.** DAQ also advised that there were four cases
presently pending with the OAH regarding the Duke
permit for construction of the Cliffside Unit 6. *Id.* **at
7, n. 2.**

Following the DAQ's issuance of permit T29, all the
named Plaintiffs in this action, with the exception of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1940048 (W.D.N.C.)
**(Cite as: 2009 WL 1940048 (W.D.N.C.))**

the Plaintiff Natural Resources Defense Council, filed a Petition for a Contested Case Hearing with the OAH on May 12, 2009. *See* **Exhibit A, *attached to Defendant's Reply to Plaintiff's Response to Motion for Summary Judgment, filed May 28, 2009.** In the petition, those parties seek essentially the same relief being sought in this action. They also reference the four cases noted above as related cases challenging DAQ's issuance of Air Quality permit T28 for construction and operation of Cliffside Unit 6. *Id.* **("II. Statement of Related Cases").** In the attachment to the hearing request form, Plaintiffs state that "[a]ccording to DAQ, Permit T29 is a 'complete permit that supersedes T28 in its entirety.' " *Id.* **at 2, Attachment to Form H-06.** Plaintiffs also quote from the Court's ruling that " 'Cliffside Unit 6 is an EGU [electrical generating unit] under construction which has the potential to emit in excess of ten tons per year of an individual HAP (hydrochloric acid) and over 25 tons of a combination of other HAPs. As such, it is subject to the requirements of § 112 of the CAA .' " *Id.* **at 4 (quoting Memorandum and Order, *supra*, at 21-22).**

\*3 In sum, four of the five Plaintiffs here are also Petitioners in an action pending in the North Carolina's OAH before the Hon. J. Randall May, Administrative Law Judge. In addition to the similarity of issues, the relief sought is identical, *i.e.,* compliance by Duke Energy with Section 112(g) of the Clean Air Act. 42 U.S.C. § 7412(g)(2)(B); 15A N.C. Admin. Code 02D.1112. As a result, two separate and independent courts are now being asked to decide the same issue. This is obviously an unwise use of scarce judicial resources. Left undisturbed, after final disposition at the trial level, two separate paths of appeal could be followed. Such a scenario is unacceptable.

In the event the Administrative Law Judge rules against Petitioners in the state proceeding, they may note their exceptions which are reviewed as a matter of course by the North Carolina EMC. If affirmed by the EMC, further judicial review is had in a North Carolina superior court. *See* N.C. Gen.Stat. §§ 150B-36, 150B-43 ("Nothing in this chapter shall prevent any person from invoking any judicial remedy available to him under the law to test the validity of any administrative action not made reviewable under this Article."); *see also,* N.C. Gen.Stat. § 150B-51 (discussion of the scope and standard of review in the North Carolina courts

and related cases). In short, not only may the parties receive a full hearing before an administrative law judge, the aggrieved party has access to a system of appropriate appellate judicial review.

## II. DISCUSSION

Defendant contends that this Court lacks jurisdiction to proceed further in finally determining the rights of the parties in this action citing *Nat'l Parks Conservation Ass'n v. TVA,* 175 F.Supp.2d 1071, 1079 (E.D.Tenn.2001), and *United States v. Solar Turbines, Inc.,* 732 F.Supp. 535, 539 (M.D.Pa.1989). **Defendant's Reply in Support of its Motion for Summary Judgment, filed May 28, 2009, at 10.** However, the Court does not choose to address this argument specifically, but is more persuaded by those cases relying on the logic and fairness of comity, federalism, and abstention. *See Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Both of these Supreme Court cases address the complex issues surrounding abstention. *See Cohens v. State of Virginia,* 6 Wheat. 264, 19 U.S. 264, 404, 5 L.Ed. 257 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." (Marshall, C.J.)). The problem is deciding the difference. *Constr. Aggregates Corp. v. Rivera de Vicenty,* 573 F.2d 86 (1st Cir.1978) .

In *Younger,* the Supreme Court referenced

the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This ... is referred to by many as "Our Federalism[.]"

\*4 *Younger,* 401 U.S. at 44-45. Though *Younger* dealt with federal interference with state criminal proceedings, it is now "carried ... increasingly [into] civil litigation." **17B Wright, Miller, Cooper & Amar,** *Federal Practice & Procedure,* § 4254 at 73 (3d ed.1998); *see also, Duty Free Shop, Inc. v. Administracion De Terrenos De,* 889 F.2d 1181, 1182 (1st Cir.1989) ("In later cases, the [Supreme] Court has held that the *Younger* doctrine is 'fully appli-

Page 4

Slip Copy, 2009 WL 1940048 (W.D.N.C.)
**(Cite as: 2009 WL 1940048 (W.D.N.C.))**

**cable to noncriminal judicial proceedings when important state interests are involved.' "** (quoting *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982)); *Crazy Eddie, Inc. v. Cotter,* 666 F.Supp. 503, 513 (S.D.N.Y.1987) **(involving state enforcement of energy regulations).**

In *Burford,* the issue involved the granting of a permit to drill oil wells issued by the Texas Railroad Commission, a state regulatory authority. The state commission ruling was subject to appellate judicial review. The Supreme Court concluded that interference by the federal court in what was primarily a state matter would likely result in "[d]elay, misunderstanding of local law, and needless federal conflict with the State policy[.]" *Burford,* 319 U.S. at 327. This appears to be particularly true where the challenge is to a permit issued by the state permitting agency. *Palumbo v. Waste Tech. Indus.,* 989 F.2d 156, 159 (4th Cir.1993).

In the case of *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), the Supreme Court held the *Burford* doctrine was improperly applied by the district court, but observed:

Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies ... where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*Id.* at 361 (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). In this case, as noted above, virtually the same parties are contesting the issuance of Unit 6 permit T29 by DAQ before the North Carolina OAH.

Recently, the Fourth Circuit has revisited the *Burford* abstention doctrine. *See MLC Auto., LLC v. Town of Southern Pines,* 532 F.3d 269 (4th Cir.2008). "There is no 'formulaic test' for *Burford* abstention, and, '[a]lthough [the] doctrine has many different forks and prongs, [abstention's] central idea has always been one of simple comity[.]' " *Id.* at 280

(quoting *Johnson v. Collins Entm't Co.,* 199 F.3d 710, 718-19 (4th Cir.1999).

Thus, the Supreme Court has admonished the federal courts to respect the efforts of state governments to ensure uniform treatment of essentially local problems. As we have explained, although abstention from the exercise of federal jurisdiction is the exception, not the rule, its importance in our system of dual sovereignty cannot be underestimated. [The Court] must "exercise [its] discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy."

**\*5***Id.*(quoting *Burford,* 319 U.S. at 318; **other internal quotation marks and citations omitted).**

As noted in the Court's review of the facts and prior proceedings in this case, the facts now differ substantially from the case beginnings.

Through their complaint, Plaintiffs sought declaratory and injunctive relief, civil penalties, attorney fees and costs against Duke for construction of the Unit 6 plant for the reason that "Duke's ongoing construction of Cliffside Unit 6 violates Section 112(g) of the Act, 42 U.S.C. § 7412(g), which prohibits construction of such a plant in the absence of a final and effective determination that the facility will achieve a level of hazardous air pollutant emissions control that satisfies" MACT requirements. **Complaint, ¶¶ 1-2.** Thus, at that time, the legality of the T28 initial permit was at issue and no MACT proceedings had been held. In the Judgment, this Court found that Plaintiffs had standing to bring the action challenging the legality of Defendant's failure and refusal to participate in a formal MACT proceeding. The Court then found that Plaintiffs prevailed on the issue of the illegality of Duke's construction of Cliffside Unit 6 without having participated in a formal MACT proceeding. Accordingly, the Court ordered Defendant to "proceed to initiate and participate in a case-by-case type MACT public process proceeding before the Division of Air Quality of the North Carolina Department of Environmental and Natural Resources which is consistent with DAQ and § 112 standards." **Judgment, at 2.** Although not a named party to the litigation, DAQ proceeded immediately to begin a full review of the permit, and as previously noted, held public hearings affording parties, experts, and the public an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1940048 (W.D.N.C.)
**(Cite as: 2009 WL 1940048 (W.D.N.C.))**

opportunity to be heard. Thereafter, DAQ issued the T29 final permit. As previously noted, following issuance of this permit, four of the Plaintiffs herein filed a petition before the OAH naming DAQ and DENR as respondents therein challenging the issuance of permit T29. The issues raised and relief sought are either identical or essentially the same to those herein and now involve the proper state forum for resolving CAA disputes and other environmental concerns.

The State of North Carolina has a strong and major interest in the health and well being of its citizens and in the orderly conduct of proceedings to protect them. Obviously, the issue of clean air is one of major public importance and is the primary responsibility of state and local governments. *Sugarloaf Citizens Ass'n v. Montgomery County, Md.,* 33 F.3d 52 (table), 1994 WL 447442 (4th Cir.1994). Moreover, in enacting the CAA, Congress found:

[T]hat air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments[.]

42 U.S.C.A. § 7401(a)(3). The Court finds that the State's administrative process is an adequate avenue to address the nature of the T29 permit at issue. Under the North Carolina regulatory framework, the Plaintiffs/petitioners may proceed in an orderly process of review to and including the North Carolina Supreme Court. Unnecessary federal intervention should not "disrupt the orderly administration of state regulatory schemes." *Bergeron v. Estate of Loeb,* 777 F.2d 792, 800 (1st Cir.1985).

**\*6** The Court is aware that "abstention [from the exercise of federal jurisdiction] is the exception, not the rule." *Pomponio v. Fauquier County Bd. of Sup'rs,*http://www.westlaw.com/Find/Default.wl?rs=dfa1.0&vr=2.0&DB=506&FindType=Y&ReferencePositionType=S&SerialNum=1994085098&ReferencePosition=1324,21 F.3d 1319, 1324 (4th Cir.1994). Nevertheless, the Court, in its discretion, may abstain in appropriate cases. *Employers Res. Mgmt. Co., Inc. v. Shannon,*http://www.westlaw.com/Find/Default.w

?rs=dfa1.0&vr=2.0&DB=506&FindType=Y&SerialNum=1995189436365 F.3d 1126 (4th Cir.1995);*Natural Res. Def. Council v. BP Products N. Amer-ica,*http://www.westlaw.com/Find/Default.wl?rs=dfa1.0&vr=2.0&DB=999&FindType=Y&SerialNum=20192361012009 WL 1854527, 2009 U.S. Dist. LEXIS 54363 (N.D.Ind. June 26, 2009). Therefore, for the reasons previously discussed, the Court, in the exercise of its discretion, will abstain from further involvement in the case and the review of the T29 permit will be carried out through the specialized State administrative review process.

The Court acknowledges that the proceedings may be prolonged by this ruling. However, the parties are also aware that in the final analysis, state or federal enforcement will dictate that Unit 6 from "day one" must be operated in strict compliance with § 112(g) of the CAA and the identical requirements of North Carolina law. This, therefore, would allow any aggrieved plaintiff to file a challenge in federal court to the final permit issued by the State after the administrative review process has been completed.

### III. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motion for summary judgment is **DENIED.**

**IT IS FURTHER ORDERED** that the Defendant's motion to amend the Court's pretrial order is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that the Plaintiffs' motion to enforce Judgment is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs' motion for leave to file a surreply to Defendant's motion for summary judgment is **ALLOWED,** and the surreply attached to the motion is hereby deemed filed and a part of the proceedings herein.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for leave to file supplemental authority is **ALLOWED,** and the attachment to such motion is deemed filed and a part of the proceedings herein.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1940048 (W.D.N.C.)
**(Cite as: 2009 WL 1940048 (W.D.N.C.))**

**IT IS FURTHER ORDERED** that, for the reasons stated herein, the Court in its discretion, abstains from further involvement in this case, and this action is hereby **DISMISSED WITHOUT PREJUDICE.**

W.D.N.C.,2009.
Southern Alliance for Clean Energy v. Duke Energy Carolinas, LLC
Slip Copy, 2009 WL 1940048 (W.D.N.C.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.