## THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 09-CV-02974-DME-BNB

WILDEARTH GUARDIANS,

      Plaintiff,

v.

LAMAR UTILITIES BOARD d/b/a LAMAR LIGHT AND POWER, and ARKANSAS
RIVER POWER AUTHORITY,

      Defendants.

---

### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

---

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………....1

FACTUAL AND LEGAL BACKGROUND……………………………………………..2

    A.  Coal-Fired Power Plants: Impacts on Public Health and the Environment……....2

    B.  The Clean Air Act: Regulation of Hazardous Air Pollution from Coal-Fired
       EGUs......................................................................................................................3

    C.  The "Delisting" Rule and New Jersey v. EPA………………………………….4

    D.  The Lamar Repowering Project……………………………………………….5

ARGUMENT…………………………………………………………………..6

    A.  The Repowering Project is a Major Source; The Process of Obtaining
       A MACT Determination Does Not Include Stack Testing……………..................6

    B.  WildEarth Guardians' Claim Survives a 12(b)(1) Challenge……………………..7

          1.  WildEarth Guardians Is Not Collaterally Attacking Lamar Utilities'
             Construction Permit…………………………………………………....7

          2.  This Case Presents No Exceptional Circumstances That Would
             Warrant the Application of the Burford Abstention Doctrine……........11

    C.  WildEarth Guardians' Claim Survives a 12(b)(6) Challenge:
       Section 112(g) Does Apply to the Repowering Project as a Matter of Law**.**…….14

          1.  Standard of Review…………………………………………………..14

          2.  Section 112(g) Cannot be Interpreted as Only a Preconstruction
             Requirement…………………………………………………………..14

          3.  EPA Has Concluded that Section 112(g) Applies to the
             Repowering Project …………………………………………………..16

          4.  Lamar Utilities Are Not Being Subjected to Retroactive Law………..17

                (i) Non-Compliance in 2006………………………………………..17

                (ii) Non-Compliance After New Jersey v. EPA………………18

          5.  Even If Lamar Utilities Faces Retroactive Application of Law,
             It Will Not be Unfairly Subjected to Retroactive Law………………..19

    CONCLUSION……………………………………………………………..20

i

## TABLE OF AUTHORITIES

CASES                                                                    Pages(s)

Ass'n of Irritated Residents v. Fred Schakel Dairy,
1:05-CV-007072008 WL 850136, (E.D. Cal. Mar. 28, 2008). ……………………………10

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) ……………………………………14

Chevron v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)…………………17

Ellis v. Gallatin Steel Co., 390 F.3d 461 (6th Cir. 2004) ………………………………...12, 13

General Elec. Co. v. EPA, 53 F.3d 1324 (D.C. Cir. 1995) …………………………................19

Georgetown Univ. Hosp. v. Bowen, 821 F.2d 750 (D.C. Cir. 1987) …………………………..19

Grayned v. City of Rockford, 408 U.S. 104 (1972) ………………………………………………19

Life-Link Int'l, Inc. v. Lalla, 902 F.2d 1493 (10th Cir. 1990) …………………………………11

Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.,
175 F. Supp. 2d 1071 (E.D. Tenn. 2001) ……………………………………………….........15

New Jersey v. EPA, 517 F.3d 574 (D.C. Cir. 2008) ……………………………………passim

New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350 (1989) ……….........11

Robbins v. Oklahoma ex rel. Dep't of Human Services,
519 F.3d 1242 (10th Cir. 2008) ………………………………………………………...14

S. Alliance for Clean Energy v. Duke Energy Carolinas, LLC,
No. 1:08CV318, 2008 WL 5110894 (W.D.N.C. Dec. 2, 2008) …………………10, 11, 12, 20

S. Utah Wilderness Alliance v. Bureau of Land Mgm't,
425 F.3d 735 (10th Cir. 2006) …………………………………………………………………..17

Skidmore v. Swift & Co., 323 U.S. 134 (1944)………………………………………………17

U.S. v. Duke Energy Corporation, 278 F.2d 619 (M.D.N.C. 2003) …………………………16

United States v. Solar Turbines, Inc., 732 F. Supp. 535 (M.D. Pa. 1989) ……………………..8

FEDERAL STATUTES AND REGULATIONS

42 U.S.C. § 7401(b) …………………………………………………………………...12, 13

42 U.S.C. § 7411(a)………………………………………………………………………15, 16

42 U.S.C. § 7412………………………………………………………………………………3

42 U.S.C. § 7412(a) …………………………………………………………………3

42 U.S.C. § 7412(c) …………………………………………………………………3

42 U.S.C. § 7412(g) …………………………………………………………...passim

42 U.S.C. § 7604(a) …………………………………………………………...8 40

C.F.R. § 52.21(i) …………………………………………………………...15

40 C.F.R. § 63.42………………………………………………………....7

40 C.F.R. § 63.42(c) …………………………………………………………15

40 C.F.R. § 63.43(b) …………………………………………………...4, 9

40 C.F.R. § 63.43(c) …………………………………………………3, 4, 9

40 C.F.R. § 63.43(d) …………………………………………………………4

40 C.F.R. § 63.54(e) …………………………………………………………...4

40 C.F.R. § 63.43(f) …………………………………………………………...4

40 C.F.R. § 63.43(g) …………………………………………………………4

40 C.F.R. § 63.43(h) …………………………………………………………4

**OTHER**

65 Fed. Reg. 79,825 (Dec. 20, 2000) …………………………………………....2, 3

70 Fed. Reg. 15,994 (March 29, 2005) …………………………………………….5

**INTRODUCTION**

WildEarth Guardians brings this suit against Defendants Lamar Utilities Board d/b/a Lamar Light and Power and Arkansas River Power Authority (hereinafter "Lamar Utilities") for constructing or reconstructing the Lamar Repowering Project ("Repowering Project"), a 38.5-megawatt coal-fired Electrical Steam Generating Unit ("EGU"), in violation Section 112(g) of the Federal Clean Air Act, 42 U.S.C. § 7412(g).  Lamar Utilities have moved to dismiss the Complaint in this matter, essential asserting that WildEarth Guardians' true dispute is with the State of Colorado and/or that Section 112(g) does not apply to Repowering Project as a matter of law.  This motion should be denied, however, for three reasons.

First, this suit is not an impermissible collateral attack on Lamar Utilities' 2006 construction permit.  Section 112(g), as well as its implementing regulations, makes it clear that Lamar Utilities' obligation to obtain a maximum achievable control technology ("MACT") determination is separate and distinct from the obligation to obtain a preconstruction permit.  Through this action, WildEarth Guardians is not seeking to challenge the decision in 2006 by the APCD to forgo a MACT determination; instead it is challenging Lamar Utilities' ongoing failure since 2006 to obtain a MACT determination despite repeated notice from the courts, the U.S. Environmental Protection Agency ("EPA"), and the state that this obligation applied to them.  As clearly contemplated by the citizen suit provision of the Clean Air Act, WildEarth Guardians' claim validly seeks to enforce a current federal requirement that Lamar Utilities obtain a MACT determination.

Second, there are no exceptional circumstances warranting an application of the <u>Burford</u> abstention doctrine because the state is not currently addressing this issue.  At this time, in fact, there is no actual state process *at all* taking place to address application of MACT on the Lamar Repowering Project.  Even if such process is initiated by Lamar Utilities by the filing of an appropriate application, that process will only address future legal obligations for the Lamar Repowering Project.  It will not, and cannot, address the subject of this case – past violation of

1

the Clean Air Act for what has been Lamar Utilities' illegal construction—and soon to be operation—of a coal-fired power plant.  Thus, far from seeking to disrupt any state administrative action, the exercise of federal jurisdiction in this case supports the policies and purpose of the Clean Air Act to protect public health and control hazardous air pollution.

Third, application of law in this case is clear – as EPA has concluded on several occasions, the Section 112(g) requirements apply to EGUs, like the Lamar Repowering Project, for which construction was commenced between March 29, 2005, and March 14, 2008. Similarly, the Colorado Department of Public Health and Environment, Air Pollution Control Division ("APCD") also acknowledged that Section 112(g) requirements apply to the Repowering Project.  These determinations are based on a plain reading of the statutory language.  Lamar Utilities began construction of the Repowering Project in July 2006, but has not obtained a final Section 112(g) MACT determination.  WildEarth Guardians has clearly stated a claim upon which relief can be granted.

## FACTUAL AND LEGAL BACKGROUND

### A.    Coal-Fired Power Plants: Impacts on Public Health and the Environment.

Following a comprehensive study of the public health hazards posed by emissions from power plants, EPA found that regulation of HAPs from EGUs was "appropriate and necessary." See Regulatory Finding on the Emissions of Hazardous Air Pollutants from Electric Utility Steam Generating Units, 65 Fed. Reg. 79,825 (Dec. 20, 2000).  As part of this finding, EPA documented the numerous impacts that emissions from EGUs have on public health and the environment.  Hazardous air pollutants emitted by power plants include arsenic, dioxins, hydrochloric acid, selenium, lead, and other heavy metals, which have been shown to cause cancer, heart disease, stroke, and neurological impairment.  Id. at 79,827.

EPA also found that of all the risks due to emissions from EGUs, mercury is the HAP causing greatest harm to humans and the environment.  Id.  "Electric utility steam generating units…are the largest source of mercury emissions in the United States, estimated to emit about

2

30 percent of current U.S. anthropogenic emissions." <u>Id.</u>  Exposure to mercury has been directly linked to a multitude of adverse health effects.  In a report to Congress, EPA affirmed that the nervous system, the kidney, and the developing fetus are most susceptible to mercury poisoning, and other affected systems include the respiratory, cardiovascular, gastrointestinal, hematologic, immune, and reproductive systems.  (Pl.'s Mot. for Jud. Notice Ex. F.)

**B.**   **The Clean Air Act: Regulation of Hazardous Air Pollution from Coal-Fired EGUs.**

Section 112 of the Clean Air Act controls the emission of HAPs by regulating both major sources and area sources that emit HAPs.  42 U.S.C. § 7412.  HAPs are defined as "any air pollutant listed pursuant to subsection (b) of this section."  <u>Id.</u> at § 7412(a)(6).  Section 112(b) lists 188 distinct air pollutants including mercury, hydrochloric acid, selenium, dioxins, and arsenic.  <u>Id.</u>  Major Sources are defined as: "[A]ny stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit . . . in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants."  <u>Id.</u> § 7412(a)(1).

In order to subject a major source to the strictures of Section 112(g), the EPA Administrator may list any source category based upon public comment or new information.  <u>Id.</u> § 7412(c)(5).  In 2000, EPA found it appropriate and necessary to establish the source category of EGUs on the list of sources subject to regulation under Section 112 of the Clean Air Act.  65 Fed. Reg. at 79,830.  The Administrator is obligated by law to promulgate a MACT emissions limitations standard for all listed source categories pursuant to Section 112(c).  42 U.S.C. § 7412(g)(2).  In cases where the Administrator has failed to timely establish the required standard, Section 112(g) mandates that an owner and operator obtain a case-by-case determination from the Administrator or State in order to construct or modify a major source.  <u>See</u> 42 U.S.C. § 7412(g)(2); 40 C.F.R. § 63.43(c).  Such determination "shall not be less stringent than the emission control which is achieved in practice by the best controlled similar sources . . .."  40 C.F.R. § 63.43(d)(1).

3

EPA regulations place the responsibility of attaining a MACT determination on the owner or operator of a major source.  "When a case-by-case determination of MACT is required by § 63.42(c), the owner and operator shall obtain from the permitting authority an approved MACT determination according to one of the review options contained in paragraph (c) of this section." Id. § 63.43(b).  The review options allow states to place the MACT requirement within their permitting processes but do not require it.  Id. 63.43(c).  The application requirements also refer to a diversity of state procedural options in applying section 112(g):

> "An application for a MACT determination (whether a permit application under title V of the Act, an application for a Notice of MACT Approval, or other document specified by the permitting authority under paragraph (c)(2)(ii) of this section) shall specify a control technology selected by the owner or operator that, if properly operated and maintained, will meet the MACT emission limitation or standard as determined according to . . . paragraph (d) of this . . .."

Id. § 63.43(e)(emphasis added).

Once the state has received a complete MACT application from the owner or operator, the state will issue a Notice of MACT approval within 90 days or "30 days after the date additional information is received from the owner or operator; whichever is earlier." Id. § 63.43(f)(4).  The Notice of MACT approval will contain "MACT emission limitation  to control the emissions of HAP." Id. § 63.43(g).  After a Notice of MACT approval is issued, the permitting authority is required to conduct a notice and comment period for the proposed MACT determination.  Id. § 63.43(h).  If no adverse comments are received the Notice of MACT approval becomes final. Id. § 63.43(h)(iii)(2),(j).  Only then can the source commence construction or operation.  See, e.g. 42 U.S.C. § 7412(g)(2).

**C.     The "Delisting" Rule and New Jersey v. EPA.**

In 2005, EPA purported to remove EGUs from the list of sources subject to Section 112.  EPA promulgated a rule that declared EPA's original determination to list EGUs under Section 112(c) was legally and factually in error, and removed EGUs from the Section 112(c) list of source categories. See 70 Fed. Reg. 15,994 (Mar. 29, 2005).  The rule contained no findings or

4

evidence to refute the previous determination that regulating EGUs was appropriate and necessary.  Id.  The State of New Jersey, among others, challenged this decision in the D.C. Circuit, and on February 8, 2008, the delisting rule was vacated.  New Jersey v. EPA, 517 F.3d 574 (D.C. Cir. 2008).  The court found that EPA had deployed the "logic of the Queen of Hearts" by substituting its own desires for the plain text of Section 112(c).  Id. at 582.  The court then vacated the delisting rule and held that EGUs remain listed under Section 112 as a source of HAPs.  Id. at 583.  The court's mandate, vacating the delisting rule, was issued in March 2008, more than 23 months ago.  (See Defendant's Motion to Take Judicial Notice of Administrative and Judicial Records (hereinafter "Def.'s Mot. for Jud. Notice"), Ex. E.)   Since that time EPA has specifically stated that those EGUs that began construction in the three-year period during which EPA purported to delist EGUs, between March 2005 and March 2008, are now obligated to obtain MACT determinations. (Def.'s Mot. for Jud. Notice Ex. E.)  EPA urged permitting authorities to begin case-by-case MACT determinations "without delay," (Id.) for those EGU's and even warned Lamar Utilities of a possible EPA enforcement action if they did not obtain a MACT determination for the Repowering Project.  (Id. at Ex. F.)

**D.** **The Lamar Repowering Project.**

The Repowering Project is the joint undertaking between Arkansas River Power Authority ("ARPA"), and Lamar Utilities Board ("LUB") (referenced together as "Lamar Utilities") to repower the gas-fired facility as a coal-fired facility with a net output of 38.5 megawatts.  (Def.'s Mot. to Dismiss 2.)  ARPA issued Colorado Power Revenue Improvement bonds to finance the $130 million plant construction cost and is the plant owner.  (Def.'s Mot. to Dismiss 2.)  LUB committed its existing facilities, the location, and steam turbine of the former gas-fired facility, and provided the site to construct the new coal-fired steam generator and a new steam turbine that will work in tandem with the existing steam turbine.  (Pl.'s Mot. for Jud. Notice Ex. A.)

On February 3, 2006, the APCD issued a permit to Lamar Utilities for the Repowering Project. (Def.'s Mot. to Dismiss 2.)  Lamar Utilities permit lacked a determination that the facility would achieve a level of HAP emissions control that satisfies MACT.  (Def.'s Mot. to Dismiss 2.)  In July 2006, absent a MACT determination, Lamar Utilities began construction of the 38.5-megawatt coal-fired power plant. (Pl.'s Compl. ¶ 34.)  After the March 2008 <u>New Jersey v. EPA</u> vacating of the delisting rule, Lamar Utilities continued construction and did not obtain a MACT determination.  <u>Id.</u>  In January 2009, when EPA specifically stated that the MACT obligations apply to those EGUs that began construction between March 2005 and March 2008, Lamar Utilities continued construction and did not obtain a MACT determination. (Def.'s Mot. for Jud. Notice Ex. E.)  As of the submission of this response brief, almost 2 years after <u>New Jersey v. EPA</u>, Lamar Utilities have still failed to submit an application to obtain a MACT determination despite the intention of operating Repowering Project in the beginning of 2010.  (Pl.'s Compl. ¶ 38.)

## ARGUMENT

### A.     The Repowering Project Is A Major Source; The Process of Obtaining a MACT Determination Does Not Include Stack Testing.

Lamar Utilities claim that a threshold question in the MACT determination process is whether the Repowering Project is, in fact, a major source. (Def.'s Mot. to Dismiss. 8.)  But this question has already been affirmatively answered by the State of Colorado in 2006.  Regardless, Lamar Utilities assert that because they are now actively engaged in redressing the 2006 major source determination and establish that the Repowering Project will generate *less* that 10 tons of any HAP or 25 tons of all HAPs annually, WildEarth Guardians' claim should be dismissed. (Def.'s Mot. to Dismiss 8.)  These arguments are misguided for two reasons.

First, the Repowering Project is currently a major source.  Lamar Utilities' Construction Permit clearly classifies the Repowering Project as a major source of HAP emissions. (Def.'s Mot. for Jud. Notice Ex. B.)  Specifically, the Repowering Project is permitted to emit up to 10.5 tons of HCl, a HAP, meeting the definition of major source contained in 42 U.S.C. §

7412(a)(1).  (Id.)  Likewise, APCD's September 18, 2009 Preliminary Analysis Summary of the Repowering Project states: "[Repowering Project] is an existing Major Stationary Source …Hence it is subject to the requirements of …MACT."  (Pl.'s Mot. for Jud. Notice Ex. B.)  If Lamar Utilities are confused as to whether the Repowering Project is a major or area source, they should postpone construction and start-up operations until this issue is clarified.

Second, testing to determine whether a source is major or an area source is *not* a threshold question in the MACT determination process. 40 C.F.R. § 63.42.  Because the Repowering Project's current Construction Permit states that it is a major source, a MACT determination *is required*.  (Def.'s Mot. for Jud. Notice Ex. B.)  The first step in the MACT determination process requires that the owner/operator of the EGU apply for a MACT determination from the appropriate permitting authority.  To allow Lamar Utilities to decide whether they are required to attain a MACT determination after they have begun to construct, and soon operate, would undermine the legislative purpose of Section 112(g).  Also, the Repowering Project is, on the face of its most recently modified construction permit, a major source.[1] (Def. Mot. to. Dismiss, Ex. D.)  If Lamar Utilities intend to disregard the findings made by the APCD to continue to delay compliance with the CAA—a factor considered in civil penalties policy—they should postpone start-up operations until this issue of whether the Repowering Project is a major or area source is clarified.[2]

**B.    WildEarth Guardians' Claim Survives a 12(b)(1) Challenge.**

   **1.  WildEarth Guardians Is Not Collaterally Attacking Lamar Utilities' Construction Permit.**

Lamar Utilities state that because they have "committed no violation that can be attributed to it other than to act in accordance with a permit it received from an authorized

---

[1]  Lamar Utilities have modified their permit twice since February 2006, most recently on October 19, 2009. (Def's Mot. to Dismiss Ex. B, C, D.)
[2]  Lamar Utilities filed a notice of Start-Up September 2008, evincing intent to begin operations without a requisite MACT determination. (Pl.'s Mot. for Jud. Notice Ex. G.)

permit-issuing authority," the present law-suit constitutes a collateral attack on the state permitting process. (Def.'s Mot. to dismiss, 10-11) (citing <u>United States v. Solar Turbines, Inc.</u>, 732 F. Supp. 535, 539 (M.D. Pa. 1989)).   This is a clear misrepresentation that conflates the requirement of obtaining a MACT determination with that of obtaining a permit.   This Court should, therefore, reject Lamar Utilities' claim that WildEarth Guardians' suit constitutes a collateral attack on the state permitting process.

The Clean Air Act states the following: "any person may commence a civil action on his own behalf - (1) against any person . . . who is alleged to have violated . . . or to be in violation of (A) an emission standard or limitation under this chapter". 42 U.S.C. § 7604(a)(1).   "The district courts shall have jurisdiction, . . . to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act…and to apply any appropriate civil penalties."   <u>Id.</u>   In this case, the emission standard or limitation that WildEarth Guardians seeks to enforce with regards to the construction of the Repowering Project is plainly set forth in Section 112(g), which requires that certain new major sources of HAPs meet "the maximum achievable control technology emission limitation."   <u>Id.</u> § 7412(g)(2)(B).

Lamar Utilities admit that they have not obtained a MACT determination.   They also do not seriously dispute that the Clean Air Act, on its face, vests jurisdiction in federal district courts to enforce Section 112's requirement that a major source obtain a final MACT determination. (Def.'s. Mot. to Dismiss 7-9.)   Instead, Lamar Utilities contend that the State of Colorado's issuance of a permit "without a formal case-by-case MACT determination" for the Repowering Project in 2006 satisfied Lamar Utilities' obligations under the Clean Air Act, and any challenge pertaining to compliance with Section 112 must now be brought against the State. (*See* Def. 's Mot. Dismiss 9-11.)   This Court should reject Lamar Utilities collateral attack argument for several reasons.

First, Lamar Utilities consistently conflate the requirement of obtaining a construction permit with that of obtaining a MACT determination. (Def.'s Mot. to Dismiss 10-11.)   The

language of Section 112(g)(2)(b) describes obtaining a MACT determination as a distinct requirement separate from that of obtaining a construction permit.  Section 112 requires a source to obtain a "determination," not a permit, with regards to coming into compliance with MACT.  42 U.S.C. § 7412(g)(2)(b).  Furthermore, the prescribed EPA review options, with regard to MACT determinations, allow the state to place this requirement in the permitting process, but do not require it.  40 C.F.R. § 63.43(c).  Most importantly, the obligation to comply is placed squarely on the owner or operator of a source: "[w]hen a case-by-case determination of MACT is required . . . *the owner and operator shall obtain* from the permitting authority an approved MACT determination according to the review options contained in paragraph (c) of this section." 40 C.F.R. § 63.43(b) (emphasis added).  There is no dispute that Lamar Utilities do not have a MACT determination, and the simple fact that they were issued a construction permit in 2006, a separate and distinct requirement, does not absolve them of their responsibility to obtain one.

Second, Lamar Utilities' argument that WildEarth Guardians should have challenged the sufficiency of such a permit during the permitting process is also flawed for the same reasons mentioned earlier: the requirement of obtaining a MACT determination is a distinct requirement from that of attaining a permit.  As an initial matter, WildEarth Guardians does not seek to challenge the application of Section 112(g) as it may or may not have applied in 2006, when Lamar Utilities' permit was issued.  Clearly at the time, as a result of the failed delisting rule, such requirement appeared as if it may not apply.  The EPA has made it clear, however, that since *vacatur* of the delisting rule in New Jersey v. EPA,  Lamar Utilities have a *current* obligation to obtain a Section 112(g) MACT determination.  (Def.'s Mot. to Dismiss, Ex. F.)  On July 6, 2009, EPA notified Lamar Utilities that they must obtain a final MACT determination for the construction of the Lamar Repowering Project "as expeditiously as possible," and that failure to do so would result in potential enforcement actions.  Id.  To this date, Lamar Utilities have not submitted an application to obtain a MACT determination.

Certainly, Lamar Utilities point to no legal authority that in this situation, WildEarth Guardians was required to raise the *failure* to obtain a MACT determination in 2006 in context of the state construction permit process.  All of the cases that Lamar Utilities cite in support of their assertion that "citizen suit provisions are not the proper forum to collaterally attack state permitting decisions," are inapposite as they involve circumstances where a state agency has *made* a permitting decision, and Plaintiffs have brought actions in federal courts challenging the substance of the actual decisions. (Def. Mot. to Dismiss at 10-11).  In a situation that is analogous to the case at bar, at least one district court has held that a Plaintiff may pursue a Clean Air Act citizen action to enforce Section 112(g) where the state permitting agency expressly *declined* to make a MACT determination. Ass'n of Irritated Residents v. Fred Schakel Dairy, No. 1:05-CV-00707, 2008 WL 850136 (E.D. Cal. Sept. 25, 2009).  Similarly, in a recent, nearly identical challenge under Section 112(g), an EGU operator's assertion that the plaintiff was mounting an impermissible collateral attack on its permit was squarely rejected in S. Alliance for Clean Energy I.  S. Alliance for Clean Energy v. Duke Energy Carolinas, LLC, 2008 WL 5110894, at *2 (W.D.N.C. Dec. 02, 2008).

In short, if Lamar Utilities had submitted a MACT determination and the APCD had then made a decision as to its applicability, these cases may have some bearing on the facts at hand. To the contrary, Lamar Utilities have not applied for nor obtained a MACT determination; and therefore, these cases cited by Lamar Utilities are inapposite to the facts of our case.[3]

---

[3] Lamar Utilities insist that they are "actively engaged with APCD regarding EPA's directive to obtain a new source MACT determination and a schedule for coming into compliance with the requirements of section 112(g), if it is determined that the Repowering Project is a major source . . .". (Def.'s Mot. to Dismiss 11-12.)  Not only have Lamar Utilities presented no evidence that such a process is occurring, but such a claim is inappropriate for the purposes of a motion to dismiss. See Fed. R. Civ. P. 12(d).  "Unlike a summary judgment motion, a motion to dismiss limits the court's review to the pleadings; the court is not resolving the merits of the case."  S. Alliance for Clean Energy I, 2008 WL 5110894 at *2.

**2. This Case Presents No Exceptional Circumstances That Would Warrant the Application of the <u>Burford</u> Abstention Doctrine.**

The Supreme Court has repeatedly noted that federal courts have a "virtually unflagging" obligation to exercise jurisdiction where jurisdiction is properly invoked. <u>New Orleans Pub. Serv., Inc v. Council of New Orleans</u>, 491 U.S. 350, 358-59 (1989) (hereinafter "<u>NOPSI</u>"). The Tenth Circuit has noted that a federal court may abstain from the obligation to exercise jurisdiction only under "truly exceptional circumstances" and with the "clearest of justifications." <u>Life-Link Int'l, Inc. v. Lalla</u>, 902 F.2d 1493, 1495 (10th Cir. 1990). In a case where the facts substantially resemble those of the case at bar, the court rejected an abstention argument similar to the one posed by Lamar Utilities. <u>S. Alliance for Clean Energy I</u>, 2008 WL 5110894 at *1. Despite these clear precedents, Lamar Utilities urge this Court to abstain from exercising properly invoked federal jurisdiction when faced with ongoing violations of federal law. Burford counsels abstention by federal courts only in rare circumstances:

> (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or
> (2) where the exercise of federal review would be disruptive of state efforts to establish coherent policy with respect to a matter of substantial public concern.

<u>NOPSI</u>, 491 U.S. at 361.

Exceptional circumstances warranting abstention are not present in this action. First, a major factor in the abstention analysis – difficult questions of state law bearing on policy problems of substantial public import – is entirely lacking in the present action. Indeed, there is no legal issue at all facing the State that this Court is being asked to decide. Lamar Utilities' legal obligations under Section 112(g) are clear: owner/operators of EGUs must obtain a final MACT determination. Furthermore, if Lamar Utilities were, at this moment, to initiate a MACT process, the state administrative process would merely be prospective, in that it would determine what MACT emissions limits are required moving forward. It would not address past and ongoing violations of Section 112(g). Issues of current and past compliance with the law

11

are factual and legal in nature, are distinct from the State's process of addressing future MACT obligations, and are squarely within this Court's jurisdiction.  Additionally, this Court is not facing voluminous litigation on state law issues such that the exercise of jurisdiction would result in confusion or delay.  Rather, this Court can provide immediate declaratory and injunctive relief to affirm Lamar Utilities' legal obligations under the Clean Air Act, to speed Lamar Utilities' compliance with federal law, and most importantly, to protect public health.

Second, abstention of federal jurisdiction in this case is also inappropriate because federal jurisdiction will not disrupt or undermine state policies.  Rather, the exercise of federal jurisdiction supports the policies and purposes of the Clean Air Act as articulated by Congress – to protect public health, and to prevent and control air pollution. 42 U.S.C. § 7401(b).  The plain language of Section 112, requiring control technologies to maximize reductions of HAP emissions, demonstrates that Congress intended for the Clean Air Act to be a strong tool for protecting public health and preventing air pollution.  Id. § 7412(d); S. Alliance for Clean Energy I, 2008 WL 5110894 at *16.  Further, the presence of a citizen suit provision in the Clean Air Act vesting jurisdiction in the federal district courts demonstrates that Congress intended to allow private citizens to invoke federal jurisdiction to enforce the obligations of the Act.

Lamar Utilities cite Ellis v. Gallatin Steel Co. to support the argument that this Court should abstain from asserting jurisdiction under Burford.  Ellis v. Gallatin Steel Co., 390 F.3d 461 (6th Cir. 2004).  Ellis is not dispositive, however, because it does not deal with an owner or operator's failure to obtain a required permit or determination, but instead, deals with a challenge to a decision made by a state permitting authority that an owner/operator does not require a prevention of significant deterioration (PSD) permit under the Clean Air Act.  Id. at 480 ("Federal review also would be disruptive here because it would require the district court to revisit earlier decisions made by the Kentucky Division of Air Quality").  The court in Ellis also

stated explicitly that if an owner or operator has *failed* to obtain a requisite permit, judicial

review would be available:

> But the question in this case is not whether citizens may sue
> companies that fail to obtain a PSD permit; *they may and Burford*
> *abstention rarely will present an obstacle to those claims.* The
> question here is whether a PSD permit was required (and what type
> of permit was required) in the setting of these associated plants.

Id. at 481 (emphasis added).  Because Lamar Utilities have neither attained, nor even sought to

comply with Section 112(g) nor obtained a case by case MACT determination, the case at bar

does not present the narrow circumstance in which Burford abstention was found to apply in

Ellis.  Furthermore, the Tenth Circuit applies a narrower test for abstention than the court in

Ellis applied.[4]

    This case does not constitute the type of "exceptional circumstance" necessary to justify the

application of the Burford doctrine and this Court should reject Defendant's argument that it

should abstain from hearing this case.  The MACT program is closely tied to federal law, and

does not present an issue traditionally reserved to the discretion of the states.  Indeed, the

application of the Burford abstention doctrine to an issue so closely tied to federal law, as that

of the Clean Air Act MACT program, would undermine the very purpose of this act: to protect

public health, and to prevent and control air pollution. 42 U.S.C. § 7401(b).  Also, if Lamar

Utilities were to seek a MACT determination at this point, it would merely be prospective in

that it would only determine what MACT requirement is currently required.  This state

administrative process would not, however, address Lamar Utilities' past and on-going

---

[4] Other cases cited by Lamar Utilities in favor of the application of the Burford abstention
doctrine are similarly not consonant with the facts of this case: they also involve actual
decisions by a state permitting authority that are challenged improperly by a plaintiff.  See
Jamison, 493 F. Supp. 2d 786, 791 (N.D. W Va. 2007); Friends of Santa Fe County v. LAC
Minerals, Inc., 892 F. Supp. 1333, 1348-49 (D.N.M. 1995).

violations of Section 112(g); this is an issue properly within the purview of this Court's jurisdiction.

**C.   WildEarth Guardians' Claim Survives a 12(b)(6) Challenge: Section 112(g) Does Apply to the Repowering Project as a Matter of Law.**

    **1.   Standard of Review.**

       A motion to dismiss is an attack on the sufficiency of the pleadings, not an attack on the merits of the case. The Supreme Court recently articulated a new standard of review for a motion to dismiss: a complaint must contain allegations sufficient "to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Tenth Circuit has interpreted "plausible" to be a relatively low standard.  See Robbins v. Oklahoma ex rel. Dep't of Human Services, 519 F.3d 1242, 1247 (10th Cir. 2008). "Plausible" does not mean a likelihood of success on the merits, nor does it require heightened pleading. Id.  Rather, the standard demands that a complaint make more than simple conclusory or speculative allegations. Id.  Therefore, to survive a motion to dismiss, the complaint must contain factual allegations sufficient to provide notice to the opposing party and demonstrate that the plaintiff has more than a speculative claim for relief. See id. at 1247-48.

    **2.   Section 112(g) Cannot be Interpreted as Only a Preconstruction Requirement.**

   Lamar Utilities interpret the Section 112(g) case-by-case MACT determination to be only a preconstruction requirement.  However, the plain language of section 112(g) fails to limit the scope of MACT determinations to only a preconstruction requirement.  42 U.S.C. § 7412(g)(2)(B) ("[N]o person may construct or reconstruct any major source of hazardous air pollutants, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met.").

       Lamar Utilities' interpretation would lead to the absurd result whereby an owner would be rewarded for initially violating Section 112(g).  "No person may construct" is a flat

prohibition on any construction until the owner has secured a valid MACT determination.[5]

While it is true that EPA regulations state that no person may "begin actual construction or

reconstruction of a major source" absent "a final and effective [MACT] determination," such

language should be seen as general program requirements, not as an attempt by EPA to weaken

any language Congress has used in the Act.  40 C.F.R. § 63.42(c).  The plain language of

Section 112(g) prohibits all construction or modification of a major source of air pollutants until

an owner obtains a final MACT determination.  Lamar Utilities failed to obtain such final

notice, and thus violated Section 112(g) by constructing the Repowering Project.  Lamar

Utilities' ongoing violation of Section 112(g) cannot excuse them from the clear statutory

mandate.

Moreover, Section 112(g) is not the only "preconstruction" requirement in the CAA;

Section 165, the Prevention of Significant Deterioration (PSD) requirements, includes language

similar to the MACT requirements.  40 C.F.R. § 52.21(i)(1).  ("[n]o stationary source or

modification... shall begin actual construction without a permit which states that the stationary

source or modification... [has met various PSD requirements].").  Courts have found that the

PSD preconstruction requirements in the CAA, analogous to MACT preconstruction

requirements, are obligatory even after construction commences.  In Nat'l Parks Conservation

Ass'n v. TVA, the court considered whether PSD requirements can apply 12 years after

construction illegally commenced without meeting the requirements. 480 F.3d 410, 416 (6th

Cir. 2006). In this case, Tennessee Valley Authority ("TVA") argued that the CAA, as reflected

in Tennessee's State Implementation Plan, prohibited only *construction* of its power plant

without a valid PSD permit and construction had occurred in 1988, more than twelve years

before the 2001 filing of the plaintiff's complaint.  Id.  Finding for plaintiff, the court concluded

that violations of PSD provisions are *continuing violations*.  Id. at 419.  Even though TVA

_____

[5] As demonstrated elsewhere in the Clean Air Act, Congress knows how to define the regulatory
status of a source based upon the commencement of construction. See 42 U.S.C. § 7411(a)(2)
(defining a "new source" under the new source performance standards program).

obtained a construction permit without the PSD provisions, such approval does not relieve any owner of the responsibility to comply with applicable provisions of local, State, or Federal law *post-construction*.  Id. at 418; see also U.S. v. Duke Energy Corp., 278 F.2d 619, 651 (M.D.N.C. 2003).

### 3.  EPA Has Concluded That Section 112(g) Applies to the Project.

Lamar Utilities assert that Section 112(g) does not impose any subsequent obligations for sources that lawfully commenced construction after the Delisting Rule but before the D.C. Circuit's opinion in New Jersey v. EPA.  However, EPA clearly disagrees with this interpretation.  On January 7, 2009, EPA sent a memo to its regional administrators affirming that Section 112(g) applied to coal-fired EGUs that began construction between March 29, 2005 and March 14, 2008.  (Def.'s Mot. for Jud. Notice, Ex. E.).  In the letter, the Principal Deputy Assistant Administrator "urge[d] permitting authorities to undertake Section 112(g) reviews without delay . . ."  (Id.)  The letter essentially acknowledges that the effect of the Court's vacatur in New Jersey v. EPA is that "coal- and oil-fired EGUs, which were a listed source category under Section 112 beginning December 20, 2000, remain on the Section 112(c) list and therefore are subject to Section 112(g)."  (Id.)

After the D.C. Circuit vacated the delisting rule, EPA acknowledged that "questions have been raised about the applicability of Section 112(g) to coal and oil-fired EGUs that are major sources and that began actual construction or reconstruction between the March 29, 2005 publication of the Section 112(n) revision rule and the March 14, 2008 *vacatur* of that rule." (Id.)  In balancing the equity between the burden on such utilities to obtain a MACT determination and the public interest in health, EPA determined that subsequent to the *vacatur* of their delisting rule, all EGUs that evaded a MACT determination under the pretense of the delisting rule are now required to obtain a valid MACT determination.  (Id.)  The EPA memo concludes that "[a]lthough these EGUs may have relied in good faith on rules that EPA issued

that were subsequently vacated, the Agency believes that these EGUs are legally obligated to come into compliance with the requirements of Section 112(g)."[6]  (Id.)

### 4.  Lamar Utilities Are Not Being Subjected to Retroactive Law.

Lamar Utilities argument—that the D.C. Circuit's decision to invalidate EPA's Delisting Rule cannot apply retroactively to render Lamar Utilities' past conduct unlawful—should be rejected for either of two reasons: (1) because EGUs were never effectively delisted and Section 112(g) has always applied to coal-fired EGU's like the Repowering Project; *or* (2) because the requirement to comply with Section 112(g) arose *after* New Jersey v. EPA was decided.  The Court, for now, need only find that one of these assertions is correct.

### (i)  Non-Compliance in 2006

Although EPA purported to remove EGUs from the Section 112(c) list in 2005, it never lawfully did so.  In New Jersey v. EPA, the D.C. Circuit expressly held that "EGUs remained listed under section 112." 517 F.3d at 583.  Therefore, since December 2000 when EPA first

---

[6] This Court need not give deference under Chevron to EPA's interpretation of the applicability of Section 112(g) to EGUs such as the Repowering Project in order to find EPA's reasoning persuasive. Chevron v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Rather, under Skidmore, EPA's application of Section 112 to EGUs "consitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  Skidmore v. Swift & Co., 323 U.S. 134 (1944).  "Under Skidmore the degree of deference given to informal agency interpretations will 'vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position.'"  S. Utah Wilderness Alliance v. Bureau of Land Mgm't, 425 F.3d 735, 759 (10th Cir. 2006). Here, EPA has carefully considered the challenges faced by owners/operators of EGUs that began construction in that time period: "EPA recognizes that the application of MACT standards to a project that has already begun construction may present challenges."  (Def.'s Mot. for Jud. Notice, Ex. E).  EPA also has been consistent in its interpretation of Section 112(g) and applied this interpretation through orders. (Pl.'s Mot. for Jud. Notice Ex. D.)  Third, EPA's interpretation has been shown to be persuasive in both Colorado and other jurisdictions, and has been accepted as such by other utilities. (Def.'s Mot. for Jud. Notice Ex. I.); (Pl.'s Mot. for Jud. Notice Ex. E.); (Pl.'s Mot. for Jud. Notice Ex. F.)  Likewise, the State of Colorado, pursuant to EPA's direction, recognizes the necessity for a Section 112(g) process for the Lamar Repowering Project. (See Def. Mot. for Jud. Notice Ex. I.)

listed them, EGUs have been subject to the requirements of Section 112, including Section

112(g)'s prohibition on constructing a major source of HAPs without a formal MACT

determination.  The court in <u>S. Alliance for Clean Energy v. Duke Energy Carolinas, LLC, I</u>

considered this retroactive argument in a substantially similar case and concluded  "…§ 112(g)

and 40 C.F.R. § 63.40 were in effect at the time [the defendant] began construction and

completion of the MACT process was required before construction began."  No. 1:08CV318,

2008 WL 5110894 (W.D.N.C. Dec. 2, 2008).  Accordingly, in the case at bar, there is no

retroactive application of the law because Section 112(g) and 40 C.F.R. § 63.40 were in effect at

the time Lamar Utilities began construction.

**(ii) Non-Compliance Arising After <u>New Jersey v. EPA</u>**

For purposes of this Motion, this Court does not have to find that 112(g) was in effect at

the time the Repowering Project's construction commenced.  Instead, for the purpose of

overcoming a 12(b)(6) motion, the court need only find that Lamar Utilities were in violation on

December 21, 2009, when WildEarth Guardians filed its complaint.  At trial, it is possible for

the Court that will conclude that the legal obligation arose on or after obtaining the 2006 permit.

The Court could find that Lamar Utilities violations commenced:

> (1) On or after March, 2008 when the D.C. Circuit court vacated the EPA's
>     attempt to delist EGUs; OR

> (2) On January 7, 2009, when EPA distributed a memo to its regional
>     administrators affirming that Section 112(g) applied to coal-fired EGUs that
>     began construction between March 29, 2005 and March 14, 2008 (Def.'s Mot.
>     for Jud. Notice, Ex. E.); OR

> (3) On July 6, 2009, when the director of the EPA Office of Civil Enforcement
>     personally notified Lamar Utilities that "[f]ailure to obtain a MACT
>     determination may subject you to enforcement. . ." (Def.'s Mot. for Jud.
>     Notice, Ex. F.)

Regardless, the Court does not need to determine whether Lamar Utilities were in violation

of the Clean Air Act on the day the Repowering Project began construction.  The exact date that

the legal obligation arose is an issue of fact and law that is better suited for the trial than for a Motion to Dismiss.

### 5.  Even If Lamar Utilities Faces Retroactive Application of Law, They Will Not Be Unfairly Subjected to Retroactive Law

Subjecting Lamar Utilities to application of Section 112(g) also does not contravene the core due process principles of fairness, notice, and reliance. Lamar Utilities had sufficient notice of the requirement to obtain a MACT determination.  See General Elec. Co. v. EPA, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995).  Fair notice is given when a "person of reasonable intelligence [has] a reasonable opportunity to know what is prohibited so that he may act accordingly." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).  Based on the three separate occasions of notice listed above, Lamar Utilities had more than a reasonable opportunity to know that construction and operation of an EGU without a MACT determination was prohibited.

Similarly, it would not be unfair to subject Lamar Utilities to a MACT determination. EPA itself took fairness into consideration and concluded that Lamar Utilities should comply with MACT post-New Jersey.   (Def.'s Mot. for Jud. Notice, Ex. F.)  EPA concluded, properly, that costs associated with compliance were trumped by the public health benefits.  (Id.) Moreover, any reasonable reliance on the de-listing rule ended when the D.C. Circuit decided New Jersey v. EPA.  After that point there was a clear legal obligation.  Even before New Jersey v. EPA, reliance on the de-listing rule was suspect because the rule so clearly violated the CAA.  Indeed, the D.C. Circuit quoted Alice in Wonderland to show how illusory and facially wrong EPA's delisting rule was.  Given the uncertainty of the agency action, the industry gambled on the lawfulness of the delisting regulation to provide a short-term benefit.  The gamble failed when the D.C. Circuit vacated EPA's delisting rule.  The *vacatur* predictably resulted in treating the delisting rule as having never been implemented.  Georgetown Univ. Hosp. v. Bowen, 821 F.2d 750, 757 (D.C. Cir. 1987) ("[T]he effect of invalidating an agency

rule is to '*reinstate* the rules previously in force.'"); <u>S. Alliance for Clean Energy v. Duke Energy Carolinas, LLC,</u> No. 1:08CV318, 2008 WL 5110894, at *10 (W.D.N.C. Dec. 2 2008).

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Defendant's Motion to Dismiss. The Court has proper subject matter jurisdiction, this case is inappropriate for application of the <u>Burford</u> abstention doctrine, and Plaintiff's Complaint sufficiently states claims upon which relief can be granted.

DATED: March 5, 2010                                    Respectfully submitted,

                                                         /s/ Michael Ray Harris

                                                        Professor Michael Ray Harris
                                                        Kevin Lynch, Esq.
                                                        Allison Vetter, Student Attorney
                                                        Ahson Wali, Student Attorney

                                                        Environmental Law Clinic
                                                        University of Denver
                                                        Sturm College of Law
                                                        2255 E. Evans Ave.
                                                        Denver, Colorado 80208
                                                        (303) 871-7870 (telephone)
                                                        (303) 871-6847 (facsimile)
                                                        mharris@law.du.edu
                                                        klynch@law.du.edu
                                                        avetter11@law.du.edu
                                                        awali11@law.du.edu

## CERTIFICATE OF SERVICE

I certify that on this 5th day of March 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Craig N. Johnson
Joseph B. Dischinger
Jason B. Robinson
Fairfield and Woods, P.C.
1700 Lincoln Street, Suite 2400
Denver, Colorado 80203
(303) 830-2400
Email: cjohnson@fwlaw.com
Email: jdischinger@fwlaw.com
Email: jrobinson@fwlaw.com

ATTORNEYS FOR DEFENDANTS

/s/ Michael Ray Harris