## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-02974-DME-BNB

WILDEARTH GUARDIANS, a New Mexico non-profit corporation, CLIFF WARREN, an individual and resident of the City of Lamar, CHARLES WARREN, an individual and resident of the City of Lamar, SHIRLEY WARREN, an individual and resident of the City of Lamar, AND VERDELL HOWARD, an individual and resident of the City of Lamar,

Plaintiffs,

v.

LAMAR UTILITIES BOARD d/b/a LAMAR LIGHT AND POWER, ARKANSAS RIVER POWER AUTHORITY, THE CITY OF LAMAR, a Colorado Home Rule Municipality, ROGER STANGER, in his official capacity as Mayor of the City of Lamar, KIRK CRESPIN, in his official capacity as city councilman, Ward I for the City of Lamar, SKIP RUEDEMAN, in his official capacity as city councilman, Ward II for the City of Lamar, BEVERELY HAGGARD, in her official capacity as city councilwoman, Ward III for the City of Lamar, JIM LARRICK, in his official capacity as city councilman, Ward I for the City of Lamar, P.J. WILSON, in his official capacity as city councilman, Ward II for the City of Lamar, KEITH NIDEY, in his official capacity as city councilman, Ward III for the City of Lamar, ROBERT G. SCHEMAHORN, JR., in his official capacity as Chairman of the Lamar Utilities Board, WILLIAM WOOTEN, in his official capacity as Vice Chairman of the Lamar Utilities Board, DONALD L. STEERMAN, in his official capacity as a member of the Lamar Utilities Board, DAVID ANDERSON, in his official capacity as a member of the Lamar Utilities Board, AND JOHN R. MUNEZ, in his official capacity as a member of the Lamar Utilities Board,

Defendants.

## [PROPOSED] FIRST AMENDED COMPLAINT

## INTRODUCTION

1.      Plaintiffs WildEarth Guardians, Cliff Warren, Charles Warren, Shirley Warren,

and Verdell Howard bring this suit pursuant to the citizen suit provision of the federal Clean Air

Act, 42 U.S.C. § 7604, against Lamar Utilities Board d/b/a Lamar Light and Power, Arkansas

River Power Authority, Roger Stanger, Kirk Crespin, Skip Ruedeman, Beverly Haggard, Jim

Larrick, P.J. Wilson, Keith Nidey, Robert G. Schemahorn, Jr., William Wooten, Donald L. Steerman, David Anderson, and John R. Munez (hereinafter "Lamar Utilities") for constructing a new 43-megawatt coal-fired power plant in Lamar, Colorado (hereinafter "Lamar Repowering Project") in violation of Section 112(g) of the Clean Air Act, 42 U.S.C. § 7412(g).  Under this section of the Clean Air Act, Lamar Utilities are prohibited from constructing or reconstructing the Lamar Repowering Project in the absence of a final determination that the facility will use the Maximum Achievable Control Technology ("MACT") to reduce emissions of mercury and other hazardous air pollutant.  Lamar Utilities further violated the Home Rule Charter of the City of Lamar when they entered a Joint Operating Agreement to construct the Lamar Repowering Project without approval of a majority of the voters in Lamar.  Plaintiffs seek declaratory and injunctive relief against Lamar Utilities, as well as applicable civil penalties.

2.      Lamar Utilities' violation of the Clean Air Act poses a serious threat to the health of Colorado's people and surrounding environment.  The U.S. Environmental Protection Agency ("EPA") has found that coal-fired power plants such as the Lamar Repowering Project emit 67 of the 188 individual hazardous air pollutants Congress listed for regulation under the 1990 Clean Air Act Amendments, including mercury, selenium, dioxins, arsenic, acid gases, and other heavy metals.

3.      Mercury and its interaction with the environment is one clear example of how hazardous air pollutants emitted by coal-fired power plants pose serious health threats to the people of Colorado.  Once mercury is deposited in Colorado's waters, the formation of highly toxic methylmercury occurs.  Methylmercury then accumulates in fish tissue and threatens human health if consumed.  Nearly 20% of the state's fish species have high mercury concentrations, and many Coloradoans routinely consume locally caught fish.

2

4.      EPA  has determined that "[n]eurotoxicity is the health effect of greatest concern with methylmercury exposure . . . Dietary methylmercury is almost completely absorbed into the blood and distributed to all tissues including the brain; it also readily passes through the placenta to the fetus and fetal brain. The developing fetus is considered most sensitive to the effects from methylmercury . . . ." 65 Fed. Reg. 79,825, 79,829 (Dec. 20, 2000).  Fetuses, breast-fed infants, and children exposed to methylmercury when they or their mothers consume contaminated fish are at particular risk for developing permanent neurological disorders including mental retardation, vision loss, hearing loss, delayed developmental milestones, attention deficits, memory problems, auditory processing problems, language difficulties, ataxia, and, in extreme cases, seizures.

5.      Other hazardous air pollutants emitted by power plants include arsenic, dioxins, acid gases, selenium, lead, and other heavy metals, which have been shown to cause serious adverse health effects, including cancer, heart disease, stroke, and neurological impairment.  One of those pollutants, dioxin, is among the most potent carcinogens on the planet.

6.      Section 7-6(a) of the Home Rule Charter of the City of Lamar prohibits the disposal of any public utility without approval of the majority of the voters in the city.  Lamar Utilities Board and the City of Lamar disposed of a public utility when they dedicated certain existing facilities to the Lamar Repowering Project.  By entering into the Joint Operating Agreement with Arkansas River Power Authority, Lamar Utilities Board and the City of Lamar deprived the voters in Lamar, including Plaintiffs, of their right to determine whether such disposal of a public utility shall occur.

7.      Plaintiffs, a citizen group and members who are harmed by Lamar Utilities' violations of the Clean Air Act, ask the Court, pursuant to the Clean Air Act's citizen suit

provision, 42 U.S.C. § 7604(a), to: (1) declare that Lamar Utilities' construction and/or reconstruction and operation of the Lamar Repowering Project without an approved MACT determination is illegal under section 112 of the Clean Air Act, 42 U.S.C. § 7412; (2) enjoin Lamar Utilities from further construction, reconstruction, or operation of the Lamar Repowering Project unless and until it complies with the Clean Air Act and any applicable regulatory requirements; (3) assess civil penalties against Lamar Utilities for its violations of the Clean Air Act; (4) enjoin defendants to set aside the Joint Operating Agreement and/or order that Defendants comply with Section 7-6(a) of the Home Rule Charter of the City of Lamar; (5) declare that Lamar Utilities Board and the City of Lamar are in violation of Section 7-6(a) of the Home Rule Charter of the City of Lamar; (6) issue injunctive relief as may be necessary and proper; and (7) award Plaintiffs their cost of litigation.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this Clean Air Act citizen suit pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331.

9. This Court has supplemental jurisdiction over all other claims arising under Colorado state law pursuant to 28 U.S.C. § 1367(a).

10. Pursuant to 42 U.S.C. § 7604(c), venue is proper because the Lamar Repowering Project is located in this District and violations have occurred and continue to occur in this District.

11. On September 10, 2009, Plaintiff WildEarth Guardians provided Lamar Utilities with notice of the Clean Air Act violations alleged in this Complaint as required by 42 U.S.C. § 7604. WildEarth Guardians also provided notice to the EPA Administrator, and to the State of Colorado via the Governor, pursuant to 42 U.S.C. § 7604(b). At least 60 days have elapsed since

WildEarth Guardians provided notice of the Clean Air Act violations alleged in this Complaint. Neither EPA nor the State of Colorado has commenced or diligently prosecuted a civil action to require compliance with the Clean Air Act violations alleged in this Complaint.

## THE PARTIES

12.     Plaintiff WILDEARTH GUARDIANS is a non-profit corporation with approximately 4,000 members throughout the United States, including in Colorado. WildEarth Guardians' mission is to bring people, science, and the law together in defense of the American West's rivers, forests, deserts, grasslands, and the delicate web of life to which we are inextricably linked.

13.     Members of WildEarth Guardians live, work, garden, and engage in outdoor recreation in areas that would be affected by the excessive amount of mercury and other hazardous air pollutants that the Lamar Repowering Project will emit if it is allowed to operate without a proper MACT determination. WildEarth Guardians regularly supports its mission by providing the State of Colorado with comments related to coal-fired power plants during the administrative review process. Thus, WildEarth Guardians, its staff, and its members have a substantial interest in this matter and are adversely affected and aggrieved by Lamar Utilities' failure to comply with the Clean Air Act. WildEarth Guardians brings this action on behalf of itself and its adversely affected members. A decision requiring Lamar Utilities to cease construction, reconstruction, or operation of the Lamar Repowering Project until it obtains a lawful MACT determination would redress these harms to Plaintiff and its members.

14.     Plaintiffs CLIFF WARREN, CHARLES WARREN, SHIRLEY WARREN, and VERDELL HOWARD are individuals and residents of the City of Lamar. Each lives with 1 mile of the Lamar Repowering Project.

15.     Defendant LAMAR UTILITIES BOARD d/b/a LAMAR LIGHT AND POWER, owns and operates the Lamar Repowering Project where the violations that gave rise to this action occurred and where construction continues on the Lamar Repowering Project.  Lamar Light and Power has constructed, reconstructed, and/or operated the Lamar Repowering Project. Lamar Light and Power is a municipal utility providing electric power to Lamar, McClave, Wiley, Bristol, and Hartman in Bent and Prowers Counties, Colorado.  Lamar Light and Power is a "person" within the meaning of 42 U.S.C. § 7602(e).

16.     Defendant ARKANSAS RIVER POWER AUTHORITY owns and operates the Lamar Repowering Project where the violations that gave rise to this action occurred and where construction continues on the Lamar Repowering Project.  Arkansas River Power Authority has constructed, reconstructed, and/or operated the Lamar Repowering Project.  Arkansas River Power Authority is a political subdivision of the State of Colorado, established pursuant to the Power Authority Act, COLO. REV. STAT. § 29-1-204.  Arkansas River Power Authority provides wholesale electric power to the seven municipalities that formed it:  Holly, Springfield, La Junta, Trinidad, Lamar, and Las Animas in Colorado and Raton in New Mexico.  The principal office for the Arkansas River Power Authority is located in Lamar, Colorado.  Arkansas River Power Authority is a "person" within the meaning of 42 U.S.C. § 7602(e).

17.     Defendant ROGER STANGER is sued in his official capacity as the elected Mayor of the City of Lamar.  Mr. Stanger is responsible for assuring that the City comply in all respects with the Home Rule Charter of the City of Lamar.

18.     Defendants KIRK CRESPIN, SKIP RUEDEMAN, BEVERELY HAGGARD, JIM LARRICK, P.J. WILSON, and KEITH NIDEY are sued in their official capacities as

elected members of the Lamar City Council.  The city council is responsible for assuring that the City comply in all respects with the Home Rule Charter of the City of Lamar.

19.     Defendant ROBERT G. SCHEMAHORN, JR. is sued in his official capacity as Chairman of the Lamar Utilities Board.  The Lamar Utilities Board is responsible for assuring that the Lamar Repowering Project complies with the federal Clean Air Act.  The Lamar Utilities Board is further responsible for assuring that the Board's actions comply in all respects with the Home Rule Charter of the City of Lamar.

20.     Defendant WILLIAM WOOTEN is sued in his official capacity as Vice Chairman of the Lamar Utilities Board.  The Lamar Utilities Board is responsible for assuring that the Lamar Repowering Project complies with the federal Clean Air Act.  The Lamar Utilities Board is further responsible for assuring that the Board's actions comply in all respects with the Home Rule Charter of the City of Lamar.

21.     Defendants DONALD L. STEERMAN, DAVID ANDERSON, and JOHN R. MUNEZ are sued in their official capacities as members of the Lamar Utilities Board.  The Lamar Utilities Board is responsible for assuring that the Lamar Repowering Project complies with the federal Clean Air Act.  The Lamar Utilities Board is further responsible for assuring that the Board's actions comply in all respects with the Home Rule Charter of the City of Lamar.

## LEGAL BACKGROUND

22.     In 2000, EPA placed "electric utility steam generating units" ("EGUs") on the list of categories of sources of hazardous air pollutants established by Clean Air Act Section 112(c), making them subject to regulation under Section 112.  65 Fed. Reg. at 79,830.  An EGU is defined in this context as "any fossil fuel fired combustion unit of more than 25 megawatts that serves a generator that produces electricity for sale."  42 U.S.C. § 7412(a)(8).

23.     A coal-fired power plant capable of producing at least 25 megawatts is a type of EGU subject to regulation under Section 112(g).

24.     After a source category is placed on the Section 112(c) list, EPA is required to promulgate maximum achievable hazardous air pollutant emissions standards for that category, at which point all new and modified plants must meet those standards.  See 42 U.S.C. §§ 7412(d), 7412(g)(2)(B).

25.     In enacting Section 112(g), Congress provided a mechanism to ensure that new or reconstructed listed source categories do not escape MACT regulation in absence an EPA promulgated standard under 42 U.S.C. § 7412(d).  This is done through a case-by-case MACT determination for new or reconstructed sources.

26.     Specifically, Section 112(g)(2)(B) of the Clean Air Act prohibits any person from "construct[ing] or reconstruct[ing] any major source of hazardous air pollutants unless the Administrator (or the State) determines that the maximum achievable control technology emissions limitation under this section for new sources will be met."  42 U.S.C. § 7412(g)(2)(B). This section further requires that the MACT determination "shall be made on a case-by-case basis where no applicable emission limitations have been established . . . ."  Id.

27.      For purposes of implementing Section 112, EPA has by regulation provided for definitions of several terms.

28.     Construction is defined as "the on-site fabrication, erection, or installation of an affected source."  40 C.F.R. § 63.2.  Reconstruction is defined as:

> "the replacement of components of an affected or a previously non-affected source to such an extent that: (1) The fixed capital cost of the new components exceeds 50 percent of the fixed capital cost that would be required to construct a comparable new source; and (2) It is technologically and economically feasible for the reconstructed source to meet the relevant standard(s) established by the Administrator (or a State) pursuant to section 112 of the Act.

Upon reconstruction, an affected source, or a stationary source that becomes an affected source, is subject to relevant standards for new sources, including compliance dates, irrespective of any change in emissions of hazardous air pollutants from that source." Id.

29.     Major source means "any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants, unless the Administrator establishes a lesser quantity, or in the case of radionuclides, different criteria from those specified in this sentence." 40 C.F.R. § 63.2.

30.     Pursuant to federal regulations implementing Section 112(g) of the Clean Air Act, a MACT determination must identify and require a level of control that "shall not be less stringent than the level of emission control which is achieved in practice by the best controlled similar source." 40 C.F.R. § 63.43(d)(1).

31.     EPA regulations governing the process for conducting a case-by-case MACT determination provide the public the right to comment on and to appeal the MACT determination.  See 40 C.F.R. § 63.43(c)(2)(ii), (h).

32.     In 2005, EPA purported to remove EGUs from the list of sources subject to Clean Air Act Section 112.  The EPA regulations provide that once a source is listed, the source may only be deleted from the source category list pursuant to Section 112(c)(9).  However, EPA did not purport to delist EGUs pursuant to Section 112(c)(9).

33.     EPA's decision was challenged in the D.C. Circuit by numerous states, tribes, and environmental organizations.

34.     On February 8, 2008, the D.C. Circuit vacated as unlawful EPA's attempt to remove coal-fired power plants from the list of sources regulated under Section 112 of the Clean

Air Act.  New Jersey v. EPA, 517 F.3d 574 (D.C. Cir. 2008).  The D.C. Circuit held that power

plants "remain listed under section 112."  Id. at 583.  Accordingly, EGUs are sources subject to

the Clean Air Act's requirements for hazardous air pollutants including mercury.

35.     To date, EPA has not promulgated maximum achievable hazardous air pollutant

emissions standards for EGUs.

36.     On January 7, 2009, EPA Headquarters sent a memo to the Regional

Administrators detailing how the MACT requirements of Section 112(g) should be applied to

coal plants which began construction between March 29, 2005 and March 14, 2008.  See

Memorandum from Bob Meyers, EPA Office of Air and Radiation to Regional Administrators

(Jan. 7, 2009).  EPA affirmed in this memo that the MACT regulations require a case-by-case

determination to be made by the permitting authority for each of these coal plants.  Id.  The

memo also urged permitting authorities to conduct these Section 112(g) reviews without delay.

Id.

37.     Pursuant to the citizen suit provision of the Clean Air Act, any person may

commence a civil action for violation of an emission standard or limitation, including the

requirements of Section 112(g).  42 U.S.C. § 7604(a), (f).  The Clean Air Act's citizen suit

provision permits citizens to seek injunctive relief and civil penalties payable to the U.S.

Treasury of up to $37,500.00 per day for each violation of the Clean Air Act.  See 42 U.S.C.

§§ 7413(b), 7604(a); 40 C.F.R. § 19.4.

38.     Section 7-6(a) of the Home Rule Charter of the City of Lamar states: "Disposition

of public utilities.  The City shall have no authority to cease to operate, sell, lease, abandon, or in

any other way dispose of any public utility by it without the approval of a majority of the votes

cast by the registered voters of the City, at a general election or a special election held for the purpose."

## FACTUAL BACKGROUND

39.     The Lamar Utilities Board ("LUB") was created by the City of Lamar and is responsible for the development, production, purchase, and distribution of all electricity for the City.

40.     Lamar Utilities has historically operated a natural gas fired EGU in Lamar, Colorado.

41.     In 1979, the Arkansas River Power Authority ("ARPA") was created as a political subdivision of the state of Colorado for the purpose of furnishing the wholesale electric power requirements of member municipalities, including the City of Lamar.

42.     In October 2003, LUB and ARPA entered into a "Letter of Intent for the Lamar Repowering Project."

43.     The Lamar Repowering Project replaced the existing natural gas-fired EGU with a 43-megawatt, coal-fired boiler type power plant.

44.     The Lamar Repowering Project involved extensive replacement of existing equipment at the plant, including, one diesel fueled compression ignition, reciprocating internal combustion engine powering a fire pump rated at 373 horsepower; one Babcock and Wilcox, bituminous or sub-bituminous coal fired, circulating fluidized bed, steam boiler;  one-custom built, railcars coal unloading system; one custom-built, Coal Dome filing system consisting of two head-boxes and loading spouts; two custom-built, bituminous or sub-bituminous coal storage domes; one custom-built, starvac coal reclaim system; coal crushing system design rated at 150 tons per hour; one coal conveying system comprising two conveyor belts and one transfer tower

between the two conveyors; three custom-built, day silos with a holding capacity of 180 tons

each; one custom built limestone crusher and one storage silo; one limestone unloading pit and

hopper; one custom built ash vacuum blower system; one custom built ash silo for holding ash

collected in the main boiler; one trackmobile titan, railcars mover, equipped with a 260

horsepower, Cummins, diesel fuel-fired engine; and truck on site haul and service roads.  See

Construction Permit No. 05PR0027 (Feb. 3, 2006) at 16-21.

45.     In November 2004, LUB and ARPA entered into a Joint Operating Agreement for

the development of the Lamar Repowering Project and its continued operation and maintenance.

46.     The Joint Operating Agreement was signed by Robert G. Schemahorn, Jr. in his

capacity as Chairman of LUB and by the Mayor of the City of Lamar.

47.     Among other things, in the Joint Operating Agreement LUB agreed to dedicate

certain real properties and physical assets to the Lamar Repowering Project at no cost to the

ARPA.

48.     In dedicating property to the Lamar Repowering Project, LUB acknowledged that

it has accepted valuable consideration in return in the forms of various benefits to be provided to

the City of Lamar from the project.

49.     ARPA agreed to fund or finance all capital improvement to the dedicated facilities

that constitute the Repowering Project.

50.     ARPA funded or financed all aspects of the Repowering Project through issuance

of Repowering Project Bonds.

51.     LUB agreed that all capital improvements to the dedicated facilities shall be

dedicated exclusively to the repowering project for a period of 40 years.

52.     ARPA appointed LUB as the operating agent of the Repowering Project for the term of the agreement.

53.     On February 3, 2006, the Colorado Department of Public Health and Environment ("CDPHE") issued construction permit # 05PR0027 to Lamar Utilities to authorize the Lamar Repowering Project.

54.     Page 13, Paragraph 5 of the February 3, 2006 permit established the following emissions of Hydrochloric Acid: 20,591 pounds/annually.

55.     On August 21, 2007, the CDPHE issued a modified construction permit # 05PR0027 to LUB authorizing the Lamar Repowering Poject.

56.     Page 10, Paragraph 15 of the August 21, 2007 permits states that "activities from the plant shall not exceed the following limitation[]:" 10.5 tons/annually of Hydrochloric Acid.

57.     Page 12 of the August 21, 2007 permit established the following emissions of Hydrochloric Acid: 20,945 pounds/annually.

58.     On October 18, 2009, the CDPHE issued a second modified construction permit # 05PR0027 to LUB authorizing the Lamar Repowering Poject.

59.     Page 8, Paragraph 15 of the October 18, 2009 permits states that "activities from the plant shall not exceed the following limitation[]:" 10.5 tons/annually of Hydrochloric Acid.

60.     Page 12, Paragraph 4 of the October 18, 2009 permit established the following emissions of Hydrochloric Acid: 20,945 pounds/annually.

61.     Construction of the Lamar Repowering Project began in late July 2006.

62.     The Lamar Repowering Project's existing permit allows for the discharge of 38 pounds of mercury annually.

63.     By July 2006, Lamar Utilities had not obtained a determination from EPA or the CDPHE that the Lamar Repowering Project will meet MACT emission limits for hazardous air pollutants.  Additionally, as of March 14, 2008, the date of the D.C. Circuit's mandate vacating EPA's attempt to remove EGUs from the list of "major sources" of hazardous air pollutants, Lamar Utilities had not attempted to properly obtain a MACT determination and continued constructing the Lamar Repowering Project.

64.     As of the date of the filing of this First Amended Complaint, Lamar Utilities had not obtained a MACT determination from EPA or CDPHE.  Likewise, CDPHE has not received an application to modify the permit, nor any documentation indicating intent to obtain a MACT determination.

65.     Lamar Utilities submitted a notice of start-up for the boiler to CDPHE on June 1, 2009.  The Lamar Repowering Project is currently undergoing a start-up process during which the plant is tested for operational and safety integrity.  The plant has begun to burn coal and produce electricity, although production is below 50% capacity.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
*Violation of Clean Air Act Section 112(g)(2)(B)*
*Construction or Reconstruction Without a MACT Determination*

66.     Plaintiffs repeat and incorporate the allegations in the preceding paragraphs as if set forth in full.

67.     The Lamar Repowering Project amounts to construction or reconstruction, within the meaning of Clean Air Act Section 112(g), of a coal-fired EGU, which is a listed source category of hazardous air pollutants under Section 112(c).

68.     The Lamar Repowering Project, as constructed or reconstructed, is a major source of hazardous air pollutants within the meaning of Section 112(a)(1).

69.     Lamar Utilities commenced construction or reconstruction of the Lamar Repowering Project in violation of Section 112(g), as well as federal and state implementing regulations.  Lamar Utilities have not obtained a case-by-case MACT determination for any of the hazardous air pollutants that would be emitted by the Lamar Repowering Project.  Pursuant to case-by-case MACT requirements, Lamar Utilities must demonstrate and obtain a final and effective determination from EPA or the State of Colorado that the Lamar Repowering Project will achieve reductions in hazardous air pollutant emissions that appropriately reflect MACT for each hazardous air pollutant emitted, which must be at least as stringent as the emissions performance achieved in practice by the best performing similar source.

70.     Lamar Utilities will continue to violate the Clean Air Act until such time as they cease construction and/or operation of the Lamar Repowering Project, or obtain a valid and effective case-by-case MACT determination for each hazardous air pollutant that the Lamar Repowering Project would emit.

### SECOND CAUSE OF ACTION
*State Law Claim Under C.R.C.P 106(a)(2)*
*Violation of Section 7-6(a) of the Home Rule Charter of the City of Lamar*

71.     Plaintiffs repeat and incorporate the allegations in the preceding paragraphs as if set forth in full.

72.     Section 7-6(a) of the Home Rule Charter of the City of Lamar states: "Disposition of public utilities.  The City shall have no authority to cease to operate, sell, lease, abandon, or in any other way dispose of any public utility by it without the approval of a majority of the votes cast by the registered voters of the City, at a general election or a special election held for the purpose."

73.     Colorado Rule of Civil Procedure 106(a)(2) authorizes relief "[w]here the relief sought is to compel a lower judicial body, governmental body, board, officer or person to perform and act which the law specifically enjoins as a duty resulting from an office, trust, or station."

74.     To obtain such relief, a party must show: (1) a clear right to the relief sought; (2) that the defendant has a clear duty to perform the act requested; and (3) that no other remedy is available.

75.     The dedication of a utility owned by the LUB to the Lamar Repowering Project in exchange for valuable consideration provided by ARPA constitutes the lease, abandonment or disposal of a public utility.

76.     Upon entering the Joint Operating Agreement, neither LUB nor the City of Lamar sought approval of a majority of the registered voters of the City.

77.     Named Plaintiffs are residents of, and registered voters in the City of Lamar who were deprived of their clear right to vote on the Joint Operating Agreement and the dedication of a utility to the Lamar Repowering Project.

78.     No provision of the Home Rule Charter of the City of Lamar, or any other local or state law, provides a remedy to address LUB and the City's violation of Section 7-6(a).

79.     LUB and the City's violation of Section 7-6(a) directly resulted in the construction of the Lamar Repowering Project in violation of the Clean Air Act.

80.     Plaintiffs' claims under Colorado Rule of Civil Procedure 106(a)(2) are so related to claims in the action within such original jurisdiction under the Clean Air Act that they form part of the same case or controversy under Article III of the United States Constitution.

81.     The Court can remedy Defendants' violation of the Home Rule Charter for the City of Lamar by issuing appropriate injunctive relief, as a state court is authorized to do under Colorado law, directing Defendants to seek voter approval of the Joint Operating Agreement, or any other proposal to cease to operate, sell, lease, abandon, or in any other way dispose of the property that has been dedicated to the Lamar Repowering Project.

### THIRD CAUSE OF ACTION
*State Declaratory and Injunctive Relief*
*Violation of Section 7-6(a) of the Home Rule Charter of the City of Lamar*

82.     Plaintiffs repeat and incorporate the allegations in the preceding paragraphs as if set forth in full.

83.     Alternatively, Plaintiffs seek a declaration from the Court that the Lamar Utilities Board and the City of Lamar violated the Home Rule Charter for the City of Lamar in entering into the Joint Operating Agreement with the Arkansas River Power Authority.

84.     Colorado Revised Statutes section 13-51-105 states: "Courts of record within their respective jurisdictions have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree."

85.     Colorado Revised Statutes section 13-51-106 states: "Any person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder."

86.     The Court can remedy Defendants' violation of the Home Rule Charter for the

City of Lamar by issuing declaratory relief and appropriate injunctive relief, as a state court is

authorized to do under Colorado law, directing Defendants to seek voter approval of the Joint

Operating Agreement, or any other proposal to cease to operate, sell, lease, abandon, or in any

other way dispose of the property that has been dedicated to the Lamar Repowering Project.  See

Colo. R. Civ. P. 65 and Colo. Rev. Stat. section 13-51-112 ("Further relief based on a

declaratory judgment or decree may be granted when necessary or proper.").

**FOURTH CAUSE OF ACTION**
*Federal Declaratory and Injunctive Relief*
*Violation of Section 7-6(a) of the Home Rule Charter of the City of Lamar*

87.     Plaintiffs repeat and incorporate the allegations in the preceding paragraphs as if

set forth in full.

88.     Alternatively, Plaintiffs seek a declaration from the Court that the Lamar Utilities

Board and the City of Lamar violated the Home Rule Charter for the City of Lamar in entering

into the Joint Operating Agreement with the Arkansas River Power Authority.

89.     Under federal law, "In a case of actual controversy within its actual jurisdiction…

any court of the United States, upon the filing of an appropriate pleading, may declare the rights

and other legal relations of any interested party seeking such declaration…."  28 U.S.C.

§ 2201(a).

90.     The Court can remedy Defendants' violation of the Home Rule Charter for the

City of Lamar by issuing declaratory relief, and appropriate injunctive relief, directing

Defendants to seek voter approval of the Joint Operating Agreement, or any other proposal to

cease to operate, sell, lease, abandon, or in any other way dispose of the property that has been

dedicated to the Lamar Repowering Project.  See 28 U.S.C. § 2202 ("Further necessary or proper

18

relief based upon a declaratory judgment or decree may be granted, after reasonable notice and

hearing, against any adverse party whose rights have been determined by such judgment.").

## PRAYER FOR RELIEF

WHEREFORE, based upon the allegations contained in the foregoing paragraphs, the

Plaintiffs request that this Court:

1. Issue a declaratory judgment that Lamar Utilities' construction, reconstruction and/or operation of the Lamar Repowering Project without an approved MACT determination is illegal under Section 112 of the Clean Air Act, 42 U.S.C. § 7412;

2. Permanently enjoin Lamar Utilities from construction, reconstruction, or operation of the Lamar Repowering Project except in accordance with a MACT determination pursuant to Section 112(g) of the Clean Air Act and applicable regulatory requirements;

3. Assess a civil penalty against Lamar Utilities of up to $37,500.00 per day for each violation of the Clean Air Act and applicable regulations;

4. Enjoin LUB and the City of Lamar under Colorado Rule of Civil Procedure 106(a)(2) to set aside the Joint Operating Agreement and/or order that Defendants comply with Section 7-6(a) of the Home Rule Charter of the City of Lamar;

5. Issue declaratory relief that LUB and the City of Lamar are in violation of Section 7-6(a) of the Home Rule Charter of the City of Lamar;

6. Issue injunctive relief as may be necessary or proper;

7. Award Plaintiffs their costs and reasonable attorney fees incurred in initiating and prosecuting this action; and

8. Grant such other relief as the Court deems just and proper.


Respectfully submitted,

/s/ Michael Ray Harris
CO Bar # 35395
Michael Ray Harris
Assistant Professor & Director
Environmental Law Clinic
University of Denver
Sturm College of Law
2255 E. Evans Ave.

Denver, Colorado 80208
(303) 871-7870 (telephone)
(303) 871-6847 (facsimile)
mharris@law.du.edu

Kevin J. Lynch
CO Bar # 39873
Environmental Law Clinic
University of Denver
Sturm College of Law
2255 E. Evans Ave.
Denver, Colorado 80208
(303) 871-6039 (telephone)
(303) 871-6847 (facsimile)
klynch@law.du.edu

Dated: April 30, 2010

Plaintiffs:
WildEarth Guardians
1536 Wynkoop St, Ste 301
Denver, CO 80202

Cliff Warren
416 N. 4th St.
Lamar, CO  81052

Shirley and Charles Warren
311 N. 11th St.
Lamar, CO  81052

Verdell Howard
800 W. Pearl
Lamar, CO  81052