**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:09-cv-02974-DME-BNB

WILDEARTH GUARDIANS, a New Mexico non-profit corporation,

        Plaintiff,

v.

LAMAR UTILITIES BOARD doing business as LAMAR LIGHT AND POWER, and
ARKANSAS RIVER POWER AUTHORITY,

        Defendants.

---

**ORDER GRANTING PLAINTIFF PARTIAL SUMMARY JUDGMENT, DENYING
PLAINTIFF'S MOTION TO TAKE JUDICIAL NOTICE, AND DENYING DEFENDANTS'
RENEWED MOTION FOR ABSTENTION AND MOTION FOR SUMMARY JUDGMENT**

---

This matter comes before the Court on three pending motions.  After considering those motions and relevant briefing, the Court GRANTS Plaintiff Wildearth Guardians' ("Wildearth's") Motion for Partial Summary Judgment (Doc. 77), DENIES Wildearth's Motion to Take Judicial Notice of Documents in Support of Their Motion for Partial Summary Judgment (Doc. 78), and DENIES Defendants Lamar Utilities Board, doing business as Lamar Light and Power, and Arkansas River Power Authority's Renewed Request for Abstention and Motion for Summary Judgment (Doc. 76).  In doing so, the Court concludes that Wildearth's request for injunctive relief is MOOT, but the remainder of the case remains justiciable.

## I.  BACKGROUND

The Court set forth the facts of this case in its Order Granting in Part and Denying in Part Defendants' Motion to Dismiss; however, due to their importance to the

Court's analysis, some facts are worth repeating here.  Over the last decade, the

Environmental Protection Agency ("EPA") has twice changed its position on how coal-

fired power plants, such as the one at issue here, are regulated under the Clean Air Act

("CAA").  See generally Wildearth Guardians v. Pub. Serv. Co. of Colo., No. 11-1400,

2012 WL 3243458, at *1-*3 (10th Cir. Aug. 10, 2012) (to be reported at 690 F.3d 1174).

This has created problems for the industry as the governing regulatory requirements

have changed at the same time plants have actively been designed, built, and operated.

That difficulty notwithstanding, it is incumbent on operators, such as Defendants Lamar

Utilities Board and Arkansas River Power Authority (collectively "the Utilities"), to ensure

that their facilities comport with federal law.  The Court will first lay out that law and then

briefly sketch the undisputed facts underlying this case.

## A.  Clean Air Act Section 112(g), the Delisting Rule and CAMR, and New Jersey v. EPA

Section 112 of the CAA, 42 U.S.C. § 7412,[1] regulates the emission of hazardous

air pollutants into the atmosphere.  In 1990, Congress amended § 112 to list more than

one hundred specific hazardous air pollutants, including mercury, that the EPA would be

required to regulate.  New Jersey v. EPA, 517 F.3d 574, 578 (D.C. Cir. 2008).  These

amendments also required the EPA to conduct a study to determine whether it was

"appropriate and necessary" to regulate, under § 112, electric utility steam-generating

units ("EGUs") as sources of hazardous air pollutants.  CAA § 112(n)(1)(A).  This study,

which the EPA completed in 1998, found "a plausible link" between human-generated

---

[1] This Order will refer to statutory provisions by the Clean Air Act section numbers (e.g., "CAA § 112") rather than the U.S. Code codification (e.g., "42 U.S.C. § 7412").

sources of mercury, such as coal- and oil-fired EGUs, and methylmercury in fish, which poses a significant human health hazard.  New Jersey, 517 F.3d at 579.

Based on this report, the EPA determined in 2000 that coal- and oil-fired EGUs would be regulated under § 112(g), which requires that all new and reconstructed EGUs meet the "maximum achievable control technology emission limitation" ("MACT") standard.  CAA § 112(g)(2)(A).  Congress had previously directed the EPA to establish specific MACT standards applicable to various categories of hazardous waste emitters. See id. § 112(d)  These standards "reflect the maximum reduction in emissions which can be achieved by application of the best available control technology."  Natural Res. Def. Council v. EPA, 489 F.3d 1364, 1368 (D.C. Cir. 2007) (internal quotation marks, alteration omitted).  In the interim, before the EPA promulgated MACT standards for EGUs, the relevant state or federal air pollution permitting authority was to determine whether an EGU met the required MACT standard "on a case-by-case basis."  CAA § 112(g)(2).  The EPA authorized the State of Colorado to make MACT determinations for EGUs in this State, see Wildearth Guardians, 2012 WL 3243458, at *1 & n.1, and the State does so through the Air Pollution Control Division ("APCD") of Colorado's Department of Public Health and Environment.[2]  In the normal course, MACT determinations are made prior to the construction or reconstruction of an EGU.

_____

[2]  The EPA adopted specific MACT emissions standards for EGUs, effective April 16, 2012.  See 77 Fed. Reg. 9304 (Feb. 16, 2012); see also Wildearth Guardians, 2012 WL 3243458, at *2.  No one has suggested that these new MACT standards are relevant here.  Instead, during the time at issue in this case, any required MACT determination would have been made by Colorado's APCD on a case-by-case basis.  The parties do suggest that now, if the Lamar Repowering Project were a major source of hazardous air pollutants, it would be considered an "existing source" for purposes of the newly

The MACT requirement applies only to EGUs that are a "major source" of hazardous air pollutants.  CAA § 112(g).  An EGU is a major source if it "emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants."  Id. § 112(a)(1).

In 2005, the EPA changed course in its approach to regulating EGUs and determined that it would "de-list" EGUs from § 112 regulation and, instead, regulate EGUs under § 111.  New Jersey, 517 F.3d at 579-80.  It did this by issuing two rules: the Delisting Rule, which removed EGUs from § 112 coverage, and the Clean Air Mercury Rule ("CAMR"), which, under § 111, set nationwide mercury emission limits and established a voluntary cap-and-trade system for new and reconstructed EGUs. New Jersey, 517 F.3d at 577.  These rules went into effect in May of 2005.  Id. at 580. A number of states filed suit against the EPA in response, arguing that § 112(c)(9) of the CAA sets forth specific procedures for delisting sources of hazardous air pollutants and that the EPA did not follow those procedures when it delisted EGUs.  Id. at 581. The D.C. Circuit agreed and vacated both the Delisting Rule and the CAMR.[3]  Id. at

---

adopted MACT standards and would, therefore, be given a reasonable time to comply with the new standards.  But, because this order concludes that the Project is no longer a major source of hazardous air pollutants, after receiving a modified permit on July 25, 2012, these newly adopted MACT standards will not apply to the Project.

[3] The CAA's citizen suit provision gives federal courts like this one jurisdiction over suits asserting that specific "major emitting facilities" violate the requirements of the CAA. CAA § 304(a), (f).  But Congress specifically reserved jurisdiction over challenges to the EPA's administrative rules and regulations implementing the statute as a whole to the U.S. Court of Appeals for the D.C. Circuit.  Id. § 307(b)(1).  Congress's designation of the D.C. Circuit as the court with exclusive jurisdiction over challenges to rules such as

583-84.  Thus, as of the issuance of the mandate by the D.C. Circuit, on March 14, 2008, coal-fired EGUs that are major sources of hazardous air pollutants were once again required to obtain a MACT determination in order to operate lawfully.

In January of 2009, the EPA Principal Deputy Assistant Administrator sent a letter to all EPA Regional Administrators addressing the question of "coal- and oil-fired EGUs that are major sources and that began actual construction or reconstruction between the March 29, 2005 publication of [the Delisting Rule and CAMR] and the March 14, 2008 vacatur of the rule[s]."  (Doc. 76-12 at 2 (footnote omitted).)  In the EPA's view, "these EGUs are legally obligated to come into compliance with the requirements of Section 112(g)."  (Id.)  In the letter, the EPA acknowledged that

> [s]ection 112(g) proceedings ordinarily are concluded before the commencement of any construction activity, so it is reasonable for the permitting authority – under these unique and compelling circumstances, and within the bounds of its discretion under [CAA] Section 112(g) and EPA's section 112(g) regulations – to give consideration to the effect of prior construction, undertaken in reasonable reliance on now-vacated rules, in making the case-by-case determination of applicable MACT requirements.

(Id. at 3 (footnote omitted).)  But the letter further urged that, in the process of evaluating the MACT status of these projects, "permitting authorities should not consider any MACT options to have been foreclosed simply by the prior issuance of permits, by the progress of administrative processes, nor by obligation of contract."  (Id.)

---

the Delisting Rule and other "standard-setting actions by the Administrator . . . ensure[s] uniformity in decisions concerning issues of more than purely local or regional impact." Natural Res. Def. Council, Inc. v. EPA, 512 F.2d 1351, 1357 (D.C. Cir. 1975). "Consequently, it is clear, and no party contests, that the D.C. Circuit's vacatur of the Delisting Rule applies unequivocally throughout all of the Federal Circuits."  Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P., 627 F.3d 134, 138 n.6 (5th Cir. 2010), cert. dismissed, 132 S. Ct. 872 (2011).

Instead, "in considering the effect of prior construction on the applicable MACT requirements," the EPA directed "permitting authorities [to] limit such consideration to actual physical construction only," and then only to actual construction occurring before February 8, 2008, when the D.C. Circuit issued its decision vacating the Delisting Rule and the CAMR.  (Id.)

## B.  The Lamar Repowering Project

This case involves an EGU constructed during the time the application of § 112 to coal-fired EGUs was in a state of flux.  In 2004, the Utilities resolved to upgrade an existing power plant in Lamar, Colorado, and to change it from a natural gas-fired plant into a coal-fired one, thus increasing its generating capacity.  This plan, known as the Lamar Repowering Project (the "Project"), involved substantial upgrades and changes to the existing plant.  On December 29, 2004, the Utilities applied to Colorado's APCD for a construction permit for the Project.  The APCD issued that permit to the Utilities on February 3, 2006.  Because at that time the Delisting Rule and CAMR were in effect, the Utilities did not have to get a MACT determination in order to obtain a permit or begin construction, and they did not do so.  Construction on the Project began in July 2006, and the Project began operating in some capacity in May 2009.  The Project, however, has not yet obtained an operating permit.

In July 2009, the EPA notified the Utilities that the D.C. Circuit, in February 2008, had vacated the Delisting Rule and that the Project was thus required to comply with CAA § 112(g).  The EPA directed the Utilities to contact APCD "as expeditiously as possible to obtain a new source [MACT] determination and a schedule for coming into

compliance with the requirements of Section 112(g)."  (Doc. 76-4 at 15.)  The EPA

further informed the Utilities that if they determined that they were not subject to the

requirements of § 112(g), then the Utilities "should maintain a record of [their]

determination and all supporting analyses.  The applicability determination and

supporting analyses should contain accurate, detailed information that enables the EPA

and the permitting authority [APCD] to make their own finding regarding" the

applicability of § 112(g) to the Project.  (Id. at 16.)

      The Utilities contacted APCD, as directed, and sought, not a MACT

determination, but instead a modification of their construction permit to limit the Project's

emissions in order to qualify the Project as a minor, rather than a major, source of

hazardous air pollutants and, thus, to obviate the need for a MACT determination.  After

three years of administrative proceedings before the APCD, that agency, on July 25,

2012, issued the Utilities a modified permit identifying the Project as a "synthetic minor

source of Hazardous Air Pollutants . . . not subject to a MACT 112(g) determination."

(Doc. 148-1 at 13.)[4]  A "synthetic minor source" is one that is legally restricted as to its

---

[4] Colorado law requires a construction permit for the construction or substantial
alteration of any source of air pollutants.  See Colo. Rev. Stat. § 25-7-114.2.  Colorado's
APCD has thus far issued the Utilities four construction permits for the Project, the initial
permit and three modified permits.  These permits require that, within 180 days of
beginning operations, the Project must demonstrate that it is in compliance with the
terms of the permit, which among other things limit the Project's emission of air
pollutants.  In this case, the parties agree that the Project began operating in May 2009,
but the Project has had a variety of problems and apparently has not yet established
that it can operate in compliance with all of the conditions established in the
construction permit(s).  Eventually, the Project must obtain final approval from the
APCD, after demonstrating compliance with the conditions set forth in the construction
permit(s), and it will then have to obtain a renewable operating permit, see Colo. Rev.

rate of emission, but has "the physical and mechanical potential to emit above a statutorily specified rate." United States v. Marine Shale Processors, 81 F.3d 1329, 1352 (5th Cir. 1996); see also United States v. E. Ky. Power Coop., Inc., 498 F. Supp. 2d 995, 1005 n.8 (E. D. Ky. 2007) (noting that "[a] synthetic minor permit keeps an otherwise regulated source from having to comply with . . . CAA requirements").

## C.  Wildearth's suit

Wildearth Guardians ("Wildearth") initiated this litigation in December 2009, as a citizens' suit under the CAA, see CAA § 304(a), alleging that the Utilities were violating § 112(g) by constructing and operating the Project without receiving a MACT determination.  At issue here are the parties' cross-motions for summary judgment.

The Utilities, in their summary judgment motion, request that this Court abstain, under Burford v. Sun Oil Co., 319 U.S. 315 (1943), from resolving Wildearth's CAA claim because this case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case," or because federal consideration of this case "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern," New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 361 (1989) (internal quotation marks, citations omitted).  For the same reasons this Court previously rejected this abstention argument, the Court again declines to abstain from considering the merits of Wildearth's CAA claim.

---

Stat. § 25-7-114.3.  The terms of the construction permit "must be incorporated into the operating permits."  (Doc. 149-2 at 11.)

Further, the Court rejects the Utilities' argument, made in a recent supplemental brief, that this CAA action is an impermissible collateral attack on the third modified permit the APCD issued the Utilities on July 25, 2012, a collateral attack over which this Court has no jurisdiction.  Although there is language in Wildearth's supplemental briefs challenging the propriety of the APCD's decision to issue that most recent modified permit, this Court does not review here the APCD's decision to issue that permit.

## II.  WILDEARTH'S MOTION TO TAKE JUDICIAL NOTICE

As a preliminary matter, Wildearth requested, pursuant to Fed. R. Evid. 201, that this Court take judicial notice of eighteen documents, Exhibits A through R, which Wildearth submits in support of its Motion for Partial Summary Judgment.  (Doc. 78.) Wildearth has now withdrawn this request as to Exhibits B, F, L, M, and R.  And the Utilities do not object, and have stipulated, to the Court considering Exhibits A, C, D, E, G, H, I, J, and O.  Therefore Wildearth's request that this Court take judicial notice is now limited to Exhibits K, N, P, and Q.  But, because the Court does not need to consider these four documents in order to resolve the parties' cross-motions for summary judgment, the Court declines to take judicial notice of them.

## III.  THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Briefly stated here, Wildearth, in its Motion for Partial Summary Judgment, asks this Court to conclude as a matter of law that the Utilities violated § 112(g) by constructing and operating the Project without the required MACT determination.  The Utilities, on the other hand, in their motion for summary judgment, seek a ruling that,

because the Project is not a major source under the CAA, it was never required to obtain a MACT determination and, thus, has not violated § 112(g).

## A.  Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In deciding whether summary judgment is appropriate, the Court construes all facts and reasonable inferences drawn from the record in the light most favorable to the nonmoving party.  Atl. Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1148 (10th Cir. 2000).  Where, as here, the parties file cross-motions for summary judgment, the Court "assume[s] that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."  James Barlow Family Ltd. P'ship v. David M. Munson, Inc., 132 F.3d 1316, 1319 (10th Cir. 1997).  Therefore, each party as the nonmovant is given "wide berth to prove a factual controversy exists."  Jeffries v. Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998) (internal quotation marks omitted), abrogated on other grounds as recognized by Zisumbo v. McLeanUSA Telecomm. Servs., Inc., 154 F. App'x 715, 728 n.8 (10th Cir. 2005) (unpublished).

## B.  The Project was a major source of hazardous air pollutants from the time the Utilities first applied for a construction permit, in December 2004, until APCD issued the third modified permit on July 25, 2012

As previously stated, only an EGU that is a "major source" of hazardous air pollutants is required to obtain a MACT determination.  CAA § 112(g).  "The term 'major source' means any stationary source or group of stationary sources located within a

10

contiguous area and under common control that emits or has the potential to emit

considering controls, in the aggregate, 10 tons per year or more of any hazardous air

pollutant or 25 tons per year or more of any combination of hazardous air pollutants."

§ 112(a)(1).  Under both federal and Colorado law, "potential to emit"

> means the maximum capacity of a stationary source to emit a pollutant
> under its physical and operational design.  Any physical or operational
> limitation on the capacity of the stationary source to emit a pollutant,
> including air pollution control equipment and restrictions on hours of
> operation or on the type or amount of material combusted, stored, or
> processed, shall be treated as part of its design if the limitation or the
> effect it would have on emissions is federally enforceable.

40 C.F.R. § 63.2; see also Colo. Rev. Stat. § 25-7-114(4) (including limitations that are

enforceable generally and adding that "[s]econdary emissions do not count in

determining the potential to emit of a stationary source"); 5 Colo. Code Regs. 1001-

5:3A.I.B.37 (same, but including only limitations that are state and federally

enforceable).

The CAA deems hydrochloric acid to be a hazardous air pollutant.  CAA

§ 112(b).  When the Utilities first applied with the APCD for a construction permit for the

Project, the Utilities indicated that the Project would emit 20,591 pounds, or 10.3 tons,

of hydrochloric acid annually.  The construction permit the APCD originally issued to the

Utilities, in February 2006, incorporated that amount.  The first modified permit the

APCD issued the Utilities, eighteen months later, in August 2007, indicated instead that

the Project's emissions "shall not exceed" 10.5 tons of hydrochloric acid per year.

(Docs. 76-2 at 18; 76-6 ¶ 8.)  And, in October 2009, the APCD issued a second

modified permit which continued to mandate that the Project's emissions "not exceed" 10.5 tons of hydrochloric acid annually.  (Doc. 76-3 at 20.)

These permits, then, establish that the Project exceeded the threshold for being a major source of hazardous air pollutants; that is, a source "that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant," § 112(a)(1).  It was not until July 25, 2012, when the APCD issued the third modified construction permit, which mandated, instead, that the Project's emissions "shall not exceed" eight tons of hydrochloric acid annually, that the Project no longer met the "major source" threshold.  Therefore, from the time the Utilities applied for and received the initial construction permit through July 25, 2012, when the Utilities received the third modified permit, the Project was a "major source" of hazardous air pollutants.  See Sierra Club, 627 F.3d at 136.

The parties' contrary arguments are unavailing.  The Utilities contend that the Project has never been a major source.  In support of that assertion, they first argue that, in issuing the third modified permit, which limited the Project's annual emission of hydrochloric acid to eight tons and identified the Project as a synthetic minor source of hazardous air pollutants, the APCD further determined that the Project "never has been" a major source.  (Doc. 149 at 2, 6, 7, 12, 20.)  But the Utilities fail to point to any such APCD determination.  Instead, in considering the Utilities' request for a modification of their construction permit, the APCD reviewed stack tests conducted while the Project was operational.  After reviewing those tests, the APCD concluded that the Project, while operating, never actually emitted hydrochloric acid in levels exceeding ten tons

12

annually.  But that does not mean that the Project never had the "potential to emit" more than ten tons of hydrochloric acid annually.  To the contrary, the APCD, in issuing the third modified permit, identified the Project as a "synthetic minor source" (Doc. 148 at 13), defined as a source that is legally restricted as to its emissions, but which has "the physical and mechanical potential to emit above a statutorily specified rate," Marine Shale Processors, 81 F.3d at 1352.  That indicates that the Project has the physical and mechanical capacity to emit a sufficient amount of hydrochloric acid annually to be deemed a major source.  And that is what the Utilities conveyed to the ACPD when they first applied for a construction permit, stating that the Project would admit more than ten tons of hydrochloric acid annually.

The Utilities counter that, when they initially applied for the construction permit, they made an overly conservative estimate of the Project's annual emissions of hydrochloric acid and that, at that time, in light of the Delisting Rule, it did not matter whether or not the Project was a major source of hazardous air pollutants.  But the Utilities' assertion of the Project's annual hydrochloric acid emissions in its application for the initial construction permit still had meaning.  The APCD issued the construction permit "in reliance upon the accuracy and completeness of information supplied by the applicant [Utilities] and . . . conditioned . . . upon conduct of the activity, or construction, installation and operation of the source, in accordance with this information and with representations made by the applicant [Utilities]."  (Doc. 76-2 at 9.)  And even though, at the time the APCD issued the Project a construction permit, characterization as a major source of hazardous air pollutants did not require the Project to obtain a MACT

determination, that characterization, too, was still meaningful.  For example, according to the EPA, "whether a facility is a major or area source of hazardous air pollutants may affect the applicability of other CAA requirements – such as when or whether the facility is required to obtain a Title V operating permit."  (Doc. 78-7 at 17.)  <u>See</u> 42 U.S.C. §§ 7661(2), 7661a(a).  <u>See generally</u> <u>MacClarence v. U.S. EPA</u>, 596 F.3d 1123, 1125-26 (9th Cir. 2010) (discussing permitting regulations).  Thus, prior to receiving the third modified permit on July 25, 2012, the Project was a major source of hazardous air pollutants because it had the potential, legally and physically, to emit more than ten tons of hydrochloric acid annually.

Wildearth, for its part, argues that, once the Project initially qualified as a major source of hazardous air pollutants, prior to construction, that source status can never be undone.  It is true that, ordinarily, the determination of whether an EGU is a major source of hazardous air pollutants must be made prior to construction.  And, generally, once an EGU is deemed a major source of hazardous air pollutants at the time of the "first compliance date," the EPA, applying its "once in, always in" policy, precludes changing the EGU's status as a major source.  (Doc. 78-7 at 21 ("EPA believes that once a source is required to install controls or take other measures to comply with a MACT standard, it should not be able to substitute different controls or measures that happen to bring the source below major source levels."), 24.)  One of the reasons underlying this EPA policy is that,

> in many cases, application of MACT will reduce a major emitter's emissions to levels substantially below the major thresholds.  Without a once in, always in policy, these facilities could "backslide" from MACT control levels by obtaining potential-to-emit limits, escaping applicability of

14

the MACT standard, and increasing emissions to the major-source threshold (10/25 tons per year). Thus, the maximum achievable emissions reductions that Congress mandated for major sources would not be achieved. A once in, always in policy ensures that MACT emissions reductions are permanent, and that the health and environmental protection provided by MACT standards is not undermined.

(Doc. 78-7 at 24.)[5]

The situation presented here, however, is not the ordinary case because there was no MACT requirement until after the Utilities began the Project's reconstruction. The EPA, in the Administrator's letter to regional administrators, recognized that these circumstances were not the usual case:

EPA recognizes that the application of MACT standards to a project already begun construction may present challenges. . . . Section 112(g) proceedings ordinarily are concluded before commencement of any construction activity, so it is reasonable for the permitting authority—under these unique and compelling circumstances, and within the bounds of its discretion under Clean Air Act Section 112(g) and EPA's section 112(g) regulations—to give consideration to the effect of prior construction, undertaken in reasonable reliance on now-vacated rules, in making the case-by-case determination of applicable MACT requirements.

(Doc. 76-12 at 3 (emphasis added; footnote omitted).)[6] And the EPA, in later directing the Project to comply with § 112(g), gave the Utilities the option of determining instead

---

[5] The parties agree that the EPA's internal "once in, always in" policy may be entitled to some deference. See Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000) (noting agency interpretations contained in opinion letters, policy statements and enforcement guidelines, which do not have the force of law, "are entitled to respect," to the extent they are persuasive, under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), but are not entitled to Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), deference); Reno v. Koray, 515 U.S. 50, 61 (1995) (affording "some deference" to internal agency guideline, even though the guideline had not been subjected to the "rigors" of the Administrative Procedure Act, including public notice-and-comment requirements, because the guideline represented a permissible construction of the relevant statute).

that § 112(g) did not apply to the Project.  The EPA further directed the Utilities, if they determined § 112(g) did not apply to the Project, to provide their analysis leading to that determination to the EPA and permitting authority, support that analysis with "accurate, detailed information," and let the APCD determine whether § 112(g) applied to the Project.

Thus, regardless of the measure of deference this Court should afford the EPA's application of its internal "first in, always in" policy in the ordinary case, the EPA itself decided not to apply that policy under the "unique and compelling circumstances" presented here.[7]  The EPA's approach is consistent with the purposes of the "once in, always in" policy, which include preventing a major source from using MACT to reduce its emissions below "major source" levels in order to then avoid having to comply with MACT limits on emissions.  That circumstance is not presented here because the Project has not used MACT to reduce its emission limits below the "major source" threshold.

For these reasons, then, the Court concludes that the Project was a major source of hazardous air pollutants, from the time the Utilities applied for and received a construction permit, until the APCD issued the Utilities the third modified permit, on July 25, 2012.

---

[6] The parties agree that the Court should also give the EPA's January 7, 2009 letter some deference.

[7] The parties dispute whether the "first in, always in" policy even applies where a MACT determination is made on a case-by-case basis.  The Court need not resolve that dispute because, assuming that policy applies generally where the MACT determination is made on a case-by-case basis, the policy does not control the issues presented here.

### C.  Violation of § 112(g)

Pursuant to the CAA, "no person may construct or reconstruct any major sources of hazardous air pollutants, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met."  CAA § 112(g)(2)(B).  Because the Project never had a MACT determination and was a major new source of hazardous air pollutants, from the time the Utilities initially applied for a construction permit for the Project (in 2004) until the APCD modified the Project's permit (on July 25, 2012), the Court must next decide for how much of this time, if any, the Utilities were violating § 112(g).

At the time the APCD issued the Utilities the initial construction permit for the Project, the Delisting Rule and the CAMR were in effect.  Thus, the Project, even though a major source of hazardous air pollutants, was not required to obtain a MACT determination.  That was the case until March 14, 2008, when the D.C. Circuit issued its mandate in New Jersey v. EPA, vacating the Delisting Rule and the CAMR and reinstating the requirement for a MACT determination.  See Wildearth Guardians, 2012 WL 3243458, at *9.  Therefore, the Project was in violation of § 112(g) beginning March 14, 2008, until the APCD modified the Project's permit on July 25, 2012.  See Sierra Club, 627 F.3d at 136, 140-42.

The Utilities' arguments to the contrary are unavailing.  The Utilities first reassert that they never violated § 112(g) because that provision sets forth only preconstruction requirements that do not apply to the Utilities because construction was already underway on the Project when the D.C. Circuit vacated the Delisting Rule.  This Court

previously rejected that argument in the Order partially denying the Utilities' motion to dismiss:

> While the plain text of the statute requires an operator to obtain a MACT determination before "construct[ing] or reconstruct[ing]" a major source, nothing in the text indicates that the operator is relieved of the responsibility of complying with the statute after construction begins. "[C]onstruct or reconstruct" are active verbs that have force after the permit is issued and after construction or reconstruction has begun.

(Doc. 75 at 12.)  The Fifth Circuit has reached the same conclusion, that § 112(g) applies to current and ongoing construction, not just the commencement of construction.  See Sierra Club, 627 F.3d at 141 ("[Section] 112(g)(2)(B) prohibits the act of construction itself and not the commencement thereof.").  And that is the position of the EPA as well, in the Administrator's January 7, 2009 letter to the agency's regional administrators, indicating that EGUs that began construction while the Delisting Rule was in effect are, after the D.C. Circuit vacated that Rule, "legally obligated to come into compliance with the requirements of Section 112(g)."  (Doc. 76-12 at 2.)  Therefore, the Utilities began violating § 112(g) as of March 14, 2008, when the D.C. Circuit issued its mandate in New Jersey.

The Utilities next argue that they should be given a reasonable time after the D.C. Circuit vacated the Delisting Rule to come into compliance with § 112(g)'s requirement that a major source obtain a MACT determination.  Once the D.C. Circuit issued its opinion in New Jersey, however, the Utilities were put on notice that § 112(g) applied to EGUs.  From that point forward, the continued reconstruction and operation of the Project without receiving a MACT determination violated § 112(g).  See Sierra Club, 627 F.3d at 141-42.  But the Court notes that, in determining the appropriate

18

remedies to be imposed for the violation of § 112(g), the Court must consider, among

other factors, "the violator's full compliance history and good faith efforts to comply." 42

U.S.C. § 7413(e)(1).

For the foregoing reasons, then, the Court concludes that the Project violated

§ 112(g)'s MACT requirement from the date the D.C. Circuit issued its mandate

vacating the Delisting Rule until the APCD issued the Utilities the third modified

construction permit, on July 25, 2012.

## IV.  REMEDIES/MOOTNESS

Wildearth seeks several remedies available under the CAA for the violation of

§ 112(g).  See CAA § 304(g)(1), (d).  Wildearth seeks an order enjoining the Utilities

from constructing, reconstructing or operating the Project except in accordance with

CAA § 112(g).  Wildearth's request for such injunctive relief is now moot, however,

because the Utilities are now no longer violating § 112(g), after the APCD issued the

Utilities the third modified permit for the Project, making the Project a synthetic minor,

rather than a major, source of hazardous air pollutants and obviating the need for a

MACT determination.  See Wildearth Guardians, 2012 WL 3243458, at *12-*13.

Wildearth also seeks the imposition of civil penalties.  In Wildearth Guardians v.

Public Service Co., supra, ("Public Service"), the Tenth Circuit concluded, under

circumstances with some similarities to those presented here, that Wildearth's claims for

a declaratory judgment, civil penalties and attorneys' fees, as well as an injunction, were

moot after the EGU at issue in that case came into compliance with the CAA.  2012 WL

3243458, at *1.  After receiving supplemental briefing from the parties on this

19

jurisdictional question, id. at *4-*5, the Court concludes that the circumstances presented here are sufficiently distinguishable from those addressed by the Tenth Circuit in "Public Service" and that Wildearth's claims for a declaratory judgment, civil penalties and attorneys' fees, therefore, remain justiciable.

In the Tenth Circuit "Pubic Service" case, Public Service constructed a major source EGU. Id. at *3. Before doing so, Public Service reached an agreement with several environmental and community groups to install "'state of the art pollution controls,' including mercury controls equal to or exceeding the MACT standards proposed by the EPA prior to the Delisting Rule." Id. (citation, internal quotation marks omitted). Public Service obtained a construction permit which incorporated the terms of the agreement into its requirements. Id. Public Service also applied with APCD for a MACT determination, which was at that time required. Id. But the EPA adopted the Delisting Rule while Public Service's application for a MACT determination was pending, and so Public Service never obtained such a determination. Id. When the D.C. Circuit later vacated the Delisting Rule and reinstated the requirement for a MACT determination, Public Service worked with the APCD to obtain such a determination but continued construction while it sought the MACT determination, as the APCD instructed it to do. Id. at *3-*4, *10. At the same time, Wildearth Guardians sued Public Service, alleging it was violating CAA § 112 by constructing a major course EGU without a MACT determination. Id. at *1, *4.

The Tenth Circuit acknowledged that, "[i]n most Clean Air Act citizen suits, mootness is difficult to establish because the plaintiff's interest in deterring the

defendant from future violations is sufficient to sustain a constitutional case or controversy between the parties." Id. at *1; see also id. at *9.  And the defendant's burden to show mootness resulting from the defendant's own voluntary cessation of the offending conduct is "formidable." Id. at *6 (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S 167, 190 (2000)).  Nevertheless, the court concluded that, under the "unusual" and "rare" circumstances presented in "Public Service," once Public Service obtained the necessary MACT determination and came into compliance with the CAA, Wildearth's cause of action, including its request for civil penalties and attorneys' fees, became moot because there was no longer any remedy that the court could order that would redress Wildearth's originally asserted injury, that Public Service was constructing a major source EGU without a MACT determination. Id. at *1, *9.

"Public Service" required the defendant to establish mootness by showing that "it is 'absolutely clear' that its 'conduct could not reasonably be expected to recur,' thereby negating the potential deterrent value of the suit." Id. at *9 (quoting Laidlaw, 528 U.S. at 189.)  The Tenth Circuit concluded Public Service was able to meet that standard, under the "unusual" circumstances presented in that case id. at *1, for three reasons: 1) Public Service's "non-compliance with the [CAA] was precipitated by events entirely outside its control." Id. at *9.  2)  Public Service "made all reasonable efforts to comply with the Act, and even went above and beyond what was required in attempting to accommodate environmental interests." Id. at *9-*10.  3)  "[T]he particular violation alleged, constructing a major source without a case-by-case MACT determination, "is unlikely to be repeated" because the EPA has now issued specific MACT standards

21

applicable to EGUs, so "if [Public Service] constructs a new coal plant in the future, it will no longer be subject to the case-by-case MACT determination provisions that Wildearth alleges were violated." Id. at *10.

The Utilities here cannot match the strong showing that Public Service made in the Tenth Circuit case and cannot meet the "formidable" burden of showing that it is "absolutely clear that its conduct" challenged here "could not reasonably be expected to recur." Id. at *9. Although the Utilities were subject to the same changing regulatory environment which was beyond the Utilities' control, the Utilities' non-compliance with the CAA here was also due in part to its own initial assertion to the permitting authority that it was a major source emitter of hydrochloric acid, an assertion the Utilities now disclaim as erroneous. Only after the requirement of major sources to obtain a case-by-case MACT determination did the Utilities attempt to change their initial estimation of the Project's potential to emit hydrochloric acid. The Utilities then continued constructing the Project, even though the Utilities had not gotten a MACT determination or a revised construction permit making the project a minor, rather than a major, source of hazardous air pollutants. Further, while the Project is now characterized as a minor source of air pollutants based upon the emission limits placed on the Project by the newly revised permit, it appears that the Project is physically capable of emitting hydrochloric acid at a major emitter level. So, the possibility remains that the Project could violate the terms of its construction permit and emit hydrochloric acid at major source levels without ever obtaining a MACT determination. Further, although if the Utilities chose to construct another EGU in the future, that EGU would not require a

22

case-by-case MACT determination since the EPA has now promulgated specific MACT

standards that apply to EGUs, the Utilities will still have to represent to the permitting

authority that it is either a major or a minor source of hazardous air pollutants.  Under

these circumstances, the Court cannot conclude that it is "absolutely clear" that the

Utilities conduct being challenged here "could not reasonably be expected to recur."  Id.

at *9.  Thus, the Utilities cannot negate the potential deterrent value here of Wildearth's

claims for the imposition of civil penalties.  See id.  Therefore, Wildearth's claim for the

imposition of civil penalties is not moot under the circumstances of this case.  In

considering that request for civil penalties, the Court must still consider, among other

factors, the Utilities' compliance history and good faith efforts to comply with CAA

§ 112(g).[8]

---

[8] "A penalty may be assessed for each day of violation."  42 U.S.C. § 7413(e)(2).  In
calculating imposition of civil penalties under 42 U.S.C. § 7604(a), 42 U.S.C.
§ 7413(e)(1) requires the court to consider

> (in addition to such other factors as justice may require) the size of the
> business, the economic impact of the penalty on the business, the
> violator's full compliance history and good faith efforts to comply, the
> duration of the violation established by any credible evidence (including
> evidence other than the applicable test method), payment by the violator
> of penalties previously assessed for the same violation, the economic
> benefit of noncompliance, and the seriousness of the violation.

Id. § 7413(e)(1); see also Pound v. Airosol Co., 498 F.3d 1089, 1094-1100 (10th Cir.
2007) (applying these factors).  Weighing these factors and determining the amount of
penalties, if any, to impose, is left to the district court's discretion.  See Pound, 498 F.3d
at 1094.  It appears that Wildearth is not entitled to a jury trial on imposition of civil
penalties.  See Tull v. United States, 481 U.S. 412, 427 (1987) (holding that jury should
decide liability under the Clean Water Act, but court, rather than jury, should determine
amount of civil penalties, if any); see also Pound, 498 F.3d at 1094 n.2 (noting that
"[t]he penalty provisions of the CAA and the Clean Water Act (CWA) are virtually

Wildearth did not seek summary judgment on the question of these penalties, acknowledging that a trial to the Court would, instead, be necessary.  The Court therefore directs the parties to contact the Court, within seven days of the date this Order is issued, to set a date for trial to the Court on the question of whether, and in what amount, imposition of civil penalties against the Utilities is warranted.  The parties should also set a date for a Final Trial Preparation Conference to precede trial.  The parties are ordered simultaneously to file trial briefs, of no more than twenty pages in length, on the issue of the possible imposition of civil penalties, no later than thirty days before the scheduled trial date.  The parties may also each file a response brief, no longer than ten pages in length, due no later than fifteen days after the filing of any trial brief.

## V.  CONCLUSION

For the foregoing reasons, therefore, it is ORDERED as follows:

1) Wildearth's motion to take judicial notice (Doc. 78) is DENIED.

2) Wildearth's motion for partial summary judgment (Doc.77) is GRANTED.

3) The Utilities' motion for summary judgment (Doc.76) is DENIED.

4) Wildearth's request for an injunction directing the Utilities to comply with CAA

§ 112(g) is DENIED as MOOT.

---

identical; thus, CWA cases are instructive in analyzing issues arising from the CAA");
United States v. Corning Glass Works, No. 3:CV-90-0207, 1991 WL 329759, at *1 (M.D. Pa. Sept. 16, 1991) (unreported) (applying Tull to CAA action).  Even if Wildearth were entitled to a jury trial on the issue of civil penalties, however, Wildearth never requested a jury.  And the Final Pretrial Order notes that trial will be to the Court.

5) The parties are directed to contact the Court, within seven days after the date this Order is issued, to schedule a trial to the Court on the possible imposition of civil penalties, and to abide by the trial briefing schedule set forth above.

Dated this ___28th___ day of _____September___, 2012.

BY THE COURT:

*s/ David M. Ebel*

U. S. CIRCUIT COURT JUDGE