**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:09-cv-02974-DME-BNB

WILDEARTH GUARDIANS, a New Mexico non-profit corporation,

    Plaintiff,

v.

LAMAR UTILITIES BOARD doing business as LAMAR LIGHT AND POWER, and ARKANSAS RIVER POWER AUTHORITY,

    Defendants.

---

### ORDER ON RECONSIDERATION

---

This matter comes before the Court on the parties' motions (Docs. 159, 160) seeking reconsideration of this Court's previous order granting Plaintiff WildEarth Guardians ("WildEarth") partial summary judgment and denying Defendants Lamar Utilities Board and Arkansas River Power Authority ("Utilities") summary judgment (Doc. 158). Having considered the relevant pleadings and the parties' oral argument, the Court GRANTS WildEarth's motion in one minor respect, but otherwise DENIES both motions.

### I. LEGAL STANDARD FOR RECONSIDERATION

The Court has discretion to revisit its nonfinal orders "as justice requires." Rodeman v. Foster, 767 F. Supp. 2d 1176, 1188 (D. Colo. 2011) (internal quotation marks omitted); see also Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1223 n.2 (10th Cir. 2008). But "[m]otions for reconsideration are 'inappropriate vehicles . . . to revisit issues already addressed or advance arguments that could have been raised in prior

briefing.'" Rodeman, 767 F. Supp. 2d at 1189 (quoting Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000)). Therefore, the Court will only "consider whether new evidence or legal authority has emerged" since the Court originally ruled on the parties' summary judgment motions "or whether the [Court's] prior ruling was clearly in error." Id.

## II. BACKGROUND

The Court will not restate all of the facts underlying this action or the previous proceedings that have occurred in this case. Briefly summarized, the Clean Air Act ("CAA") requires a "major source" of hazardous air pollutants to meet a "maximum achievable control technology emission limitation" ("MACT") standard set by the Environmental Protection Agency ("EPA"). CAA § 112(d), (g)(2)(A). Until the EPA established these MACT standards, however, the relevant federal or state air pollution permitting authority determined a major source's compliance with MACT requirements on a case-by-case basis, CAA § 112(g)(2)(A). In Colorado, the relevant permitting authority is the State's Air Pollution Control Division ("APCD"). In the normal course, the permitting authority conducts MACT determinations prior to the construction of a major source, in order to incorporate MACT into the facility's design and because, by statute, "no person may construct or reconstruct any major source of hazardous air pollutants, unless the [EPA] Administrator (or the State) determines that the [MACT] limitation . . . for new sources is met," CAA § 112(g)(2)(B).

The dispute at issue here stems from the Utilities' reconstruction of a Lamar, Colorado power plant (the "Lamar Repowering Project," or the "Project"). When the

Utilities applied with the APCD for a construction permit for the Project, in December 2004, the Utilities estimated that the Project would emit the hazardous air pollutant hydrochloric acid at a level of more than ten tons annually. Emitting hydrochloric acid at that rate qualified the Project as a major source of hazardous air pollutants. See CAA § 112(a)(1). Based on the Utilities' representations in their permit application, the APCD issued the Utilities an initial permit, and two later modified permits, allowing the Project to emit more than ten tons of hydrochloric acid each year.

Under the CAA, the Project is an electric utility steam-generating unit ("EGU"). CAA § 112(a)(8). During the time the Utilities applied for and obtained a construction permit for the Project and began reconstruction, the EPA's regulations applying MACT requirements to EGUs like the Project was in a state of flux. Although at the time the Utilities initially applied for a construction permit, a major-source EGU like the Project was subject to MACT requirements, by the time the APCD issued the Utilities their initial construction permit, the EPA had eliminated MACT requirement for major source EGUs. Thus, at the time the Utilities began reconstructing the Project, in 2006, the Project did not need to obtain, and did not obtain, a MACT determination.

While the Project was under reconstruction, however, the EPA regulations changed again, in March 2008, to require major source EGUs once more to comply with MACT requirements. See New Jersey v. EPA, 517 F.3d 574, 583-84 (D.C. Cir. 2008). Thereafter, the EPA determined that major source EGUs, like the Project, that were already under construction when the MACT requirements for EGUs were reinstated had to comply with those requirements. (See Doc. 76-12 at 2-3.) The EPA acknowledged

that applying preconstruction MACT obligations to major-source EGUs that were already under construction presented "unique and compelling circumstances." (Id. at 3.) Nonetheless, the EPA notified the Utilities, in July 2009, to contact the APCD "as expeditiously as possible" in order to obtain a MACT determination for the Project. (Doc. 76-4 at 15.)

The Utilities contacted the APCD, but instead of obtaining a MACT determination, they sought and obtained a modification to their construction permit that restricted the Project's annual hydrochloric acid emissions to less than the ten-ton major-source level. The APCD issued the Utilities this third modified permit in July 2012, making the Project a synthetic minor, rather than a major, source of hazardous air pollutants. A "synthetic minor source" is one that has "the physical and mechanical potential to emit above a statutorily specified rate," but is legally restricted to a lower rate of emissions.[1] United States v. Marine Shale Processors, 81 F.3d 1329, 1352 (5th Cir. 1996); see also Colo. Rev. Stat. § 25-7-114(6).

### III. MOTIONS FOR RECONSIDERATION

In this litigation, WildEarth contends that the Utilities are violating the CAA by reconstructing the Project without the MACT determination that the CAA requires of major-source EGUs. The Utilities claim, instead, that the Project is not, and never has

---

[1] In its motion for reconsideration, WildEarth challenges the APCD's decision to issue the Project a synthetic minor permit, arguing that the Utilities failed to present the APCD with sufficiently accurate, detailed information to support that permit. But, as the Court previously held, this litigation does not provide a vehicle to attack the APCD's permitting decision. WildEarth indicated that it has filed suit in Colorado state court challenging the APCD's decision to issue the Project a synthetic minor permit.

been, a major source of hazardous air pollutants and so is not required to comply with the CAA's MACT obligations.

The Court, in addressing the parties' summary judgment motions, previously determined the following: The Project was a major source of hazardous air pollutants, from the time the Utilities first obtained a construction permit until the APCD issued the Project a synthetic minor permit on July 25, 2012. Beginning in March 2008, with the reinstatement of MACT obligations for major-source EGUs, the Project was required to obtain a MACT determination. Therefore, the Utilities violated the CAA when they continued reconstructing the Project, from March 2008 through July 25, 2012, without first obtaining the required MACT determination. Once the APCD issued the Project a synthetic minor permit, however, the Project was no longer a major source of hazardous air pollutants required to obtain a MACT determination and, thus, was no longer violating the CAA.

## A.  The Utilities' motion for reconsideration

In their motion for reconsideration, the Utilities continue to assert that the Project has never been a major source of hazardous air pollutants.

### 1.  Major source standard

An EGU such as the Project is a major source if it "emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants." CAA § 112(a)(1). The parties do not dispute that the Project has never actually emitted

hydrochloric acid at a rate of ten tons or more annually. But the Project will still be a major source if it has the "potential to emit" hydrochloric acid at that rate.

Under both federal and Colorado law, "potential to emit"

> means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the stationary source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable.

40 C.F.R. § 63.2; see also Colo. Rev. Stat. § 25-7-114(4); 5 Colo. Regs. 1001-5:3A.I.B.37. As previously stated, in the normal course, the determination of whether an EGU has the potential to emit at a major-source level must be made at the design stage, prior to construction or reconstruction. See CAA § 112(g)(2)(B).

**2. The Utilities' representation in their permit application to the APCD that the Project would emit hydrochloric acid at major-source levels**

The Utilities contend that WildEarth failed to meet its burden of establishing that the Project was a major source of hazardous air pollutants.[2] But WildEarth met its burden by pointing to the Utilities' own representation to the APCD, made in the Utilities' permit application, that the Project as designed would annually emit hydrochloric acid above the ten-ton major-source threshold. Even though the Utilities made this

---

[2] The Utilities contend that the question of whether an EGU has the potential to emit hazardous air pollutants at a major-source level is one of fact. The Court accepts that contention for purposes of this discussion. See United States v. Louisiana-Pacific Corp., 682 F. Supp. 1122, 1131-34 (D. Colo. 1987). But, at the summery-judgment stage of litigation, the Court may decide factual questions as a matter of law if there is no genuine dispute as to that fact. See Becker v. Bateman, --- F.3d ---, 2013 WL 697910, at *1 (10th Cir. Feb. 27, 2013).

6

representation prior to reconstruction, based on the Project's design estimates, that is the time when the Project's source-status would ordinarily be made for purposes of determining MACT obligations. And, although at the time the Utilities represented that the Project would be a major source, an EGU that was a major source of hazardous air pollutants was not be subject to MACT requirements, the Project's source status still had other regulatory significance. Therefore, the Utilities' representation to the APCD that the Project would emit hydrochloric acid at major-source levels cannot simply be disregarded, but was, instead, sufficient to establish that the Project was, at least initially, a major source of hazardous air pollutants.[3]

The Utilities submit evidence in this litigation to contradict their preconstruction estimate, made to the APCD, that the Project would emit hydrochloric acid at major-source levels. But once the Utilities represented to the APCD in their permit application that the Project would be a major source of hazardous air pollutants, the APCD was entitled to rely, and did rely, on that representation to make permitting decisions. The Utilities cannot now simply disavow the estimate of the Project's annual hydrochloric

---

[3] In a related argument, the Utilities contend that the mere fact that the APCD issued the Project a permit to emit hydrochloric acid at major-source levels does not establish that the Project had the physical capacity to emit as a major source. In support of this contention, the Utilities cite to United States v. Louisiana-Pacific, 682 F. Supp. 1122 (D. Colo. 1987). And they further point to the deposition testimony of Gary McCutchen, who testified that emission limits contained in construction permits do not necessarily reflect an EGU's potential to emit. But the Court did not determine that the Project was a major source of hazardous air pollutants solely because the construction permits allowed the Project to emit hydrochloric acid at major-source levels. Rather, the Court relied on the Utilities' representation to the APCD that the Project would emit hydrochloric acid at a major-source level, which in turn was the basis for the major-source emission levels included in the initial, and first and second modified, construction permits.

acid emissions made in their permit application. Cf. N.Mex. ex rel. Reynolds v. Molybdenum Corp. of Am., 570 F.2d 1364, 1369 (10th Cir. 1978) (citing principles of waiver, estoppel and administrative res judicata and upholding determination that water user could not challenge water use limits to which the user previously stipulated, and which were included in permits that the user had accepted and used for "many years"); United States v. CPS Chem. Co., 779 F. Supp. 437, 453-54 (E.D. Ark. 1991) (rejecting, in Clean Water Act enforcement action, defendant's assertion that it was impossible for plant to meet the discharge limits included in its permit, where defendant accepted permit without challenge and indicated for a time that it was meeting most of the permit's discharge limits). Under these circumstances, then, the evidence which the Utilities reassert in their reconsideration motion is not persuasive on the question of whether the Project had the potential to emit hydrochloric acid at major-source levels.[4]

---

[4] Even if this Court had to decide the question of whether the Project ever had the potential to emit hydrochloric acid at major-source levels apart from the Utilities' representation to the APCD in their permit application that the Project would be a major source, much of the evidence on which the Utilities rely is not relevant to that question. For example, the Utilities point to evidence that the Project, after its start-up, never actually emitted hydrochloric acid at major-source levels. That evidence includes the results of stack tests performed in 2009 and 2010, while the Project was operating at 44% and 66% of capacity. Assuming the validity of those tests, however, the results do not directly address the Project's potential to emit at major source levels.

 The Utilities also rely on the affidavit and deposition testimony of Alice Brunelli indicating that when she completed the Utilities' application for the initial construction permit for the Project she erred or at least used an overly conservative estimate of the Project's estimated annual hydrochloric acid emissions. The Utilities claim that, in ruling on the parties' summary judgment motions, the Court improperly discredited Brunelli's evidence. But that is not the case. The Court considered the evidence from Brunelli, without making any credibility determination. Nevertheless, while Brunelli's testimony is evidence of why the Utilities represented to the APCD that the Project would emit

The Utilities further contend that the APCD, in issuing the Project a synthetic minor permit in July 2012, determined retroactively that the Project had never had the physical capacity to emit hydrochloric acid at major-source levels. The Utilities specifically point to language in the APCD's July 2012 "Summary Preliminary Analysis" that indicated the following: "The major impact of this action is that the HCl emissions

---

hydrochloric acid at major-source levels, it does not provide any basis for disregarding that representation, which was made and relied upon.

The Utilities also indicate that they have expert evidence that the Project never actually had the physical capacity to emit hydrochloric acid over the ten-ton major-source level. But the Utilities never presented this evidence to the Court at the summary-judgment stage of this litigation. The Utilities further contend that the Court precluded them from presenting this expert evidence, pointing to an exchange between the Court and the Utilities' attorney during a status conference held in July 2012. This status conference, however, occurred after the parties had fully briefed and supported their summary judgment motions, motions which clearly presented and addressed the question of whether the Project was a major source. During the status conference, the Utilities informed the Court that they had expert evidence, and the Court inquired whether the Utilities had attached that evidence to their summary judgment pleadings and whether that evidence created a factual dispute that would require an evidentiary hearing. The Utilities responded that they had not attached their expert evidence to the summary judgment pleadings and that the expert evidence was unnecessary because their "summary-judgment briefs have shown that there is no genuine issue of any material fact necessary for the Court to conclude that we are not a major source." (Doc. 159-1 at 29.) The Utilities further explained at that time that their position was (and remains) that WildEarth has the burden to show that the Project was a major source of hazardous air pollutants, and that WildEarth had failed to meet that burden. The Court ultimately disagreed with that position. But in doing so, the Court did not preclude the Utilities from presenting any of their expert evidence.

Regardless of the problems with the evidence on which the Utilities now rely to contradict their representation in the permit application that the Project would emit at major-source levels, that evidence is not germane, under the circumstance presented here, to the question of whether the Project was initially a major-source of hydrochloric acid emissions. In this case, the Utilities represented to the APCD, in their construction permit, that the Project was a major source EGU and the APCD was entitled to rely, and did rely, on that representation until the Utilities corrected that estimate and obtained from the APCD a synthetic minor permit.

are adjusted down from 10.5 tons per year to 8.0 tons per year clarifying that the source has not been a major source of hazardous air pollutant[s]." (Doc. 159 at 6 (quoting Doc. 149-3 at 2).) And "the [APCD] has performed the analysis required by the January 7, 2009 EPA Memorandum. That analysis has confirmed that the HCl . . . emissions at the Lamar [Project] have never exceeded major source thresholds. Therefore, a case-by-case MACT determination was not, and is not, required." Id. (quoting Doc. 149-3 at 3). After reviewing both the synthetic minor permit and the APCD's "Summary of Preliminary Analysis," the Court reaffirms its conclusion that the APCD did not retroactively determine that, at the time that the Utilities applied for a construction permit in 2004, the Project, as designed, lacked the physical capacity to emit hydrochloric acid at major-source levels. Instead, the APCD, in issuing the synthetic minor permit, determined that the Project had never actually emitted hydrochloric acid at major-source levels and restricted the Project's future emissions to below major-source levels. Those determinations are not inconsistent with this Court's rulings.

### 3. The Utilities' reliance on Louisiana-Pacific

Next, the Utilities contend that United States v. Louisiana-Pacific, 682 F. Supp. 1122 (D. Colo. 1987),[5] requires this Court, in determining the Project's source status, to consider more than just the Utilities' estimate, made in their permit application, that the Project would emit hydrochloric acid at major-source levels. But Louisiana-Pacific is inapposite. Unlike this case, the emitters at issue in Louisiana-Pacific, two Colorado waferboard plants, never represented to the permitting authority (the APCD) that they

---

[5] Louisiana-Pacific was decided prior to Congress enacting the regulatory scheme at issue in this case.

were major sources of air pollutants. Instead, the two waferboard plants were already operating as minor sources of hazardous air pollutants when the EPA charged them with being major sources that were required to obtain additional permits under the CAA. 682 F. Supp. at 1124-27. Under those circumstances, the district court conducted a trial to determine whether the already operating plants were in fact major sources, and in doing so the court considered stack test results and expert evidence interpreting those results. Id. at 1134-35. Here, on the other hand, the Utilities represented to the permitting authority, at the outset of the Project and prior to reconstruction, that the Project would be a major source of hydrochloric acid emissions. Louisiana-Pacific does not require this Court, under these circumstances, to consider evidence beyond the Utilities' representation in their permit application before determining that the Project was a major source EGU.

### 4. Conclusion as to the Utilities' motion for reconsideration

For the foregoing reasons, the Court reaffirms its determination that the Project was a major source of hazardous air pollutants, from the time the Utilities obtained a construction permit until the Utilities obtained a synthetic minor permit, in July 2012.

### B. WildEarth's motion for reconsideration

WildEarth, in its motion for reconsideration, challenges the Court's determination that, once the APCD issued the Utilities their synthetic minor permit, the Project was no longer a major source EGU subject to MACT requirements. In support of this argument, WildEarth reasserts its contention that, once an EGU is a major source of hazardous air pollutants, the EPA's internal "once in, always in" policy precludes ever revisiting that

11

determination. The Court previously rejected that argument because, regardless of the deference this Court might ordinarily owe this internal agency policy, the EPA itself decided not to apply it under the "unique and compelling circumstances" presented here, which require application of the reinstated pre-construction MACT obligations to EGUs like the Project that were already under construction. (Doc. 76-12 at 3.) WildEarth contends the Court misinterpreted the EPA's guidance on applying MACT requirements to such EGUs that were already under construction.

The EPA, in its January 2009 letter to its regional administrators, indicated that EGUs that were currently under construction had to comply with § 112(g)'s reinstated requirement that major source EGUs had to obtain a MACT determination. The EPA, however, directed its regional administrators and the relevant permitting authorities to take a flexible approach, "within the bounds of [their] discretion under [CAA] Section 112(g) and EPA's section 112(g) regulations - to give consideration to the effect of prior construction, undertaken in reasonable reliance on [the] now-vacated rules" that did not require a major source to obtain a MACT determination. (Doc. 76-12 at 3 (footnote omitted).) The EPA further cautioned permitting authorities that they "should not consider any MACT options to have been foreclosed simply by the prior issuance of permits, by the progress of administrative processes, nor by the obligation of contract." (Id.)

The EPA subsequently notified the Utilities to contact the APCD to obtain the required MACT determination. But, taking the same flexible approach that the EPA initially set forth in its January 2009 letter to its regional administrators, the EPA further

12

informed the Utilities that, if they determined that the Project was not subject to CAA § 112(g)'s MACT requirements, then the Utilities "should maintain a record of [their] determination and all supporting analyses. The applicability determination and supporting analyses should contain accurate, detailed information that enables the EPA and the permitting authority [APCD] to make their own finding regarding" the applicability of § 112(g) to the Project. (Doc. 76-4 at 16.) The Utilities chose to follow this approach, which ultimately resulted in the APCD issuing the Project a synthetic minor permit.

WildEarth contends that the Court misinterpreted the EPA's July 2009 letter to offer the Utilities an opportunity to establish that the Project was not a major source subject to the CAA § 112's MACT requirements. But the EPA's letter, sent specifically to the Utilities, stated in pertinent part the following:

> This letter is to notify you that coal- and oil-fired EGUs that began actual construction or reconstruction after December 15, 2000, including those that began actual construction between the March 29, 2005 publication of the Section 112(n) Revision Rule and the March 14, 2008 issuance of the mandate vacating that rule, and relied on the vacated Section 112(n) Revision Rule, are required to comply with the requirements of Section 112(g). You must contact the appropriate permitting authority as expeditiously as possible to obtain a new source maximum achievable control technology (MACT) determination and a schedule for coming into compliance with the requirements of Section 112(g). As discussed in the attached Meyers memorandum [the EPA's January 2009 letter to its regional administrators], the fact that an EGU may have commenced construction before the Section 112(n) Revision Rule and [Clean Air Mercury Rule] were vacated does not permit the source to avoid obtaining a MACT determination and MACT emission limits for the source's hazardous air pollutants, pursuant to Clean Air Act 112(g). Failure to obtain a MACT determination may subject you to enforcement under Section 113 of the Clean Air Act, 42 U.S.C. § 7413. . . .

> If a source determines that it is not subject to the requirements of Section 112(g), the source should maintain a record of its applicability determination and all supporting analyses. The applicability determination and supporting analyses should contain accurate, detailed information that enables EPA and the permitting authority to make their own finding regarding the source's Section 112(g) applicability status.

(Doc. 76-4 at 1-2 (footnote omitted).) By this language, the EPA offered the Utilities an opportunity to establish that the Project was not a major source of hazardous air pollutants subject to MACT requirements.

WildEarth further contends that affording the Project this opportunity contradicted § 112(g)'s requirement that a major source must comply with § 112(g)'s MACT obligations. But the EPA only provided the Utilities with an opportunity to establish that the Project was not a major source subject to MACT requirements. The EPA did not, contrary to § 112(g), allow a major source of hazardous air pollutants to avoid its MACT obligations. For these reasons, the Court reaffirms that the Project was no longer a major source subject to § 112(g)'s MACT requirements, after the APCD issued the Project a synthetic minor permit.

## C. The EPA's newly promulgated MACT standards for EGUs

During the time period at issue in this case, the EPA had not yet promulgated MACT standards for EGUs and so the APCD would have conducted any required MACT determination on a case-by-case basis. While this litigation was pending, however, the EPA, on April 16, 2012, adopted specific MACT standards applicable to major-source EGUs. In footnote 2 of the Court's summary judgment order, the Court noted that those newly adopted MACT standards do not apply to the matters at issue here. The parties do not challenge that determination. But WildEarth asks that the

Court retract its further comment, in footnote 2, that "because this order concludes that the Project is no longer a major source of hazardous air pollutants, after receiving a modified permit on July 25, 2012, these newly adopted MACT standards will not apply to the Project" (Doc. 158 at 3 n.2).  The Court agrees that that comment is extraneous to the matters at issue in this litigation and therefore grants WildEarth's request.  The Court will issue this date a revised summary judgment order removing this extraneous language.

## IV.  CONCLUSION

Accordingly, the Court ORDERS the following:

WildEarth's motion for reconsideration (Doc. 160) is GRANTED to the limited extent that the Court's language, found in footnote 2 of the Court's prior summary-judgment order (Doc. 158 at 3 n.2), is revised as stated above.

The parties' motions for reconsideration (Docs. 159, 160) are DENIED in all other respects.

Dated this __21st__ day of _____March_, 2013.

BY THE COURT:

*s/ David M. Ebel*

U. S. CIRCUIT COURT JUDGE